UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA


VIRGIN OIL COMPANY, INC.     *         CASE NO:  09-11899
                                *
           *Debtor*       *         Section "A"
                                *
                                *        Chapter 11
*************************************


**DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
PROPOSED BY VIRGIN OIL COMPANY, INC.**


DATE:  July 30, 2010


LAW OFFICE OF EMILE L. TURNER, JR., L.L.C.
EMILE L. TURNER, JR. (#12963)
LEO D. CONGENI, *of counsel* (#25626)
424 Gravier Street
New Orleans, LA 70130
Telephone:  (504) 586-9120
Facsimile:  (504) 581-4962

***Attorneys for Virgin Oil Company, Inc.***

# TABLE OF CONTENTS

I.     Introduction ………………………………………………………… 1
II.    Purpose of Disclosure Statement and Summary of Plan …………………  1
III.   Description of Debtor's Business……………………………………… 2
       A.  History and Events Leading to the Bankruptcy Case…………………  2
       B.  Pre-Petition Structure……………………………………………  4
             i.    Loans……………………………………………………..  4
             ii.   Equity / Ownership…………………………………………..  4
             iii.  Management……………………………………………….  4
       C.  Events During Chapter 11 Cases……………………………………  5
             i.    Continuation of Business………………………………….  5
             ii.   Motions and Applications to Employ Professionals…………… 6
             iii.  Cash Collateral Orders……………………………………  6
             iv.   Schedules and Claims Bar Date……………………………  7
             v.    Trustee Motion……………………………………………  7
             vi.   Adversary Proceedings and Mediation……………………...  7
IV.    Summary of Plan………………………………………………….  7
       A.  General Overview…………………………………………………  7
       B.  Classification and Treatment of Claims and Interests………………  8
       C.  Effect of Confirmation…………………………………………  11
       D.  Objections to Claims……………………………………………  15
       E.  Obligations relating to P&A and RLI Insurance Company…………  15
V.     Executory Contracts……………………………………………….  16
       A.  Interest in Oil and Gas Leases……………………………………..  15
       B.  Assumption………………………………………………………  16
       C.  Cure Payments and Procedures…………………………………….  17
       D.  Effect of Confirmation…………………………………………….  18
       E.  Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
            Unexpired Leases Rejected Pursuant to the Plan…………………….  19
VI.    Confirmation Procedures……………………………………………  19
       A.  Voting Procedures………………………………………………  19
       B.  Confirmation Hearing……………………………………………  20
       C.  Requirements for Confirmation of the Plan…………………………  21
       D.  Liquidation Analysis………………………………………………  22
       E.  Feasibility…………………………………………………………  22
       F.  Unfair Discrimination and Fair and Equitable Treatment……………  24
VII.   Certain Risk Factors to be Considered………………………………..  24
       A.  Objection to Classifications……………………………………  24
       B.  Risk of Non-Confirmation………………………………………  25
VIII.  Tax Consequences………………………………………………….  25
IX.    Conclusion…………………………………………………………..  26

**EXHIBIT LIST**

Exhibit 1       Plan of Reorganization

Exhibit 2       Commitment Letters

Exhibit 3       Empire Drilling, Completion and Workover Costs

Exhibit 4       Empire Joint Interest Owner Summary of Payments

Exhibit 5       Equity Holders

Exhibit 6       Decimal Ownership Active Leases with Virgin Offshore Joint Interest Partners

Exhibit 7       Empire 10% ORI Share Determination

Exhibit 8       Plug and Abandonment Estimated Costs

Exhibit 9       Liquidation Analysis

Exhibit 10      Projected Revenue and Expenses Scenario 1

Exhibit 11      Projected Revenue and Expenses Scenario 2

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE PLAN. ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

# I.  INTRODUCTION

On August 26, 2009, the United States Bankruptcy Court for the Eastern District of Louisiana entered an Order converting the involuntary case filed on June 25, 2009 under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code") against Virgin Oil Company, Inc. to Chapter 11 of the Bankruptcy Code.  The Debtor's Plan of Reorganization is attached to this Disclosure Statement as Exhibit 1.  In the event of conflict or difference in definitions and provisions contained in this Disclosure Statement and the Plan, the definitions and provisions in the Plan shall control.

# II.  PURPOSE OF DISCLOSURE STATEMENT AND SUMMARY OF PLAN

All persons receiving this Disclosure Statement and the Plan attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached thereto, in addition to reviewing the text of this Disclosure Statement.  This Disclosure Statement is not intended to replace careful review and analysis of the Plan.  Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan.  Every effort has been made to explain fully the various aspects of the Plan as it affects all Holders of Claims and Interests.  However, to the extent any questions arise, the Debtor urges you to seek independent legal advice.

The Plan contemplates the reorganization of the Debtor through the infusion of new capital in the amount of $10 million by Paxton Energy or AESI Holdings, LLC in exchange for acquisition of an equity interest in the Reorganized Debtor and/or Reorganized Debtor entering into a credit facility to fund the Plan and future drilling operations and security agreement to secure repayment of funds borrowed, which terms will be negotiated in good faith.  Attached as Exhibit 2 are copies of commitment letters to provide the funds necessary to fund the Plan.

The liens in favor of the Debtor's lenders, CIT Capital USA, Inc. ("CIT") and Whitney National Bank ("Whitney"), will be extinguished on the Effective Date by payment of the present value of their liens against the property of the estate, with the remaining deficiency claim, if any, provided for in the class governing general unsecured creditors or, alternatively, if CIT and Whitney elect to have their allowed claims treated as secured under 1111(b) of the Bankruptcy Code, the full allowed amount, and the present value of their liens, will be paid over time from operating revenue of the Reorganized Debtor.  The Debtor will cure defaults under and assume its Joint Operating Agreement with Century Exploration Company governing the operation of Federal Offshore Oil and Gas Leases referred to as Blocks 150, 153, 154, Ship Shoal Area and the agreement governing operations of the Louisiana State oil and gas lease referred to as Empire.  Creditors under Master Service Agreements with Virgin Offshore USA, Inc. ("VOS") shall be paid their pro rata share of ten (10%) percent production proceeds in Empire. Existing equity interest holders will contribute new value monies to retain their interest, subject to the terms to be negotiated with AESI or Paxton.  The new value contribution and recovery, if any, from insurers issuing certain directors and officers policies shall fund distributions to general unsecured creditors under the Plan.  The Debtor shall emerge from bankruptcy as the Reorganized Debtor with the assets of the Debtor revesting in the Reorganized Debtor pursuant to the terms of the Plan, free and clear of any liens, encumbrances or other

interests, subject to CIT's right to elect under § 1111(b) to retain its liens.

## III.  DESCRIPTION OF DEBTOR'S BUSINESS

### A.    History and Events Leading to the Bankruptcy Case

Debtor was incorporated as a Louisiana "C" corporation on March 8, 1996, for the purpose of developing an exploration and production oil and gas business in China and the United States.  Upon securing its first drilling concession in China, Debtor formed Virgin-China, Ltd., a wholly owned Cayman Island subsidiary, in March 1998.  Four wells were successfully drilled, and a second concession was acquired during that year.  The business was subsequently sold to an investor group from China when management concluded the risks of continuing Chinese operations were outweighed by the rewards of reducing exposure.

In 1999, the Debtor participated in four wells with Hunt Petroleum located offshore, Gulf of Mexico, through a newly-formed entity called Virgin Offshore, LLC.  This entity is owned approximately 17% by Debtor, and continues to hold interests in two wells on the block, currently shut-in awaiting pipeline replacement following hurricane-related damages.

On March 23, 2002, following the participation in seventeen wells by the Debtor as a non-operating partner, Debtor formed a wholly-owned subsidiary, Virgin Offshore, U.S.A., Inc. ("VOS"), for the purpose of serving as Operator of properties to be acquired.  The Debtor and VOS' business model involved the purchase of oil and gas leases in the name of VOS. Eventually a decision to drill a well was made depending on factors including probability of success, size of the reservoir and pipeline and facilities accessibility.  Debtor and Offshore would then raise money from third party investors often on a third for a quarter basis.  Typically this meant investors would pay 33% of the drilling costs to earn a 25% interest in the well.  In a typical case, the investors would pay 66% of the drilling costs to earn a 50% interest and Virgin Oil would receive a 50% interest and pay only 33% of the drilling costs.

VOS' involvement was necessary to enable transfers to the investors free and clear of liens in favor of CIT or Whitney.  The liens were to affect only the Debtor's working interest, not the third party investors or VOS'.  The portion not transferred to investors would be transferred to the Debtor and the Debtor's interest would be carried for at least a portion of the drilling costs. The Debtor's lenders have always been aware of this business model and its benefits to the Debtor.

By 2004, the Debtor and VOS had grown their reserve base to 11.0 MMBoe, and was operating six facilities through VOS.  By year-end 2005, the Debtor and VOS' proved reserve base had grown to approximately 16.0 MMBoe, however, the Debtor's borrowing base of $28 million was fully-leveraged following $17 million of dry hole expense incurred from the drilling of two high-potential wells separately with Chevron and Mariner Energy as partners.  The Debtor began "self-marketing" its assets during the first half of 2006, and on June 30, 2006 entered into an agreement with a London-based oil company for an asset sale, projected to close by year-end.  However, the buyer proved unable to close, and the agreement was terminated in December 2006.

During the summer of 2007, the Debtor participated in the drilling of a fifty billion cubic foot prospect at High Island Block 198, situated structurally high to a productive Spinnaker Exploration well, and logged 150 feet of gas pay in the well. The well was subsequently completed, for a total well cost of approximately $18 million. The completion proved to be "tight," thus providing a very limited reservoir and in six months the well no longer produced. This and other wells needing investment caused the Debtor to seek additional capital through a larger credit facility. On September 11, 2007, Debtor entered into a $75 million credit agreement with CIT and Whitney, providing an immediate $38 million of available funding to satisfy outstanding obligations.

By mid-2008, the Debtor decided to participate in the drilling of a well on a lease set to expire with proved reserves of approximately 1.0 MMBoe at Empire Field, onshore Plaquemines Parish, Louisiana. At the time the decision was made to raise capital to drill Empire, the Debtor was the owner of an 85% interest in the Empire Lease. The Debtor contends that CIT agreed to release its lien against an approximate 35% interest in the Empire lease to facilitate the Debtor and VOS selling a 50% interest on a promoted basis. The deal provided for a transfer of 50% interest to investors free and clear of CIT's lien in exchange for investors paying drilling costs of the first well based on the AFE in the amount of approximately $2.4 million. Based on the estimated cost to drill the first well, sufficient income would be generated to pay 100% of the costs to drill the first well.

During the testing phase of the Empire well operation in September 2008, Hurricane Ike related issues forced the owners to set a plug and re-drill the well, which caused the Debtor to incur approximately $7 million of expenses owed to vendors. While every hurricane in the past resulted in only a few days of shut-in time on the offshore properties, Hurricane Ike followed the coastline from Louisiana to Texas, causing the destruction of major commercial pipelines which move oil and gas into shore. Repairs took months, and in the Debtor's case production was not re-established on its properties until June 2009. The Debtor's pre-hurricane monthly cash flow had been approximately $4 million, comfortably covering its budget for ongoing obligations and well plans.

Attached as Exhibit 3 is chart reflecting Empire Drilling, Completion and Workover Costs and Exhibit 4 reflects actual payments made by Empire joint owners toward said costs.

In 2008, the Debtor engaged Scotia Waterous (USA) Inc. to assist with marketing its assets. The Debtor entered into serious negotiations for a sale of approximately 75% of assets of the Debtor and VOS in 2009 for $44 million, but an agreement was never finalized.

The ten month down-time after the Hurricanes in 2008 and inability to close a sale of the Debtor's assets resulted in the Debtor's inability to keep unsecured creditors from pushing the company into bankruptcy. An involuntary Chapter 7 case was filed on June 25, 2009, and eventually converted to Chapter 11 on August 20, 2010.

### B. Pre-Petition Structure

#### i. Loans

The Debtor is a borrower in (i) an asset based revolving loan facility ("First Lien Credit Facility") with CIT as administrative agent, and CIT and Whitney as lenders (collectively "First Lien Lenders"), secured by a first lien on all of the Debtor's right, title, and interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production, and (ii) a term loan facility ("Second Lien Credit Facility") with CIT as administrative agent for the second lien lenders ("Second Lien Lenders") secured by a second lien on the Debtor's interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production (the First Lien Facility and the Second Lien Facility are collectively, the "Credit Facility").

CIT contends that as of the Petition Date, pursuant to the First Lien Credit Facility, the Debtor was indebted to the First Lien Lenders in the approximate amount of not less than $17 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "First Lien Debt").

CIT contends that as of the Petition Date, pursuant to the Second Lien Credit Facility, the Debtor was indebted to the Second Lien Lenders in the approximate amount of not less than $18 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "Second Lien Debt").

#### ii. Equity / Ownership

Attached as Exhibit 5 is a complete list of all equity interest holders by type and class of stock. No corporation or individual owns more than 10% of any class of the Debtor's equity interests.

#### iii. Management

Current management will continue to manage the Reorganized Debtor after its emergence from bankruptcy.

R. Fulton (Tony) Smith, Jr., is the Chairman and Chief Executive Officer of the Debtor. He began his career thirty-five years ago as a contract petroleum landman for Exxon. Later he formed and served as chairman of Alliance, PLC, a London-based production company. Mr. Smith took Alliance public in 1988 on the London Stock Exchange. Mr. Smith founded the Debtor in 1996. He earned a degree in Business Administration in Economics from Loyola University and participated in post-graduate studies in Management at Harvard Business School. He is an active member and past director of the Independent Petroleum Association of American and member of the American Association of Petroleum Landmen.

Prior to the Petition Date, Mr. Smith's monthly salary was $20,715.00. Mr. Smith agreed to a temporary reduction in salary to $15,000.00 per month during the pendency of this case. The Reorganized Debtor shall agree to employ Mr. Smith for an initial two-year term with a

monthly gross salary of $20,715.00.

Keith Pyle is the Treasurer of the Debtor. He has over twenty years of experience in the financial side of the oil and gas industry. He began his career at Texaco Exploration as an accountant and later worked at Dominion Exploration as lead production and budgeting analysis. Mr. Pyle graduated from Louisiana State University with a Bachelor of Science degree in Finance.

Mr. Pyle shall continue to be employed by the Reorganized Debtor at his current pay of $6,667.00 per month.

William F. Vollenweider was employed by the Debtor after the Petition Date as a Geologist / Consulting Exploration Manager. He has over fifty years of experience in the oil and gas industry as a petroleum geologist. He is a certified petroleum geologist, Member No. 3826 of the American Association of Petroleum Geologists and a member of the Society of Independent Professional Earth Scientists – No. 2278.

After its emergence from bankruptcy the Reorganized Debtor intends to retain Mr. Vollenweider on a consulting basis.

Brennan Disher is the Operations Manager for the Debtor. He has over thirty-five years of experience in many different areas of the oil and gas industry. He first joined Texaco in 1975 as a petroleum engineer and remained there until 1993, after which time he consulted with a number of oil and gas firms, including Unocal, ChevronTexaco, Helis and Forest Oil.

Mr. Disher is paid $15,000 per month by the Debtor and will be retained by the Reorganized Debtor.

## C.  Events During Chapter 11 Case

On June 25, 2009, certain petitioning creditors filed an involuntary petition for relief against Virgin Oil. An order for relief under Chapter 7 of the Bankruptcy Code was entered on August 20, 2009 and, on August 26, 2009, the Court converted this case to Chapter 11, retroactive to August 20, 2009. The case was originally assigned to the Honorable Jerry Brown, Bankruptcy Judge, and transferred to the Honorable Elizabeth Magner, Bankruptcy Judge.

### i)  Continuation of Business

Following the Petition Date, the Debtor has continued to operate as debtor-in-possession with the protection of the Bankruptcy Court and the automatic stay pursuant to § 362 of the Bankruptcy Code. The automatic stay, with limited exceptions, enjoined the commencement or continuation of litigation against the Debtor.

Subject to the supervisory powers of the Bankruptcy Code, operations during the pendency of this Chapter 11 case by the Debtor have included efforts to increase production at Empire. The Debtor had an acid treatment completed in November, 2009. The next step taken

by the Debtor was installation of a compressor. The Debtor's efforts resulted in significant enhancement in productivity from the Empire well. Post-petition, Debtor paid Empire expenses based on a 53% working interest. Since the Petition Date, net revenue on an 8/8ths basis from the Empire well has been escrowed per order of this Court, subject to payment of expenses to operate the Empire well. As of June 30, 2010, approximately $1.7 million had been deposited into the Empire Escrow account.

### ii)      Motions and Applications to Employ Professionals

The Debtor filed a number of motions and applications since the Petition Date, including the following:

a.)     Application to Employ the Law Office of Emile L. Turner, Jr., LLC and Leo D. Congeni, *of counsel*, as counsel for the Debtor. A final order approving the application was entered on September 25, 2009 (P-96).

b.)     Application to employ Geiger, Laborde & Laperouse, L.L.C. as special counsel to represent the Debtor in connection with oil and gas regulatory, ownership, and operatorship matters and ongoing litigation involving the Debtor. This employment of special counsel was approved per Order entered October 26, 2009 (P-149).

c.)     Application to employ James F. Hubbard and James F. Hubbard Petroleum Consultant, L.L.C. ("JFH") for the purposes of assisting in evaluating oil and gas properties for sales, acquisitions, financing, accounting documents and expert testimony. The employment of JFH was approved by the Court on March 9, 2010 (P-313).

d.)     Application to employ Weider Horizons Investment Corporation ("WHI") as a geologist for purposes of assisting in investigating additional reserves on the Debtor's properties. The employment of WHI was approved by the Court on March 9, 2010 (P-313).

e.)     Application to employ Global Hunter Securities, LLC ("GHS") as financial advisor and investment banker (P-370). The employment was approved on June 1, 2010. Since its engagement, GHS has circulated literature to prospective parties, established a virtual data room received confidentiality agreements from multiple persons and, generally, adhered to the estimated sales process timeline prepared per the Court's directive.

### iii)      Cash Collateral Orders

Since the Petition Date, the Bankruptcy Court has entered a number of orders relating to the use of cash collateral. An Amended Final Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection Liens was entered on April 5, 2010 (P-336) (the "Cash Collateral Order").

### iv)  Schedules and Claims Bar Date

On October 1, 2009, the Debtor filed its Schedules, identifying its assets and liabilities. The Schedules were amended on October 23, 2009 and on February 9, 2010.

On March 12, 2010, the Bankruptcy Court established a Bar Date for filing of proofs of claim as May 3, 2010. (the "Bar Date").

### v)  Trustee Motion

On October 20, 2009, CIT filed a Motion to Appoint Chapter 11 Trustee.  After extensive discovery, a trial on the Trustee Motion was held on February 10, 2010, at which time the Court ruled orally from the Bench that the Trustee Motion would be denied.  On February 17, 2010, an Order and Ruling were entered by the Court, denying the Trustee Motion.

### vi)  Adversary Proceedings and Mediation

On May 19 – 20, 2010, the Debtor, CIT, Whitney, the Official Committee of Unsecured Creditors and several other interested parties participated in a mediation before former Bankruptcy Judge Gerald Schiff.  The mediation was precipitated by a Complaint filed by the Official Committee of Unsecured Creditors on February 15, 2010, pursuant to which the Committee requested that the estates of the Debtor and its non-debtor subsidiary, VOS, be substantively consolidated.  At the conclusion of the mediation several of the parties, including the Debtor and the Committee, entered into a non-binding Term Sheet that forms the basis of the treatment under the Plan of the Empire Lien Holders and creditors under Master Service Agreements.

On July 13, 2010, CIT filed an Original Complaint seeking a declaration regarding ownership of the Empire Lease and the validity, priority and extent of liens affecting the Empire Lease.

## IV. SUMMARY OF PLAN

### A.  General Overview

The Debtor believes that the Plan is in the best interests of creditors, will provide maximum return to creditors and enable the Reorganized Debtor to emerge from bankruptcy as a viable entity with the ability to meet its day-to-day obligations, including its obligations under State and Federal law to plug and abandon wells no longer used.

The Plan will recognize the ownership decimals on active leases in which the Debtor and VOS are joint as owners as reflected on Exhibit 6, except that to the extent CIT elects under 1111(b) to have the full amount of its Allowed Claim treated as secured, the Debtor will retain an 85% working interest in the Empire Lease and a 29.891% net revenue interest in the Empire Lease.  The Plan also settles all claims relating to the Empire property.  Accordingly, the pending adversary proceedings are resolved per the terms of the Plan.

**B. Classification and Treatment of Claims and Interests**

Allowed Administrative Expense Claims against the Debtor are unclassified under the Plan. The Debtor presently estimates such Claims as follows:

Professional Fees of Committee Remaining to be Paid = approximately $70,000
Professional Fees of Debtor Counsel Remaining to be Paid = approximately $5,000

Debtor estimates professional fees and expenses through confirmation as follows:

Professional Fees of Committee = approximately $75,000
Professional Fees of Debtor's Counsel = approximately $125,000

Each Allowed Administrative Expense Claim shall be paid in full, in Cash, by the Reorganized Debtor on the Effective Date or upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Reorganized Debtor or otherwise established pursuant to an order of the Bankruptcy Court; provided, however, that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession shall be paid by the applicable Reorganized Debtor in accordance with the terms and conditions of the particular transactions, the applicable non-bankruptcy law, and any agreements relating thereto or any order of the Bankruptcy Court.

All Professionals, who are seeking compensation or who have been compensated from the estate of the Debtor in Possession during the Chapter 11 Case, or who are seeking compensation from the estate of the Debtor in Possession or from the Reorganized Debtor for services rendered or reimbursement of expenses incurred from the Petition Date through and including the Effective Date, pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code, shall (a) File final applications for allowance of compensation for services and reimbursement of expenses incurred from the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, be paid in full by the Reorganized Debtor or as otherwise provided in this Plan in such amounts as are Allowed by Final Order of the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) when mutually agreed upon by such holder of an Administrative Expense Claim and the Reorganized Debtor.

Administrative Expense Claims must be Filed (except as provided above) no later than thirty (30) days after the Effective Date or any such Administrative Expense Claim is and shall be deemed to be forever barred and unenforceable against the Debtor, Reorganized Debtor, its respective estate, and its Assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

The following is a summary of the treatment of classified Claims under the Plan:

| CLASS | TREATMENT |
|-------|-----------|
| Class 1 Allowed Priority Tax<br><br>Estimated Amount:<br><br>$65,000 | Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim, excluding any penalties assessed by such taxing authority, but including applicable interest which at the option of the Reorganized Debtor shall be paid (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Priority Tax Claim and the Reorganized Debtor; or (c) in Cash payments commencing sixty (60) days after the Effective Date, in equal quarterly installments, with an amortization rate calculated on a twenty-five (25) year repayment period, with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code, with the outstanding principal balance, together with all accrued and unpaid interest, being due and payable on August 20, 2014.<br><br>Class 1 is Impaired by the Plan. The holders of Class 1 Claims are entitled to vote to accept or reject the Plan. |
| Class 2 Allowed Property Tax Claims<br><br>Estimated Amount:<br><br>Debtor does not believe there are any claims in this class. | Each holder of an Allowed Property Tax Claims shall be paid the Allowed Amount of its Allowed Property Tax Claim, at the option of the Reorganized Debtor: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Claim and the Reorganized Debtor; or (c) in full, in Cash, in four (4) equal quarterly installments, with interest at the applicable legal rate, with the first payment being due sixty (60) days after the Effective Date.<br><br>Provided further, that the Debtor shall be authorized to pay any Claims of any Claimants in this Class in full in order to preserve and protect its rights and interests in such property and in order to redeem, repurchase or reclaim such property in accordance with applicable law prior to the expiration date of any such redemption, reclamation or repurchase period.<br><br>Notwithstanding the foregoing, nothing in this Plan or the treatment provided in this section is intended to discharge or alter the validity, priority, and enforceability of any Liens or security interests afforded to or permitted for Allowed Property Tax Claims under applicable law.<br><br>Class 2 is Impaired by the Plan. The holders of Class 2 Claims are entitled to vote to accept or reject the Plan. |
| Class 3 Secured Claim of CIT<br><br>Estimated Amount:<br><br>$35 million | The Class 3 claim of CIT shall receive on the Effective Date the sum of $10,000,000.00 in full satisfaction of any security interests CIT possess in any assets of the Debtor or, to the extent that CIT makes an 1111(b) election, CIT shall receive quarterly payments such that the value of such payments has a present value of $10,000,000 and the sum of the payments equal the face amount of the CIT Claim on the Petition Date reduced by any payments received by the CIT during the case. In the event CIT makes an 1111(b) election, then CIT shall be allowed to retain its security interests unless such interests are subordinated to the claims of VOS.<br><br>Class 2 is Impaired by the Plan. The holders of Class 2 Claims are entitled to vote to accept or reject the Plan. |
| Class 4 Empire Lien Claimants | VOS, to satisfy its liability to entities who either billed VOS or the Debtor under Master Service Agreements with VOS as agent for the Debtor, shall give to such creditors their pro-rata share of a ten (10%) percent production payment in the Empire Lease in perpetuity in settlement of such claims, including the right to distributions as |

| | |
|---|---|
| Estimated Amount:<br><br>$3,500,000 | a Class 7 Allowed Unsecured Claimant, and the lien of such entities on the Empire Lease. To the extent an entity does not participate in the settlement, the production payment shall be reduced by that entity's pro rata interest.<br><br>Attached as Exhibit 7 is VOS estimate of creditors' proportionate share of the 10% production payment in the Empire Lease.<br><br>In addition, the creditors accepting the settlement shall receive their pro rata share of $1,000,000.00 reduced by the amounts that would have been paid to the non-settling creditors. |
| Class 5 Virgin Offshore USA, Inc.<br><br>Estimated Amount:<br><br>$6 million in costs due under Ship Shoal and Empire Operating Agreements, plus penalties and other charges thereunder | VOS in settlement of the default by the Debtor under the Empire Operating Agreement and the Ship Shoal Operating Agreement shall receive the following:<br><br>VOS, in settlement of its claim against the Debtor arising out of the Empire Operating Agreement, shall receive:<br><br>    a)  A net revenue interest in the Empire Lease of 35.109%<br><br>    b)  All amounts held in escrow by the Court representing the proceeds of production from the Empire Lease.<br><br>    c)  To the extent that CIT does not make an 1111(b) election, an ownership interest in the Empire Lease such that the ownership of VOS in the Empire Lease after the transfer equals 46.812%.<br><br>    d)  VOS agrees to loan the Reorganized Debtor funds for purposes of paying: i) Allowed Administrative Expenses under the Plan to the extent the New Value Contribution proves insufficient, ii) $650,000 to the Debtor for purposes of obligations to plug and abandon wells on expired leases.<br><br>VOS, in settlement of its claim against the Debtor arising out of the Ship Shoal Operating Agreement, shall receive monthly payments from the Debtor out of the proceeds of production from the Ship Shoal lease such that amount necessary to cure and compensate VOS for the default under the Ship Shoal Operating Agreement shall be paid in 12 monthly installments, the first payment commencing after payment in full of Class 4 Claims.<br><br>Class 5 is Impaired by the Plan. The holders of Class 5 Claims are entitled to vote to accept or reject the Plan. |
| Class 6 Century Exploration<br><br>Estimated Amount:<br><br>$500,000 | Century shall receive monthly payments from the Debtor out of the proceeds of production from the Ship Shoal lease such that the amount of the Century claim is paid within twelve (12) months from the Effective Date.<br><br>Class 5 is Impaired by the Plan. The holders of Class 5 Claims are entitled to vote to accept or reject the Plan. |
| Class 7 RLI Ins. Co.<br><br>Estimated Amount:<br><br>The Debtor believes joint owners owe | RLI shall retain its liens against the following accounts held at Whitney National Bank, Restricted P&A Accounts xxxx5519, xxxx5535, xxxx5500, xxxx7767, xxxx5913, xxxx5489, xxxx5497, xxxx5527, which liens shall have the same priority as the priority of the liens in favor of RLI against the P&A Accounts as existed as of the Petition Date, and the obligations under the indemnity agreements issued by RLI in |

| | |
|---|---|
| approximately $550,000 in premiums and other charges to RLI | connection with the bonds will be assumed pursuant to Article 6 of the Plan. |
| Class 8 General Unsecured<br><br>Estimated Amount:<br><br>$8,000,000 | Each holder of an Allowed Class 8 Unsecured Claim will receive its pro-rata share of the sum of the New Value Contribution and the proceeds of the D&O Claim less any amounts paid to the holders of Allowed Administrative Claims and the Class 7 creditors. To the extent an entity elects to purchase the Equity Interests of the Debtor for an amount in excess of the New Value Contribution the amount paid to the Class 7 creditors shall be increased.<br><br>Class 8 is Impaired by the Plan. The holders of Class 8 Claims are entitled to vote to accept or reject the Plan. |
| Class 9 Convenience Claims<br><br>Estimated Amount:<br><br>$5,500 | Each holder of an Allowed Convenience Claim will be paid Cash equal to one hundred (100%) of the Allowed Amount of such holder's Convenience Claim on the later of: (a) the Effective Date, or (b) the date such Convenience Claim becomes an Allowed Claim. Provided that all Creditors shall have the option to notify the Debtor of its election to reduce its claim to $1,000.00 and be treated as holder of an Allowed Convenience Claim, within forty five (45) days of the Effective Date.<br><br>Class 9 is impaired by the Plan. The holders of Class 9 Claims are entitled to vote to accept or reject the Plan. |
| Class 10 Equity Interests | The holder of the Interests in the Debtor shall retain such Interests in the Debtor in exchange for the payment of the New Value Contribution. The holder of Equity Interests shall not receive any dividends, loans or other distributions other than tax distributions based upon the ownership of Equity Interest in the Debtor until all Allowed Claims have been satisfied in full. Provided further that if there are any adverse tax consequences resulting from the "pass through" tax attributes of Debtor under federal tax laws, then the Debtor shall reimburse the Equity Interest holders to the extent of any such tax liability resulting from the Equity Interest upon the filing of a tax return.<br><br>Class 10 is impaired by the Plan. The Holders of Class 10 Equity Interests are entitled to vote on the Plan. |
| Class 11 Empire Lien Claimants Deficiency Claims<br><br>Estimated Amount:<br><br>$0 | Each holder of an Allowed Class 11 Unsecured Claim shall share pro rata with the Class 8 creditors.<br><br>Class 11 is impaired by the Plan. The holders of Class 11 Claims are entitled to vote to accept or reject the Plan. |
| Class 12 CIT Deficiency Claims<br><br>Estimated Amount:<br><br>$25,000,000 | Each holder of an Allowed Class 12 Unsecured Claim shall share pro rata with the Class 8 creditors.<br><br>Class 12 is impaired by the Plan. The holders of Class 12 Claims are entitled to vote to accept or reject the Plan. |

### C.  Effect of Confirmation

**Vesting of Assets and Retained Causes of Action:**  Except as otherwise provided herein, on the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all Assets of the Debtor in Possession and its respective Estate shall vest in the Reorganized Debtor free and clear of any and all Claims, Liens, Interests, and other interests, charges and encumbrances, except as otherwise expressly provided in this Plan or in the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and may own, use, acquire and dispose of Assets free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if the Chapter 11 Case had never been filed.  The Debtor will not pursue any Avoidance Claims for affirmative recoveries or assert Avoidance Claims against the holders of General Unsecured Claims with respect to such General Unsecured Claims, but reserve all such Avoidance Claims for defensive purposes and may assert Avoidance Claims as defenses against other Claims filed against the Debtor.

Except as otherwise specifically provided in the Plan, the Reorganized Debtor shall retain all rights and are authorized to commence and pursue, as the Reorganized Debtor deem appropriate, any and all claims and Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, and including, but not limited to, the claims and Causes of Action specified in the Plan.  Due to the size and scope of the Debtor's business operations and the multitude of business transactions therein, there may be other claims and Causes of Action that currently exist or may subsequently arise, all of which other claims and Causes of Action shall revest in the Reorganized Debtor.  The Reorganized Debtor does not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued by the Debtor, that any such claims or Causes or Action have been waived or will not be pursued.  Under the Plan, the Reorganized Debtor retains all rights to pursue any and all claims and Causes of Action to the extent the Reorganized Debtor deem appropriate (under any theory of law or equity, including, without limitation, the Bankruptcy Code and any applicable local, state, or federal law, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case) except as otherwise specifically provided in the Plan.

**Binding Effect:**  The provisions of the Plan shall bind any holder of a Claim against or an Interest in the Debtor and such holder's successors and assigns, whether or not such holder's Claim or Interest is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**Discharge of the Debtor:**  Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the treatment of the Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Interests in the Debtor, the Debtor in Possession, the Reorganized Debtor or the Assets, properties, or property of the Debtor, the Debtor in Possession or the Reorganized Debtor of any nature whatsoever, including any interest accrued on any Claim from and after the Petition Date. Except as expressly otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, all Claims arising before the Effective Date (including those arising under Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code) against the Debtor and the Debtor in

Possession (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor, or any conduct for which the Debtor may be deemed to have strict liability under any applicable law), and all Interests shall be irrevocably satisfied, discharged, cancelled and released in full.

For the avoidance of doubt, the Reorganized Debtor shall be responsible only for (a) those payments and Distributions expressly provided for or due under this Plan and (b) Claims and Interests that are not canceled and discharged pursuant to specific and express provisions of this Plan, and then only to the extent and in the manner specifically and expressly provided in this Plan. All Entities are precluded and forever barred from asserting against the Debtor, the Debtor in Possession or the Reorganized Debtor, or the Assets, properties, or property of the Debtor, the Debtor in Possession or the Reorganized Debtor of any nature whatsoever any Claims or Interests based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date, except for (a) those payments and distributions expressly due under this Plan and (b) Claims and Interests, if any, that are not canceled and discharged under the Plan, but instead survive pursuant to specific and express provisions of the Plan, and then only to the extent and in manner specifically and expressly provided in the Plan.

**Indemnification Obligations:** The obligations of the Debtor to indemnify, reimburse or limit liability of any person who is serving or has served as one of its directors, officers, employees or agents by reason of such person's prior or current service in such capacity as provided in the applicable articles of organization, operating agreements, partnership agreements, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtor, shall be deemed to be and treated as executory contracts that are assumed by the Debtor and assigned to the Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code and shall not be affected by or discharged by this Plan. Nothing in the Plan shall be deemed to affect any rights of any director or officer or any other person against any insurer with respect to any directors or officers liability insurance policies.

**Exculpation:** Under the Plan, neither the Debtor, Reorganized Debtor, Official Committee of Unsecured Creditors or any of their respective employees, officers, directors, agents, representatives, professional persons or attorneys shall have or incur any liability to any person and are hereby released from any such liability or any claims or causes of action related thereto for any act taken or omission made in connection with, relating to, or arising out of the: i) the Chapter 11 Case; ii) negotiation, formulation and filing of Plans or other documents relating thereto; iii) formulation, preparation, dissemination or approval of the Disclosure Statement or any financial information or projections included therein or solicitation of votes on or funds for the Plan, iv) confirmation of the Plan and consummation and administration of the Plan and any property to be distributed pursuant to the Plan.

**Term of Certain Injunctions.** Unless otherwise provided in the Plan or in the Confirmation Order, all of the injunctions and/or stays provided for in, or in connection with, the Chapter 11 Case, whether pursuant to Section 105, Section 362, or any other provision of the Bankruptcy Code or other applicable law, in existence on the Confirmation Date, shall remain in

full force and effect through the Effective Date and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

**No Successor Liability:** Under the Plan, neither the Debtor nor the Reorganized Debtor will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtor or the Debtor's past or present subsidiaries relating to or arising out of the operations of or Assets of the Debtor or the Debtor's past or present subsidiaries, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. The Reorganized Debtor shall have no successor or transferee liability of any kind or character, for any Claims; provided, however, that the Reorganized Debtor shall have the obligations for the payments specifically and expressly provided, and solely in the manner stated, in the Plan.

**Preservation of Causes of Action:** Unless a claim or Cause of Action against a Creditor or other Entity is expressly and specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Reorganized Debtor expressly reserves such claim or Cause of Action for adjudication or pursuit by the Reorganized Debtor after the Effective Date, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or otherwise. The Reorganized Debtor expressly reserves the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtor or the Debtor in Possession, as trustees for or on behalf of the Creditors, not specifically and expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order against any Entity, including, without limitation, the plaintiffs or codefendants in any lawsuits. The Reorganized Debtor shall be a representative of the Estate appointed for the purposes of pursuing any and all such claims and Causes of Action under 11 U.S.C. § 1123(b)(3)(B).

Any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may, to the extent not theretofore specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Entity has filed a proof of claim against the Debtor in the Chapter 11 Case, (b) such Entity's proof of claim has been objected to, (c) such Entity's Claim was included in the Debtor's Schedules, or (d) such Entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as disputed, contingent, or unliquidated.

### D.  Objections to Claims

The Debtor and, after the Effective Date, the Reorganized Debtor, shall have the exclusive right to object to the allowance, amount or classification of Claims and Interests asserted in the Chapter 11 Case, and such objections may be litigated to Final Order by the Debtor or Reorganized Debtor, as applicable, or compromised and settled in accordance with the business judgment of the Debtor or Reorganized Debtor, as applicable, without further order of the Bankruptcy Court.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims and Interests shall be Filed no later than one hundred and twenty (120) days after the Effective Date, subject to any extensions granted pursuant to further order of the Bankruptcy Court, which extensions may be obtained by the Reorganized Debtor without notice upon ex parte motion.

The Debtor and, after the Effective Date, the Reorganized Debtor may at any time request that the Bankruptcy Court estimate for all purposes, including distribution under this Plan and including payments to the Disputed Claims Reserve account, any Disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code whether or not the Debtor or the Reorganized Debtor has previously objected to such Claim or Interest.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

Notwithstanding anything else contained in the Plan, except with respect to any undisputed, non-contingent and liquidated portion of General Unsecured Claims, no distribution shall be due or made with respect to all or any portion of any Disputed, contingent, or unliquidated Claim until the Claim becomes an Allowed Claim by Final Order.  The Reorganized Debtor shall set aside or reserve a portion of the consideration payable to the holders of Allowed Claims and Allowed Interests in a particular Class to be held in the Disputed Claims Reserve for such Class in an amount sufficient to pay to the holders of all Disputed Claims in such Class the full distributions they may be entitled to if its respective Claims and Interests were ultimately to be allowed in full by Final Order.

### E.  Obligations relating to P&A and RLI Insurance Company

The Debtor believes that certain wells in which it holds or held an interest should be decommissioned or plugged and abandoned in accordance with State and Federal Law.  The Reorganized Debtor will assume said obligations.  Attached as Exhibit 8 is an estimate of potential plug and abandonment obligations of the Debtor.

Joint owners of the wells listed on Exhibit 8 will remain responsible for their proportionate share of the plug and abandonment costs.

RLI Insurance Company has issued bonds securing certain P&A obligations of the Debtor and VOS to the Minerals Management Service.  The Bonds ensure compliance with regulations governing the plug and abandonment of wells.  In return for the bonds, the Debtor assigned its interest in the following accounts held at Whitney National Bank, Restricted P&A Accounts  xxxx5519,  xxxx5535,  xxxx5500,  xxxx7767,  xxxx5913,  xxxx5489,  xxxx5497,

xxxx5527.

The Debtor's obligations under indemnity agreements with RLI in connection with the bonds issued will be assumed and the P&A Accounts transferred to the Reorganized Debtor, subject to the liens and encumbrances of RLI which liens shall have the same priority as the priority of the liens in favor of RLI against the P&A Accounts as existed as of the Petition Date

## V.  EXECUTORY CONTRACTS

### A.  Interests in Oil and Gas Leases

The Debtor contends that its interests in oil and gas leases constitute interests in property under applicable law, not an executory contract or unexpired lease.  However, for the avoidance of doubt, except as may be expressly provided herein or in the Plan, neither this Disclosure Statement or Plan shall be construed as rejection of any interest of the Debtor in any oil and gas lease, the rights appurtenant to such leases or the production therefrom.

Certain leases are not included on Schedules filed in this case due to, among other things, record title being held in name of a third party, but any such omission should not be construed as a rejection or abandonment of any interest of the Debtor in any oil and gas lease.  The Debtor reserves the right to amend its Schedules.

### B.  Assumption

Each executory contract or unexpired lease of the Debtor that has not expired by its own terms before the Effective Date or previously been assumed by the Debtor in Possession pursuant to an order of the Bankruptcy Court, shall be assumed by the Debtor as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for any executory contract or unexpired lease (i) that is listed on a "Schedule of Executory Contracts and Unexpired Leases to be Rejected" (to be Filed on or before the day that is ten (10) days prior to the Confirmation Hearing), (ii) that has been previously rejected by the Debtor in Possession pursuant to an order of the Bankruptcy Court, (iii) as to which a motion for rejection of such executory contract or unexpired lease is filed prior to the Effective Date, or (iv) added to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" prior to the Effective Date.  Nothing in the Plan, any Exhibit to the Plan, or any document executed or delivered in connection with the Plan or any such Exhibit creates any obligation or liability on the part of the Debtor, the Reorganized Debtor, or any other person or entity that is not currently liable for such obligation, with respect to any executory contract or unexpired lease except as may otherwise be provided in the Plan.

Any executory contract or unexpired lease assumed pursuant to the Plan shall be and hereby is assumed by the Debtor as of the Effective Date and shall be fully enforceable by the Debtor in accordance with its terms thereof, and shall include all written modifications, amendments, supplements of said executory contract or unexpired lease and, as with respect to executory contracts or unexpired leases that relate to real property, shall include all written agreements and leases appurtenant to the premises, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easements, and

any other interests in real property or rights in rem related to such premises. Listing a contract or lease on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" is not deemed an admission by the Debtor or Reorganized Debtor that such contract is an executory contract or unexpired lease or that the Debtor or Reorganized Debtor has any liability thereunder.

The Debtor reserves the right at any time before the Effective Date to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to: (a) delete any executory contract or unexpired lease listed on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its assumption under the Plan, or (b) add any executory contract or unexpired lease to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its rejection under the Plan. The Debtor shall provide notice of any such amendment of the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to the party to the affected executory contract and unexpired lease.

The terms of the acceptance of the Empire Operating Agreement and the Ship Shoal Operating Agreement are set forth in Article 4 of this Plan. The terms of acceptance of the indemnity obligations of the Debtor to RLI are set forth in Article 4 of the Plan.

### C. Cure Payments and Procedures

All payments, including any and all cure payments, adequate assurance or compensation for actual pecuniary loss, that are required to be paid or provided by Section 365(b)(1)(A)-(C) of the Bankruptcy Code (collectively, all cure payments, and any and all provisions for adequate assurance and/or compensation for actual pecuniary loss due or required to be paid under Section 365(b)(1)(A)-(C) of the Bankruptcy Code, the "Cure Payments") for any executory contract or unexpired lease that is being assumed under the Plan, unless disputed by the Debtor, shall be made in accordance with the Plan or the schedule of cure payments that will be filed on or before the hearing on the Disclosure Statement that accompanies this Plan. Any non-Debtor party to any executory contract or unexpired lease to be assumed under the Plan that objects to assumption of the executory contract or unexpired lease or believes that a Cure Payment or additional cure payment is due in connection with such assumption must file a written objection to the assumption of such executory contract or unexpired lease in a separate pleading ten (10) days prior to the Confirmation Hearing as an objection to the Plan or the Contract and state in the written objection the grounds for such objection and specifically set forth the amount of any request for a Cure Payment within 10 days after the hearing on the Debtor's Disclosure Statement. Unless the non-debtor party to any executory contract or unexpired lease to be assumed files and serves on the Debtor and its counsel an objection to assumption of such executory contract or unexpired lease for any reason, or asserting that a Cure Payment or additional Cure Payment is required or owed in connection with such assumption, by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan, then the executory contracts and unexpired leases shall be assumed, and any default then existing in the executory contract and/or unexpired lease shall be deemed cured as of the Effective Date, and there shall be no other cure obligation or Cure Payment due or owed by anyone, including the Debtor and the Reorganized Debtor, in connection with such assumption of the executory contract or unexpired lease. Any Claims for Cure Payments not Filed as part of a written

objection to the proposed assumption within such time period will be forever barred from assertion against the Debtor, its Estate, the Debtor, and its Assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof. In the event of an objection to the assumption of executory contracts or unexpired leases regarding the amount of any Cure Payment, or the ability of the applicable Reorganized Debtor to provide adequate assurance of future performance or any other matter pertaining to assumption, (a) the Bankruptcy Court will hear and determine such dispute at the Confirmation Hearing, and, (b) in the discretion of the Debtor, the Debtor (i) may assume such disputed executory contract or unexpired lease by curing any default or providing adequate assurance in the manner determined by the Bankruptcy Court, or (ii) the Debtor may reject such executory contract or unexpired lease as of the Effective Date. The Reorganized Debtor shall make any Cure Payment on the later of the Effective Date and the date such Cure Payment is due pursuant to a Final Order or this Plan, provided however that the applicable Reorganized Debtor shall have five (5) Business Days after any order determining the amount of a disputed Cure Payment becomes a Final Order in which to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to provide for the rejection of such executory contract or unexpired lease and, in such an event, such executory contract or unexpired lease shall be deemed rejected as of the Effective Date.

### D.  Effect of Confirmation

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Section 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, its estate, and all parties in interest. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) there are no defaults of the Debtor, no Cure Payments or additional Cure Payments owing (including that there is no compensation due for any actual pecuniary loss), (ii) there is adequate assurance of future performance with respect to each such assumed executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtor and its estate, (iv) upon the Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or unexpired lease. All executory contracts and unexpired leases assumed under the Plan or during this Chapter 11 Case constitute valid contracts and leases, as applicable, enforceable by the Debtor against the non-Debtor counterparties regardless of any cross default or change of control provisions in any contracts or leases assumed or rejected under the Plan or during the Chapter 11 Case.

Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection as of the Effective Date of all executory contracts and unexpired leases which are not assumed under this Plan, with the rejection effective as of the day before the Petition Date, as being burdensome and not in the best interest of the estate.

### E. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Any Claims for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed within thirty (30) days after the Effective Date or, with respect to any executory contracts or unexpired leases which are rejected after the Effective Date by amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," no later than thirty (30) days after the date of such amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," or such Claims will be forever barred and unenforceable against the Debtor, Reorganized Debtor, and its Assets and the holders of any such Claims are barred from receiving any distributions under the Plan.

## VI. CONFIRMATION PROCEDURES

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor discloses specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also imposes requirements that, given an Impaired Class, at least one Class of Impaired Claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims or Interests Impaired under the Plan. The Bankruptcy Court may confirm the Plan only if it finds that all of the requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met. The Debtor believes that the requirements for confirmation have been satisfied.

### A. Voting Procedures

To be confirmed by the Bankruptcy Court, the Plan must be accepted by each Class of Claims whose rights are impaired by the provisions of the Plan. Generally, a Claim that will not be paid in full is considered "Impaired." Under the Bankruptcy Code, a Class of Claims is deemed to have accepted the Plan if the Plan is accepted by Claimants in such a Class holding at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that in each case have actually voted on the Plan.

Ballots are to be used for voting on the Plan. Completed Ballots should be sent to:

> Virgin Oil Company, Inc.
> **Attention: Leo D. Congeni,** *of counsel*
> Law Office of Emile L. Turner, Jr. LLC
> 424 Gravier Street
> New Orleans, LA 70130

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M., CENTRAL STANDARD TIME, ON _____, 2010 (THE "BALLOT DATE"). ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT

WHICH IS EXECUTED BY THE HOLDER OF ANY ALLOWED CLAIM OR INTEREST THAT DOES NOT SHOW AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.  NOTE:  FAXED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE WILL NOT BE COUNTED.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTOR AS FOLLOWS:

Mr. Leo D. Congeni, *of counsel*
Law Office of Emile L. Turner, Jr., LLC
424 Gravier Street
New Orleans, LA 70130
Telephone:  (504) 586-9120
Facsimile:   (504) 581-4962

You may be contacted by representatives of the Debtor with regard to your vote of the Plan.  Votes cast by Holder of Claims and Interests will be irrevocable once received by the Debtor, unless the Bankruptcy Court, after application, notice and hearing, permits a change of vote.  If any ballot received by the Debtor is not discernible as to the Class of the Claim or Interest of the name of the Holder thereof, such ballot will be disregarded and not counted.

### B.  Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold the Confirmation Hearing upon appropriate notice to all creditors.  Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

By Order of the Bankruptcy Court dated _____, the Confirmation Hearing has been scheduled for _____, 2010 at ___:___o'clock __.m., at the United States Bankruptcy Court, Eastern District of Louisiana, 500 Poydras Street, Courtroom B-709, New Orleans, Louisiana 70130.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice to Creditors or parties in interest except an announcement made at the Confirmation Hearing or any adjournment of it.  Any objection to confirmation must be written and filed with the Bankruptcy Court with proof of service and served upon the following parties on or before _____, 2010:

Mr. Leo D. Congeni, *of counsel*
Law Office of Emile L. Turner, Jr., LLC
424 Gravier Street
New Orleans, LA 70130

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND**

**FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.  If the Bankruptcy Court determines that such requirements have been satisfied, an order will be entered confirming the Plan.  The requirements of Section 1129 are as follows:

1.  The Plan complies with the applicable provisions of the Bankruptcy Code.

2.  The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.  The Plan has been proposed in good faith and is not by any means forbidden by law.

4.  The Debtor will pay for services or for costs and expenses in, or in connection with the Reorganization Case, or in connection with the Plan and incident to the Reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy court as reasonable.

5.  The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in the Plan with the Debtor, or a successor to the Debtor under the Plan.  The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider.

6.  With respect to each Class of Impaired Claims or Interests, either each holder of a Claim or Interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest, property of a value, as of the Distribution Date under the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.]

7.  Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

8.  Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and other Priority Claims will be paid in full on the Distribution Date.

9.  If at least one Impaired Class exists, at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding

a Claim of such Class.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11. The Debtor believes that the Plan (i) satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) complies with or will comply with all of the requirements of Chapter 11, and (iii) was proposed in good faith. The Debtor further believes that Holders of all Claims and Interests under the Plan may ultimately receive payments under the Plan having present value as of the Distribution Date in amounts not less than the amounts likely to be received by holders of such Claims if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code.

### D. Liquidation Analysis

Among the requirements of the Bankruptcy Code listed above is that in order for a plan to be confirmed, each creditor must receive or retain under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plans a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Pursuant to the Debtor's liquidation analysis, the Debtor believes that recoveries under a Chapter 7 liquidation scenario would be significantly lower than that proposed by the Plan for a variety of reasons. First, the sale of the Debtor's assets under a compressed timeframe and the distressed nature of a Chapter 7 liquidation will most likely result in lower sale value that the Debtor will receive under the terms of the Plan. These properties have been extensively marketed by management of the Debtor and, at this time, management believes that the resulting reorganization plan provides the best value to the estate. Second, the conversion of the case to Chapter 7 liquidations would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Interests. Third, litigation regarding the priority of claimant relating to the payment of costs to drill and complete the Empire renders the Plan and the avoidance of such litigation the best alternative for all parties concerned.

Accordingly, each holder of a Claim will receive or retain under the Plans a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

A Liquidation Analysis prepared by the Debtor is attached as Exhibit 9 to this Disclosure Statement.

### E. Feasibility

Among the requirements under the Bankruptcy Code listed above is that in order to confirm the Plan the Bankruptcy Court must find that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or

any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11).

The Debtor believes that confirmation will not likely be followed by liquidation or the need for further reorganization of the Debtor. Financial projections demonstrating the pro forma financial results of the Reorganized Debtor are attached as Exhibits 10 and 11. Exhibits 10 and 11 reflects that the Debtor will have sufficient cash flow to satisfy CIT and Whitney's secured claim, whether or not they make an election under § 1111(b) of the Bankruptcy Code. Accordingly, Debtor believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. However, the Debtor cautions that no representations can be made as to the accuracy of the Projections or to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtor. Some assumptions invariably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTOR'S INDEPENDENT ACCOUNTING FIRM.**

**WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTOR AND THE REORGANIZED DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR OR THE REORGANIZED DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. HOLDERS OF CLAIMS AND INTERESTS, AS WELL AS OTHER INTERESTED PARTIES, MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO APPROVE A PLAN.**

### F. Unfair Discrimination and Fair and Equitable Treatment

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed. If a class of claims rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to § 1129(b) of the Bankruptcy Code – commonly referred to as the "cramdown" provision of the Bankruptcy Code. Under that section, a plan may be confirmed if it does not "discriminate unfairly" within the meaning of the Bankruptcy Code and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

With respect to a secured Claim, "fair and equitable" means either (i) the Impaired Secured Creditor retains its liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Distribution Date at least equal to the value of such creditor's interest in the property securing its liens; or (ii) property subject to the lien of the Impaired Secured Creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) or (iii) herein; or (iii) the Impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to an Unsecured Claim, "fair and equitable" means either: (i) each Impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

In the event one or more Classes of Impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interest.

The "cramdown" prohibition of "unfair discrimination" with respect to the claims of any impaired, non-accepting class depends upon the particular facts of a case and nature of the claims at issue. Courts have generally interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

The Debtor believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "fair and equitable" and "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

## VII.      CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED

HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN ITS IMPLEMENTATION.

### A. Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no guaranty that the Bankruptcy Court would reach the same conclusion.

### B. Risk of Non-Confirmation of the Plan

Even if the voting classes accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets for the requirements for confirmation and requires, among other things, that the confirmation of a plan must be proposed in good faith and is not likely to be followed by the liquidation or the need for further financial reorganization unless such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan under the Bankruptcy Code.

There can be no guaranty, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## VIII.     TAX CONSEQUENCES

THE TAX CONSEQUENCES UNDER THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER. MOREVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF A CLAIM

OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE U.S. INTERNAL REVENUE SERVICE, ANY STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE CODE.  STATEMENTS REGARDING TAX IMPLICATIONS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) ARE NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## IX. CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative.  The alternative is liquidation of the Debtor's assets, which would involve substantial litigation and delay and additional administrative costs.  Further, the liquidation analysis provided with this Disclosure Statement reflects that the recovery for creditors would be significantly less than may be realized under the Plan.  The fact that the Plan results in an assumption by the Reorganized Debtor of the decommissioning obligations of the Debtor also renders the Plan a better option than liquidation.

Consequently, the Debtor urges creditors and interest holders to vote in favor the Debtor's Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated:  July 30, 2010

**DISCLOSURE STATEMENT FILED BY:**

**VIRGIN OIL COMPANY, INC.**

*/s/ Robert F. Smith*
BY:_____
Robert F. Smith, President

**LAW OFFICE OF EMILE L. TURNER, JR., L.L.C.**

*/s/ Leo D. Congeni*
BY:_____
EMILE L. TURNER, JR. (#12963)
LEO D. CONGENI, *Of Counsel* (#25626)
424 Gravier Street
New Orleans, LA  70130
Phone: 504-586-9120

**Attorneys for Virgin Oil Company, Inc.**