## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 09-11899 |
| | * | |
| VIRGIN OIL CO., INC., | * | CHAPTER 11 |
| | * | |
| DEBTOR | * | SECTION "A" |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### DISCLOSURE STATEMENT IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION FILED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND CIT CAPITAL USA, INC.

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD
Stewart F. Peck (#10403)
Christopher T. Caplinger (#25357)
Benjamin W. Kadden (#29927)
Joseph Briggett (#33029)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
*Attorneys for Official Committee of*
*Unsecured Creditors*

PATTON BOGGS, LLP
Brent R. McIlwain (TX Bar No. 24013140)
Brian J. Smith (TX Bar No. 24066101)
2000 McKinney, Suite 1700
Dallas, Texas 75201

and

CARVER, DARDEN, KORETZKY,
TESSIER,
FINN, BLOSSMAN & AREAUX, LLC
David F. Waguespack (#21121)
1100 Poydras Street, Suite 3100
New Orleans, Louisiana 70163
*Attorney for CIT Capital USA, Inc., as*
*Administrative Agent for CIT Capital USA,*
*Inc. and Whitney National Bank*

# TABLE OF CONTENTS

I.  INTRODUCTORY STATEMENT.................................................................................................1
    A.  General Statement...............................................................................................................1
    B.  Definitions............................................................................................................................2
    C.  Adequacy of this Disclosure Statement.............................................................................12
    D.  Cramdown, Solicitation, Voting, and Ballots....................................................................12
    E.  Source of Information.........................................................................................................13
    F.  Additional Disclaimers.......................................................................................................13

II.  DESCRIPTION AND BUSINESS OF THE DEBTOR.............................................................15
    A.  History and Events Leading to the Bankruptcy Case.........................................................15
    B.  Pre-Petition and Post-Petition Business Structure.............................................................17
        1.  Loans.........................................................................................................................17
        2.  Equity/Ownership......................................................................................................17
        3.  Operations..................................................................................................................17
        4.  Post-Confirmation Management................................................................................18
    C.  Description of Oil and Gas Properties................................................................................18
        1.  Unexpired Leases......................................................................................................18
        2.  Expired Leases...........................................................................................................20
    D.  Significant Events During the Debtor's Chapter 11 Case...................................................20
        1.  Filing of Involuntary Bankruptcy and Conversion to Chapter 11.............................20
        2.  Continuation of Debtor's Business............................................................................20
        3.  Motions and Applications to Employ Professionals..................................................21
        4.  Cash Collateral Orders..............................................................................................22
        5.  Schedules and Claims Bar Date.................................................................................22
        6.  CIT's Motion to Appoint Chapter 11 Trustee...........................................................22
        7.  Substantive Consolidation Adversary Proceeding.....................................................22
        8.  Mediation...................................................................................................................23
        9.  Empire Litigation.......................................................................................................23
        10. Denial of Approval of the Debtor's Disclosure Statement and Termination of Exclusivity........................................................................................23

III.  DESCRIPTION OF THE PLAN..............................................................................................24
    A.  Summary of the Plan..........................................................................................................24
    B.  Unclassified Claims............................................................................................................25
        1.  Administrative Claims...............................................................................................25
        2.  Professional Fee Claims............................................................................................25
        3.  Priority Tax Claims....................................................................................................26
    C.  Classification and Treatment of Claims and Interests........................................................26
        1.  Class 1: Other Priority Claims...................................................................................26
        2.  Class 2: CIT Secured Claims.....................................................................................27
        3.  Class 3: Oil Well Lien Claims and General Unsecured Claims.................................28
        4.  Class 4: RLI Insurance Company Claim....................................................................28
        5.  Class 5: Debtor Equity Interests Claims....................................................................29
    D.  Means of Implementation of the Plan.................................................................................29

| | 1. | Operation of the Debtor Between the Confirmation Date and the Effective Date | 29 |
|---|---|---|---|
| | 2. | Operation of the Plan Trust Post-Effective Date | 29 |
| | 3. | Valuation of Properties Subject to Oil Well Lien Claims | 29 |
| | 4. | The Plan Trust and Appointment, Powers and Removal of Plan Trustee | 30 |
| | | a. Establishment of the Plan Trust | 30 |
| | | b. Purpose of the Plan Trust | 30 |
| | | c. Transfer of Trust Assets by Debtor to the Plan Trust | 30 |
| | | d. Appointment of the Plan Trustee | 30 |
| | | e. Successor Plan Trustee | 31 |
| | | f. Powers and Duties of the Plan Trustee | 31 |
| | | g. Payment of Fees and Expenses of the Plan Trustee | 32 |
| | | h. Liability | 33 |
| | | i. Termination of Plan Trust and Plan Trustee | 33 |
| | | j. Tax Treatment of the Plan Trust | 33 |
| | | k. Budget; Cash Reports | 34 |
| | 5. | Creditors Committee and Plan Committee | 34 |
| | | a. Creditors Committee | 34 |
| | | b. Establishment of the Plan Committee; Powers and Responsibilities | 34 |
| | | c. Payment of Fees and Expenses of the Plan Committee | 35 |
| | | d. Retention of Professionals | 35 |
| | | e. Indemnification and Limitation of Liability | 35 |
| | | f. Termination of the Plan Committee and/or Plan Committee Members | 36 |
| | 6. | Failure or Refusal of Debtor's Pre-Confirmation Management to Cooperate with Plan Implementation | 36 |
| | 7. | Settlement and Compromise of Empire Litigation | 36 |
| | 8. | Dismissal of Substantive Consolidation Litigation | 37 |
| | 9. | Conditions Precedent to Confirmation and Effectiveness of Plan and Waiver and Timing of Same | 37 |
| | 10. | Payment or Satisfaction of Claims in Classes 1, 2, 3 and 4 | 38 |
| E. | | Executory Contracts and Unexpired Leases | 38 |
| F. | | Release, Discharge, Injunction, and Exculpation | 39 |
| | 1. | Release by the Debtor | 39 |
| | 2. | Continuance of Automatic Stay and Injunctions | 39 |
| | 3. | Injunction | 40 |
| | 4. | Exculpation and Limitation of Liability | 40 |
| G. | | Other Provisions of the Plan | 41 |
| | 1. | Transfer of Assets by Debtor to the Plan Trust | 41 |
| | 2. | Reservation of Claims | 42 |
| | 3. | Objections to Claims | 44 |
| | 4. | Default Under the Plan | 44 |
| | 5. | Modification of the Plan | 45 |
| | 6. | Revocation of the Plan | 45 |

|  | 7. | Payment of Statutory Fees.................................................................45 |
|  | 8. | Payment of Post-Confirmation Fees and Expenses......................................45 |
|  | 9. | Exemption from Transfer Taxes..........................................................45 |
|  | 10. | Retention of Jurisdiction...................................................................46 |

IV.    FINANCIAL INFORMATION..........................................................................46

V.    MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN
    FOR THE DEBTOR AND CERTAIN HOLDERS OF CLAIMS.....................................46

    A.    Tax Consequences to Certain Holders of Claims….......................................47

    B.    Information Reporting and Backup Withholding........................................49

    D.    The Disputed Claims Reserve..........................................................49

VI.    ALTERNATIVES TO THE PLAN..................................................................49

VII.    VOTING PROCEDURES.............................................................................52

    A.    Ballots and Voting Deadline..............................................................52

    B.    Claims Existing Equity Interests Entitled to Vote....................................53

VIII.    CONFIRMATION OF THE PLAN.................................................................53

    A.    Confirmation Hearing.......................................................................53

    B.    Requirements for Confirmation of the Plan............................................54

    C.    Cramdown....................................................................................56

    D.    Feasibility....................................................................................56

IX. CONCLUSION…...........................................................................................57

# I.   INTRODUCTORY STATEMENT

**A.    General Statement**.   The Official Committee of Unsecured Creditors (the "Committee") and CIT Capital USA, Inc. ("CIT"), as Administrative Agent for CIT and Whitney National Bank ("Whitney"), (collectively CIT is referred to herein with the Committee as the "Plan Proponents") file this Disclosure Statement (the "Disclosure Statement") for the purposes required under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and in support of the Chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith by the Plan Proponents and attached hereto as ***Exhibit 1***.

**NO PERSON IS AUTHORIZED BY THE PLAN PROPONENTS, IN CONNECTION WITH THE SOLICITATION OF VOTES FOR THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN IS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS.  IF ANY SUCH INFORMATION OR REPRESENTATIONS ARE GIVEN OR MADE, THEY ARE NOT TO BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PLAN PROPONENTS. THE PLAN PROPONENTS WILL FURNISH TO CREDITORS AND EQUITY HOLDERS ENTITLED TO VOTE ON THE ACCEPTANCE OF THE PLAN ANY SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW OR BY THE BANKRUPTCY COURT PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AS OF ANY SUBSEQUENT TIME TO THE DATE OF THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT, INCLUDING ITS EXHIBITS, IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES UNDER THE PLAN.  MOST STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ABOUT THE DEBTOR HAVE BEEN OBTAINED FROM DOCUMENTS AND INFORMATION PREPARED BY OR ON BEHALF OF THE DEBTOR.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED.   THE DELIVERY OR FILING OF THIS DISCLOSURE STATEMENT SHALL UNDER NO CIRCUMSTANCES CONSTITUTE A REPRESENTATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF COMPILATION OF THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS BELIEVE THAT THIS INFORMATION IS RELIABLE, BUT THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WAS PREPARED BY THE DEBTOR WITHOUT THE INVOLVEMENT OF THE PLAN PROPONENTS AND HAS NOT BEEN AUDITED BY AN INDEPENDENT THIRD PARTY.  ALTHOUGH EVERY REASONABLE EFFORT HAS**

BEEN MADE TO PRESENT ACCURATE INFORMATION, THE ACCURACY OF THIS INFORMATION CANNOT BE GUARANTEED.

This Disclosure Statement and Section 1.2 of the Plan contain a number of definitions, which terms shall have the same meaning in this Disclosure Statement and in the Plan. Any undefined terms appearing in this Disclosure Statement which are otherwise defined in the Bankruptcy Code shall have the meaning described in the Bankruptcy Code.

Neither the Plan Proponents nor their respective professionals have personal knowledge as to the entirety of the business history of the Debtor, Virgin Oil Company, Inc. ("Virgin Oil" or "Debtor"), or its wholly-owned subsidiary, Virgin Offshore USA, Inc. ("Offshore"), or its current business operations and financial condition. However, the Plan Proponents have carefully reviewed the pleadings and other filings in the Debtor's Chapter 11 Case, including, specifically, the Chapter 11 Plan of Reorganization for Virgin Oil Company, Inc. as of October 20, 2010 (the "Debtor's Plan) (Docket No. 530) and this Disclosure Statement as of October 20, 2010 for Plan of Reorganization Proposed by Virgin Oil Company, Inc. (the "Debtor's Disclosure Statement") (Docket No. 529), each of which were filed by the Debtor. As a result, the Plan Proponents cannot and do not represent that the information contained in this Disclosure Statement regarding the business operations, assets, and financial condition of the Debtor and/or Offshore is accurate.

All persons receiving this Disclosure Statement and the Plan attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached hereto, in addition to reviewing the text of this Disclosure Statement. This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to explain the various aspects of the Plan as it affects all Holders of Claims and Interests. However, to the extent any questions arise, the Debtor urges you to seek independent legal advice.

B.      **Definitions**

**"Administrative Claim"** shall mean a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estate under Section 1930 of Title 28 of the United States Code, and (v) Cure payments for Executory Contracts and Unexpired Leases that are assumed under Section 365 of the Bankruptcy Code.

**"Administrative Claim Bar Date"** shall mean the date established by the Bankruptcy Court or the Plan as the last date for filing requests for allowance of Administrative Claims, other than costs or expenses in the ordinary course of operation of the Debtor.

**"Allowed Claim"** shall mean a Claim (i) that is a Filed Claim and as to which either (a) no objection to its allowance has been timely filed, or (b) any objection to its allowance has been settled or withdrawn by the Debtor or has been denied by a Final Order; (ii) that is not Disputed by the Debtor in the Schedules; (iii) that has been listed in the Schedules as Disputed by the Debtor but has been settled, determined, resolved or adjudicated, as the case may be, in the procedural manner in which such Claim would have been settled, determined, resolved or adjudicated if the Chapter 11 Case had not been commenced; (iv) that has been expressly allowed in the Plan; or (v) that has been adjudicated before the Bankruptcy Court and is allowed by a Final Order; *provided, however,* all Allowed Claims shall remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

**"Asset"** shall mean any property of the Debtor as defined in Section 541(a) of the Bankruptcy Code.

**"Assumed Contract"** means a Pre-Petition executory contract or unexpired real or personal property lease which is assumed by the Debtor pursuant to §365 of the Bankruptcy Code. The Plan Proponents shall file an exhibit including a list of assumed contracts at least ten (10) days before the Confirmation Hearing.

**"Avoidance Claim"** shall mean all lien avoidance, preference, and fraudulent transfer Causes of Action under Chapter 5 of the Bankruptcy Code or otherwise applicable state or other law, including, but not limited to, any action for avoidance of any of the transfers listed and identified in response to Question 3(b) and 3(c) of the Debtor's Statement of Financial Affairs as well as any amendments or supplements thereto made on or prior to the entry of the Confirmation Order.

**"Baker Claims"** shall mean, without limitation, any and all actions, Causes of Actions or Claims against Baker Hughes Incorporated, as more particularly described in Section III(G)(2) of the Disclosure Statement.

**"Ballot"** shall mean the form to be distributed with the Disclosure Statement to each Holder of an impaired Claim or Interest on which the Holder is to indicate acceptance or rejection of the Plan.

**"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, 11 U.S.C. §101 *et seq.*, as amended, and effective as of the Petition Date.

**"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Eastern District of Louisiana, having jurisdiction over the Chapter 11 Case, or if such court ceases to exercise jurisdiction over the Chapter 11 Case, such other court that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for such district.

**"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as

applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**"Bar Date"** shall mean May 3, 2010, which is the bar date fixed by the Final Order of the Bankruptcy Court entered on March 13, 2010 (Docket No. 310), pursuant to Bankruptcy Rule 3003(c)(3), by which all Persons asserting Claims against the Debtor (other than Administrative Claims, Priority Claims, or Rejection Claims) were required to file Proofs of Claim or be forever barred from asserting such Claims against the Debtor or its property and for voting on the Plan and/or sharing in any Distribution thereunder.

**"Business Day"** shall mean any day other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a)(6).

**"Cash"** shall mean cash and cash equivalents in the currency of the United States of America, or instruments, including but not limited to, bank deposits, certified or cashiers' checks, timed certificates of deposit issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

**"Causes of Action"** shall mean, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands, actions, defenses, offsets, powers, privileges and licenses whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise. Causes of Action includes, but is in no way limited to, (i) rights of setoff, counterclaim or recoupment, and Claims on contracts or for breaches of duties imposed by law, (ii) Claims pursuant to Bankruptcy Code Section 362, (iii) such Claims and defenses as fraud, mistake, duress, and usury, (iv) all Avoidance Claims, and (v) the Offshore Claims.

**"Chapter 11 Case"** shall mean the Chapter 11 case of the Debtor pending before the Bankruptcy Court and proceedings related thereto.

**"Chapter 11 Professionals"** shall mean the professionals retained by the Debtor and the Committee wherever they are referred to collectively in the Plan, the retention of which has been approved by the Bankruptcy Court.

**"CIT"** shall mean CIT Capital USA, Inc., as Administrative Agent for CIT and Whitney National Bank.

**"CIT Secured Claim"** shall mean the Allowed Secured Claim of CIT as Administrative Agent for CIT and Whitney.

**"Claim"** shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

**"Claimant"** shall mean the Holder of any Claim.

**"Class"** means a category of holders of Claims or Debtor Equity Interests, as described in Article IV of the Plan.

**"Collateral"** shall mean any property or interest in property of the Estate of the Debtor subject to a Lien that secures the payment or performance of a Claim, which Lien has not been avoided under the Bankruptcy Code or otherwise declared to be invalid under the Bankruptcy Code or other applicable state or federal law.

**"Confirmation"** means confirmation of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

**"Confirmation Date"** shall mean the date of entry of the order by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**"Confirmation Hearing"** shall mean the hearing before the Bankruptcy Court regarding confirmation of the Plan and related matters under Section 1128 of the Bankruptcy Code.

**"Confirmation Order"** shall mean the order entered by the Bankruptcy Court confirming the Plan.

**"Consummation"** shall mean the occurrence of the Effective Date.

**"Conversion Date"** shall mean August 26, 2009, which was the date on which the Bankruptcy Court entered the Order converting the Debtor's Chapter 7 Case to a case under Chapter 11 of the Bankruptcy Code.

**"Cramdown"** shall mean the confirmation of the Plan pursuant to 11 U.S.C. § 1129(b) notwithstanding any rejection by an Impaired Class or Classes of holders of Claims or Interests of the Plan.

**"Creditor"** shall mean a Holder of a Claim.

**"Creditors Committee"** shall mean the Official Committee of Unsecured Creditors in the Chapter 11 Case appointed pursuant to Section 1102(a) of the Bankruptcy Code and the Notice of Appointment filed by the Office of the United States Trustee on September 11, 2009 (Docket No. 77), as the same may be reconstituted from time to time.

**"Cure"** shall mean the Distribution, by the Debtor or the Plan Trust on behalf of the Debtor, on or within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption of an Executory Contract or Unexpired Lease, pursuant to Section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable

non-bankruptcy law.

**"Cure Claim"** shall mean the Claim of any party for monetary damages arising out of the assumption of an Executory Contract by the Debtor pursuant to Section 365 of the Bankruptcy Code.

**"Debtor"** shall mean Virgin Oil Company, Inc.

**"Debtor Equity Interests"** means member or shareholder interests held by all Holders of issued or outstanding membership interests or shares of stock (as defined in applicable law) in the Debtor.

**"Disclosure Statement"** shall mean the Disclosure Statement for the Plan, as the same may be amended and modified from time to time, distributed to Holders of Claims according to Section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3017(d), (e) and (f).

**"Disputed Claims"** shall mean all Claims: (a) which are listed in the Schedules as disputed, contingent or unliquidated or (b) as to which (i) a Proof of Claim has been filed, (ii) an objection, or request for estimation, has been timely filed (and not withdrawn) by any party in interest, and (iii) no Final Order has been entered thereon. In the event that any part of a Claim is disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of Distribution under the Plan unless a Final Order has been entered allowing such Claim. Without limiting any of the above, a Claim that is the subject of a pending objection, motion, complaint, counterclaim, setoff, Avoidance Action, litigation Claim or other defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed to constitute a Disputed Claim.

**"Disputed Claims Amount"** shall mean an amount of Cash equal to one hundred percent (100%) of the Distributions to which the Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims.

**"Disputed Claim Fund"** shall mean the cash fund established in accordance with the provisions of the Plan for the purposes of reserving Distributions to Holders of Disputed Claims in the Estate pending the determination and allowance, if applicable, thereof by Final Order of the Bankruptcy Court.

**"Disputed Debtor Equity Interest"** means any Debtor Equity Interest as to which an objection has been or may timely be filed or deemed filed under applicable law and any such objection has not been (a) withdrawn, (b) overruled, or denied by Final Order, or (c) sustained or granted by a Final Order.

**"Distribution"** shall mean the distributions to the various Classes of Claims as provided in, *inter alia,* Article VI of the Plan.

**"D&O Claim"** shall mean any and all Claims and Causes of Action against any present or former director or officer of the Debtor, along with any and all other Causes of Action or Claims of any kind against any present or former director or officer of the Debtor or any other Person which may be covered under Policy No. DOC 2974663 08 issued by Zurich North America Specialties or Policy No. 555-75-82 issued by National Union Fire Ins. Co. of Pittsburg or any other insurance policies to which the Debtor or its present or former officers or directors may be beneficiaries.

**"Effective Date"** shall mean the Business Day on which the conditions specified in Sections 5.12 and 5.13 of the Plan have been satisfied or waived and upon which the Plan becomes effective, which date shall not be later than sixty (60) days after the Confirmation Date.

**"El Paso Claims"** shall mean, without limitation, any and all actions, Causes of Action or Claims against El Paso Corporation or El Paso Production Company, as more particularly described in Section III(G)(2) of the Disclosure Statement.

**"Empire Escrow"** shall mean that certain bank account or fund established by the Debtor during the course of the Chapter 11 Case and into which the Debtor has and continues to deposit or account for the monthly production proceeds attributable to and received by the Debtor on account of the production from the Empire Lease.

**"Empire Lease"** shall mean State of Louisiana Lease for Oil and Gas and Other Liquid or Gaseous Minerals No. 18165, Plaquemines Parish, Louisiana.

**"Empire Litigation"** shall mean Adversary Proceeding No. 10-01068, filed by CIT against the Debtor, Offshore and certain other parties.

**"Entity"** shall have the meaning ascribed to that term in §101(15) of the Bankruptcy Code.

**"Estate"** shall mean the estate of the Debtor as defined in and created by Section 541 of the Bankruptcy Code.

**"Executory Contract"** shall mean any contract that shall qualify as an "Executory Contract" pursuant to Section 365 of the Bankruptcy Code.

**"Final Order"** shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on the docket in the Debtor's Chapter 11 Case, or the docket of any other court of competent jurisdiction, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; provided, however that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order or judgment and such filing shall not be deemed to cause such order or judgment not to be considered a Final Order.

**"General Unsecured Claim"** shall mean an Allowed Claim held by a Creditor of the Debtor other than a Secured Claim, Priority Tax Claim, or Administrative Claim, including Claims arising out of the rejection of Executory Contracts or arising out of any deficiency in the value of the Collateral securing a Secured Claim.

**"Holder"** shall mean the Holder, as of the Record Date, of any Claim, including, but not limited to, an Administrative Claim, a Priority Tax Claim, a Secured Tax Claim, if any, an Other Priority Claim, a CIT Secured Claim, an Oil Well Lien Claim, a General Unsecured Claim, a RLI Claim against, or a Debtor Equity Interest in, the Debtor.

**"Impaired"** shall mean, when used with reference to a Claim or Interest, a Claim or Debtor Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Indemnification Obligation"** means any obligation of any of the Debtor to indemnify, reimburse, or provide contribution pursuant to by-laws, partnership agreements, limited liability company agreements, articles or certificates of incorporation or similar organizational documents or pursuant to contracts or otherwise.

**"Initial Distribution Date"** shall mean the date on which the Plan Trustee makes the first Distribution made to Holders of General Unsecured Claims.

**"Lien"** shall mean any Claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, covenant, restriction, servitude, reservation, agreement of record or other encumbrance or interest used to secure payment of a debtor or performance of an obligation.

**"Net Available Cash Flow"** shall mean the available cash flow of the Debtor on the Effective Date—or the Plan Trust on a quarterly basis thereafter—remaining after payment and/or accrual of any expenses incurred in the ordinary course of its business and function as contemplated under and the Plan, including without limitation, capital expenditures, accrual of necessary reserves, or payments required under the Plan to satisfy Claims and pursue reserved Causes of Action, and other fees and costs associated with restructuring and implementation of the Plan.

**"Offshore"** shall mean the Debtor's wholly-owned subsidiary, Virgin Offshore USA, Inc.

**"Offshore Claims"** shall mean, without limitation, any and all actions, Causes of Actions or Claims by the Debtor against Offshore, as more particularly described in Section III(G)(2) of the Disclosure Statement.

**"Oil Well Lien Claim"** shall mean an Allowed Claim held by a Creditor of the Debtor secured by a Lien on an oil and gas property of the Debtor, to the extent of the Debtor's interest, including without limitation the Empire Lease, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a

Claim that is subject to a valid right of setoff

**"Oil Well Lien Claimant"** shall mean any Entity or Person possessing or claiming any Claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, covenant, restriction, servitude, reservation, agreement of record or other encumbrance or interest against oil and gas properties of the Debtor, including without limitation the Empire Lease.

**"Other Priority Claim"** means a Claim against the Debtor entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

**"Person"** means any person, individual, firm, business entity, enterprise, corporation, partnership, limited liability company, joint venture, association, company, joint stock company, joint venture, estate, trust, trustee, Office of the United States Trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

**"Petition Date"** shall mean June 25, 2009, which was the date on which certain of the Debtor's creditors initiated this Bankruptcy Case by filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code.

**"Plan"** has the meaning set forth in the introductory paragraph of the Plan and includes all exhibits, as the same may be amended, modified, or supplemented from time to time.

**"Plan Committee"** shall mean the Plan Committee created pursuant to Section 5.3 of the Plan.

**"Plan Proponents"** shall mean the Committee and CIT, as Administrative Agent for CIT and Whitney.

**"Plan Trust"** shall mean the trust, established for the benefit of certain Holders of Claims as set forth in the Plan, on the Effective Date pursuant to the terms of the Plan Trust Agreement in accordance with Treasury Regulation Section 301-701-4(d), which shall have the sole purpose of Plan and distributing the Plan Trust Assets according to the terms of the Plan.

**"Plan Trust Agreement"** shall mean that document which is attached to the Plan as *Exhibit A* approved in the Confirmation Order, which contains provisions customary to trust agreements utilized in comparable circumstances, including but not limited to, any and all provisions necessary to govern the rights, powers, obligations, and appointment and removal of the Plan Trustee or any successor Plan Trustee.

**"Plan Trust Assets"** shall mean all Assets transferred to the Plan Trust under this Plan, including, but not limited to, (i) 85% of the funds on deposit in the Empire Escrow, (ii) all of cash

or cash equivalents of the Debtor, including any other revenue and accounts generated from the production of the Debtor's oil and gas properties prior to the Effective Date, (iii) the entirety of the Debtor's interests in certain oil and gas properties to be identified in a plan supplement to be filed prior to the Confirmation Hearing, (iv) all Causes of Action of the Debtor reserved under this Plan, including without limitation, the Avoidance Claims, the Offshore Claims, the D&O Claims, the El Paso Claims and the Baker Claims, (v) the Debtor's equity interest in Offshore, (vi) any and all other property held by the Plan Trust, and, (vii) the proceeds, products and offspring of any such property.

**"Plan Trust Beneficiaries"** shall mean the Holders of Allowed Claims and Interests that receive an interest in the Plan Trust created pursuant to the Plan.

**"Plan Trust Distribution"** shall mean a Distribution of Plan Trust Assets, *pro rata*, to holders of beneficial interests in such Plan Trust Assets, made fourteen (14) days after the Effective Date of the Plan, equal to the Net Available Cash, and thereafter, *pro rata* distributions on at least a quarterly basis.

**"Plan Trustee"** shall mean the individual duly appointed by the Bankruptcy Court (a) to act as agent for the Plan Trust pursuant to the terms of the Plan and the Plan Trust Agreement; (b) to pursue the Causes of Action assigned to the Plan Trust; (c) to object to, litigate, compromise, dismiss and/or otherwise administer any and all Claims against the Debtor asserted or which could be asserted whether pending or not, or whether legally appropriate; and (d) to make the Distributions to Holders of Claims in accordance with the terms of the Plan. Except as otherwise provided herein, the Plan Trust and the Plan Trustee shall possess all of the rights and powers of the Debtor and Plan Trust to prosecute or compromise any Cause of Action or Claim in the best interest of the Debtor's Estate in its sole and absolute judgment.

**"Priority Claim"** shall mean a Claim entitled to priority pursuant to Section 507 of the Bankruptcy Code, other than Priority Tax Claims.

**"Priority Tax Claim"** shall mean a Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**"Professional"** means (a) any professional employed in the Chapter 11 Case pursuant to Sections 327 or 1103 of the Bankruptcy Code or otherwise pursuant to an order of the Bankruptcy Court and (b) any professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b) (4) of the Bankruptcy Code.

**"Professional Fee Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Effective Date.

**"Proof of Claim"** shall mean Official Form B10 or any form containing the information

required thereon and filed with the Clerk of the Bankruptcy Court.

**"Quarter"** shall mean the period beginning on the Initial Distribution Date and ending on the next December 31, March 31, June 30 or September 30, and each three-month-period thereafter.

**"*Pro rata*"** means, at any time, the proportion that the amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or Classes, unless the Plan provides otherwise.

**"Record Date"** shall mean the day on which the Court holds the Confirmation Hearing.

**"Rejection Claim"** shall mean any Claim arising out of the rejection of an Unexpired Lease or Executory Contract pursuant to Section 365 of the Bankruptcy Code. Allowed Rejection Claims are classified as General Unsecured Claims and treated in Class 3.

**"RLI"** shall mean RLI Insurance Company.

**"Schedules"** shall mean the schedule of assets and liabilities and the statement of financial affairs filed in the Chapter 11 Case by the Debtor, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**"Secured Claim"** shall mean a Claim (i) that is secured by a Lien on property in which an Estate has an interest, other than a Oil Well Lien Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; (iii) the amount of which is agreed upon in writing by the Plan Trustee and the holder of such Claim or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction; or (iv) that is otherwise designated as a Secured Claim pursuant to the Plan.

**"Substantive Consolidation Litigation"** shall mean Adversary Proceeding No. 09-01019, filed by the Committee against the Debtor and Offshore.

**"Tax Code"** shall mean the Internal Revenue Code of 1986, as amended.

**"Transfer"** shall mean, as appropriate, the creation of a Lien or other encumbrance on property and/or the voluntary or involuntary disposition of property or an interest in property by one party, in favor of another, by any means, including, but not limited to: sale, exchange, giving in payment, assignment, contribution or donation.

**"Unimpaired"** means, with respect to any Claim, that such Claim is not impaired within

the meaning of Section 1124 of the Bankruptcy Code.

**"Unexpired Lease"** shall mean any lease for which the term has not yet expired and which shall qualify as an Unexpired Lease pursuant to Section 365 of the Bankruptcy Code.

**"Unsecured Creditor"** shall mean the Holder of a General Unsecured Claim.

**"Voting Deadline"** means the deadline established by the Bankruptcy Court by which each holder of a Claim in Classes that are entitled to vote on the Plan must submit the ballot indicating each such holder's vote on the Plan.

**"Whitney"** shall mean Whitney National Bank.

C.    **Adequacy of Disclosure Statement**.  By Order dated _____ __, 2011, the Bankruptcy Court determined that this Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor to make an informed judgment concerning the Plan.  The Bankruptcy Court's approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan.  The Bankruptcy Court has not authorized any other representation, statement, or warranty concerning the Plan, the Debtor, its future business operations or the value of the Debtor's Assets.  You should not rely upon any information, representation or inducement that might have been made to obtain your acceptance that varies with or is otherwise, inconsistent with the information in this Disclosure Statement.

D.    **Cramdown, Solicitation, Voting, and Ballots**.  Provided that at least one class of Impaired Claims votes in favor of the Plan, if any class or classes of Creditors whose Claims are Impaired fails to accept the Plan, it may still be confirmed under the "cramdown" provisions of Section 1129(b) of the United States Bankruptcy Code.  These provisions require that the Plan be fair and equitable as to the objecting class.  As to a class of Unsecured Creditors, this means that the class must be paid in full before any junior class of Claims or Interests receive or retain any property under the Plan.  This principle is sometimes referred to as the "Absolute Priority Rule."[1]  In order to establish that the Plan is fair and equitable as to the Secured Creditors, the Plan must provide such Secured Creditors with the indubitable equivalent of their Claim or that they retain their Lien on, and receive deferred cash payments equal to the value of their interest in, property of the Estate securing such Claim.  The Plan Proponents believe that the Plan meets these requirements and hereby requests confirmation of the Plan under Section 1129(b) if one or more classes fail to accept the Plan.  Alternatively, the Plan Proponents reserve the right to amend the Plan and the treatment of any junior class of Claims or Interests to conform the Plan to the requirements of the Absolute Priority Rule.

---

[1]    *Collier on Bankruptcy* (15th Ed.) at §1129.04[4][a][I] summarizes the "Absolute Priority Rule" as follows:

"a plan of reorganization may not allocate any property whatsoever to any junior class on account of the member's interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their Allowed Claim, or the debtor's reorganization value, whichever is less."

In order to vote on the Plan, a Creditor or Interest Holder must have filed a Proof of Claim or Interest prior to May 3, 2010, unless the Claim is scheduled by the Debtor and it is not described in the Schedules as disputed, unliquidated or contingent. Any Creditor scheduled as undisputed, liquidated, and not contingent, is to the extent scheduled, deemed to have filed a Claim. In order for the Plan to be accepted by Creditors, a majority in number and two-thirds (2/3) majority in amount of Claims filed, allowed (for voting purposes) and voting in each Impaired class of Creditors must vote to accept the Plan. In order for the Plan to be accepted by Interest Holders, a two-thirds (2/3) majority in amount of Interests allowed (for voting purposes) and voting in each Impaired class of Interests must vote to accept the Plan. If the Plan Proponents are unable to obtain the requisite acceptances, then they may be able to obtain confirmation of the Plan, despite the non-acceptance of one or more classes pursuant to 11 U.S.C. §1129(b) as discussed more fully above.

**THE PLAN PROPONENTS BELIEVE THAT THEIR PROPOSED PLAN OF REORGANIZATION, AS DESCRIBED HEREIN, IS IN THE BEST INTERESTS OF ALL CREDITORS. AS SUCH, THE PLAN PROPONENTS STRONGLY URGE ALL CREDITORS TO VOTE <u>IN FAVOR</u> OF THE PLAN BY NO LATER THAN 5:00 P.M., CENTRAL STANDARD TIME, ON _____ \_\_\_, 2011, WHICH IS THE VOTING DEADLINE SET BY THE BANKRUPTCY COURT.**

A Holder of a Claim or Interest may vote on the Plan by filling out and mailing the enclosed Ballot. The voting procedure is fully described at Article VII of this Disclosure Statement. Please note that facsimile copies of the Ballot will not be accepted, unless the Plan Proponents, by and through the designated representative(s), specifically consent to such a facsimile copy, and the Ballot must bear an original signature. The ballots must be returned by _____ \_\_\_, 2011 and no vote received after such time will be counted nor included in the vote tally in any manner. Whether a Holder of a Claim or Interest votes on the Plan or not, such Holder will be bound by the terms of the Plan if such Plan is confirmed. You are, therefore, urged to complete, date, sign, and promptly mail the ballot to the following address:

Stewart F. Peck
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130

**E.     Source of Information.** As described in Section I(A) of this Disclosure Statement, and except as otherwise expressly indicated, portions of this Disclosure Statement describing the Debtor, its business, properties and management have been prepared from information furnished by the Debtor and its professionals including former professionals. The Plan Proponents have not and cannot verify the accuracy of this information, and therefore all parties are cautioned to consider this when reviewing and voting upon the Plan.

**F.     Additional Disclaimers. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION**

CONTAINED HEREIN. APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND PARTNERSHIP INTEREST HOLDERS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS, INTEREST HOLDERS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN OR TAKE A POSITION WITH RESPECT TO THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, IT IS THE PLAN PROPONENTS' POSITION THAT THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE PLAN PROPONENTS ASSERT THAT THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, AND IT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE DEBTOR'S REORGANIZATION ON HOLDERS OF CLAIMS AGAINST OR

INTERESTS IN THE DEBTOR.

TO THE EXTENT ALLOWED BY LAW, THE PLAN PROPONENTS EXPRESSLY RESERVE THE RIGHT TO TAKE A POSITION CONTRARY TO ANY OPNION OR POSITION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO A CONTRARY OR CONFLICTING POSITION FOR PURPOSES OF ANY TAX LIABILITY, CALCULATION, OR TREATMENT.

## II. DESCRIPTION OF THE DEBTOR'S BUSINESS AND CHAPTER 11 CASE

AS DESCRIBED IN SECTION I(A) HEREINABOVE, NEITHER THE PLAN PROPONENTS NOR THEIR RESPECTIVE PROFESSIONALS HAVE PERSONAL KNOWLEDGE AS TO THE ENTIRETY OF THE BUSINESS HISTORY OF THE DEBTOR OR OFFSHORE, OR THESE ENTITIES' CURRENT BUSINESS OPERATIONS OR FINANCIAL CONDITION EXCEPT AS CAN BE GLEANED FROM THE PUBLIC FILINGS OF AND DISCOVERY PROVIDED BY THE DEBTOR AND INTERESTED PARTIES. HOWEVER, THE PLAN PROPONENTS SET FORTH THE FOLLOWING DESCRIPTION BASED UPON SUCH FILINGS, INCLUDING WITHOUT LIMITATION, THE DEBTOR'S PLAN AND THE DEBTOR'S DISCLOSURE STATEMENT, TOGETHER WITH OTHER PLEADINGS FILED BY CREDITORS AND OTHER PARTIES IN INTEREST IN THE DEBTOR'S CHAPTER 11 CASE.

### A. History and Events Leading to the Bankruptcy Case

According to the Debtor, the Debtor was incorporated as a Louisiana "C" corporation on March 8, 1996, for the purpose of developing an exploration and production oil and gas business in China and the United States. Upon securing its first drilling concession in China, Debtor formed Virgin-China, Ltd., a wholly owned Cayman Island subsidiary, in March 1998. Four wells were successfully drilled, and a second concession was acquired during that year. The business was subsequently sold to an investor group from China when management concluded the risks of continuing Chinese operations were outweighed by the rewards of reducing exposure.

According to the Debtor, in 1999, the Debtor participated in four wells with Hunt Petroleum located offshore, Gulf of Mexico, through a newly-formed entity called Virgin Offshore, LLC. This entity is owned approximately 17% by Debtor, and continues to hold interests in two wells on the block, currently shut-in awaiting pipeline replacement following hurricane-related damages.

According to the Debtor, on March 23, 2002, following the participation in seventeen wells by the Debtor as a non-operating partner, the Debtor formed a wholly-owned subsidiary, Offshore, for the purpose of serving as Operator of properties to be acquired. The Debtor alleges that the Debtor and Offshore's business model involved the purchase of oil and gas leases in the name of Offshore. The Debtor further alleges that when a decision to drill a well was made the Debtor and Offshore would raise money from third party investors often on a third-for-a-quarter basis. The

Debtor and Offshore failed to document many of the alleged intercompany transactions. Further, upon information and belief, the alleged third party investors did not actually record an assignment of the oil and gas properties that were allegedly made by Offshore.

The Debtor alleges that during the summer of 2007, the Debtor participated in the drilling of a fifty billion cubic foot prospect at High Island Block 198, situated structurally high to a productive Spinnaker Exploration well, and logged 150 feet of gas pay in the well. The well was subsequently completed, for a total well cost of approximately $18 million. The completion proved to be "tight," thus providing a very limited reservoir and in six months the well no longer produced. This and other wells needing investment caused the Debtor to seek additional capital through a larger credit facility. On September 11, 2007, the Debtor entered into a $75 million credit agreement with CIT and Whitney, providing an immediate $38 million of available funding to satisfy outstanding obligations.

The Debtor alleges that by mid-2008, the Debtor decided to drill a well on the Empire Lease, which was set to expire with proved reserves of approximately 1.0 MMBoe. At the time the decision was made to raise capital to drill the well at the Empire Lease, the Debtor was the owner of an eighty-five percent (85%) interest in the Empire Lease, which was and continues to be mortgaged to CIT. Despite that fact, Offshore allegedly sent documentation to third parties indicating that some portion of the Empire Lease above and beyond the fifteen percent (15%) owned by Offshore was available for transfer. However, the Debtor and Offshore failed to obtain the release of CIT's mortgage against the additional thirty-five percent (35%) of the Empire Lease, and no assignment was ever made from the Debtor to Offshore any portion of that lease. The extent of CIT's mortgage and security interest as to the Empire Lease is subject to a declaratory action initiated by CIT referred to herein as the Empire Litigation.

The Debtor alleges that during the testing phase of the first well on the Empire Lease in September 2008, Hurricane Ike-related issues forced the Debtor to set a plug and re-drill the well, which caused the Debtor to incur approximately $7 million of expenses owed to vendors. While every hurricane in the past resulted in only a few days of shut-in time on the offshore properties, Hurricane Ike followed the coastline from Louisiana to Texas, causing the destruction of major commercial pipelines which move oil and gas into shore. Repairs took months, and in the Debtor's case production was not re-established on its properties until June 2009.

In 2008, the Debtor engaged Scotia Waterous (USA) Inc. to assist with marketing its assets. The Debtor entered into serious negotiations for a sale of approximately seventy-five percent (75%) of assets of the Debtor and Offshore in 2009 for $44 million, but an agreement was never finalized.

The Debtor alleges that the ten (10) month down-time after the Hurricanes in 2008 and inability to close a sale of the Debtor's assets resulted in the Debtor's inability to keep unsecured creditors from pushing the company into bankruptcy. An involuntary Chapter 7 case was filed on June 25, 2009, and eventually converted to Chapter 11 on August 20, 2009.

### B.  Pre-Petition and Post-Petition Business Structure

#### 1.  Loans

The Debtor is a borrower in (i) an asset based revolving loan facility ("First Lien Credit Facility) with CIT as administrative agent, and CIT and Whitney as lenders, secured by what CIT contends is a first lien on all of the Debtor's right, title, and interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production, and (ii) a term loan facility ("Second Lien Credit Facility") with CIT as administrative agent for the second lien lenders secured by what CIT contends is a second lien on the Debtor's interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production (the First Lien Facility and the Second Lien Facility are collectively, the "Credit Facility").

As of the Petition Date, the principal amount owed under the First Lien Credit Facility is an approximate amount of not less than $17 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "First Lien Debt").

As of the Petition Date, the principal amount owed under the Second Lien Credit Facility is an approximate amount of not less than $18 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "Second Lien Debt").

#### 2.  Equity / Ownership

Attached as *Exhibit 2*[2] is a complete list of all Persons whom the Debtor has identified as equity interest holders in the Debtor broken down by type and class of stock.  No corporation or individual owns more than 10% of any class of the Debtor's equity interests.

#### 3.  Operations

As of the Petition Date, the Debtor employed or had engaged Chief Executive Officer, R. Fulton (Tony) Smith, Chief Financial Officer Joseph Gibbs, Brennan Disher as Operations Manager, Charles Roberts, Petroleum Engineer, General Counsel Denise M. Dorner and two officer assistants.  Upon information and belief, the Debtor's wholly-owned subsidiary, Offshore, has no employees or operations, and all operations of Offshore are conducted by the employees of the Debtor without compensation by Offshore to the Debtor.  All permits and licenses required by the State or Federal Government relating to the oil and gas properties owned and operated by Debtor and Offshore are allegedly in the name of Offshore.  Currently the Debtor employs CEO, R. Fulton (Tony) Smith, Controller Keith Pyle, accountant Kraig Stutes, Operations Manager Brennan Disher, Geologist Weider Horizons, two assistants and a receptionist.

---

2 *Exhibit 2* to this Disclosure Statement is identical to Exhibit 5 to the Debtor's Disclosure Statement.

### 4.    Post-Confirmation Management

As is described in further detail hereinbelow, under the proposed Plan, the Debtor's current management will no longer be employed as of the Effective Date. Instead, the Plan Trust to be formed pursuant to the Plan will be afforded the authority, subject to certain restrictions, to appoint an operator for the Plan Trust's financial and oil and gas operations.

### C.    Description of Oil and Gas Properties

Attached as **Exhibit 3**[3] is a list of the Debtor's position as to its decimal ownership interest in oil and gas leases, which was prepared by the Debtor by, among other things, reviewing the reserve report dated March 17, 2010 (the "Reserve Report"), prepared by James F. Hubbard, Petroleum Engineer. A copy of the pertinent portions of the Reserve Report is attached hereto as **Exhibit 4**,[4] including Mr. Hubbard's summary and evaluation of proved reserves for each property.

The Debtor's estimates regarding the net investment necessary for each property, lease operating expenses and cost to plug and abandon the properties have been described as the Debtor's managements' estimates based on its experience with similar properties.

### 1.    Unexpired Leases

#### EAST CAMERON 2

The Debtor has stated that it owns a 25.014% working interest in a Federal Oil and Gas Lease referred to as OCS G10605, Block 2 of East Cameron ("East Cameron 2"). Potential future net income from new drilling amounts to approximately $8.66 million (classified as "proven" reserves in the Reserve Report). The estimated net investment totals approximately $1.25 million. Net operating expenses during the estimated term of production totals approximately $540,000. Net plugging and abandonment expenses total $625,000, to be paid in 2016, proceeds to be escrowed from production revenues.

#### EAST CAMERON 219

The Debtor has stated that it owns a 65.952% working interest in Federal Oil and Gas Lease referred to as OCS G19750, Block 219, East Cameron ("East Cameron 219"). Potential future net income from new drilling (6500 sd. prospect) amounts to approximately $30 million (classified as "possible" reserves in the Reserve Report). The estimated net investment to cover new drilling expenses totals approximately $4.62 million. Net operating expenses during the estimated term of production totals approximately $3 million. Net plugging and abandonment expenses total $1.98 million, to be paid in 2020, proceeds to be escrowed from production revenues.

---

3 **Exhibit 3** to this Disclosure Statement is identical to Exhibit 6 to the Debtor's Disclosure Statement.
4 **Exhibit 4** to this Disclosure Statement is identical to Exhibit 7 to the Debtor's Disclosure Statement.

## EMPIRE

The Debtor has stated that it owns a disputed interested in Louisiana State Oil and Gas Lease referred to as SL 18165, Empire Field, Plaquemines Parish, Louisiana (the "Empire Lease"). This currently producing well provides an estimate of potential future net income (classified "proven" reserves in the Reserve Report) of $72.5 million. The estimated net additional investment to cover new drilling expenses totals approximately $386,000. Net operating expenses during the estimated term of production totals approximately $2.62 million. Net plugging and abandonment expenses total $250,000, paid after 2024, proceeds to be escrowed from production revenues.

## HIGH ISLAND 199

The Debtor has stated that it owns an unrecorded 50% working interest in Federal Oil and Gas lease referred to as OCS G30664, Block 199, High Island. Potential future net income from new drilling (assumed drilled from an existing platform facility operated by Mariner Energy), comprises $30 million (classified "proven" reserves in the Reserve Report). The estimated net investment totals approximately $3.5 million. Net operating expenses during the estimated term of production totals approximately $2.76 million. Net plugging and abandonment expenses total $500,000, paid in 2016, proceeds to be escrowed from production revenues.

## SHIP SHOAL 153 / 154

Pursuant to a Joint Development Agreement with Century Exploration, the Debtor has stated that it owns a working interest in Federal Oil and Gas Leases referred to as Block 154, Ship Shoal and Block 153, Ship Shoal. This currently producing property comprising two wells provides an estimate of potential future net income (classified "proven producing" reserves), at a modified 30% of the Reserve Report numbers based on early encroachment of produced water in the reservoir, of $8.57 million. Net operating expenses during the estimated term of production totals approximately $3.71 million. Net plugging and abandonment expense totals $1.13 million, paid in 2013, proceeds escrowed from production revenues. There are two additional prospects to drill comprising future net income of $64.5 million. The estimated net investment totals $6.7 million. Net operating expenses during the estimated term of production totals approximately $4.32 million. Net plugging and abandonment expenses total $1.61 million, paid in 2020, proceeds to be escrowed from production revenues.

## WEST CAMERON 78

The Debtor has stated that it owns a 17.732% working interest in Federal Oil and Gas Lease referred to as OCS G 33043, Block 78, West Cameron ("West Cameron 78"). Potential future net income from re-drilling the prospect from the existing platform totals $8.56 million. The estimated net additional investment to cover drilling expenses totals $1.4 million. Net operating expenses during the estimated term of production totals approximately $510,000. Net plugging and abandonment expenses total $434,000, paid in 2016, proceeds to be escrowed from production

revenues. The Debtor previously had an interest in Lease 19702, Block 78, West Cameron – said lease expired and was reacquired in June, 2009.

## HIGH ISLAND 200

The Debtor has stated that it owns an interest in an Federal Oil and Gas Lease referred to as OCS G 330665, Block 200, High Island, which leasehold interest has nominal value - no estimated or booked reserves.

### 2. Expired Leases

Attached as *Exhibit 5*[5] is a list of expired oil and gas leases in which the Debtor has stated that it had an interest, along with the Debtor's estimate of potential plug and abandonment obligations of the Debtor. Under applicable non-bankruptcy law and pertinent operating agreements, joint owners of the wells listed on *Exhibit 5* may remain responsible for their proportionate share of the plug and abandonment costs.

### D. Significant Events During the Debtor's Chapter 11 Case

### 1. Filing of the Involuntary Bankruptcy and Conversion to Chapter 11

On June 25, 2009, certain petitioning creditors filed an involuntary petition for relief against the Debtor. An order for relief under Chapter 7 of the Bankruptcy Code was entered on August 20, 2009 and, on August 26, 2009, the Court converted this case to Chapter 11, retroactive to August 20, 2009. The case was originally assigned to the Honorable Jerry Brown, Bankruptcy Judge, and transferred to the Honorable Elizabeth Magner, Bankruptcy Judge.

### 2. Continuation of the Debtor's Business

Following the Petition Date, the Debtor has continued to operate as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code and with the protections afforded by the automatic stay existing under Section 362 of the Bankruptcy Code. The automatic stay, with limited exceptions, enjoined the commencement or continuation of litigation against the Debtor.

Subject to the supervisory powers of the Bankruptcy Code, operations during the pendency of this Chapter 11 case by the Debtor have included efforts to increase production at Empire. The Debtor had an acid treatment completed in November 2009. The next step taken by the Debtor was installation of a compressor. The Debtor has asserted that these efforts resulted in significant enhancement in productivity from the Empire Lease. Since the Petition Date, net revenue on an 8/8ths basis from the Empire well has been escrowed per order of this Court, subject to payment of expenses to operate the Empire well. According to the Monthly Operating Report filed by the Debtor for the month of November 2010, as of November 30, 2010, $2,783,636.96 has been deposited into the Empire Escrow Account pending further order of the Bankruptcy Court.

---

5 *Exhibit 5* to this Disclosure Statement is identical to Exhibit 8 to the Debtor's Disclosure Statement.

### 3. Motions and Applications to Employ Professionals

The Debtor filed a number of motions and applications relating to the retention of professionals since the Petition Date, including the following:

a.    Application to Employ the Law Office of Emile L. Turner, Jr., LLC and Leo D. Congeni, *of counsel*, as counsel for the Debtor. A final order approving the application was entered on September 25, 2009 (P-96).

b.    Application to employ Geiger, Laborde & Laperouse, L.L.C. as special counsel to represent the Debtor in connection with oil and gas regulatory, ownership, and operatorship matters and ongoing litigation involving the Debtor. This employment of special counsel was approved by Order of the Bankruptcy Court entered on October 26, 2009 (P-149).

c.    Application to employ James F. Hubbard and James F. Hubbard Petroleum Consultant, L.L.C. ("JFH") for the purposes of assisting in evaluating oil and gas properties for sales, acquisitions, financing, accounting documents and expert testimony. The employment of JFH was approved by Order of the Bankruptcy Court entered on March 9, 2010 (P-313).

d.    Application to employ Weider Horizons Investment Corporation ("WHI") as a geologist for purposes of assisting in investigating additional reserves on the Debtor's properties. The employment of WHI was approved by Order of the Bankruptcy Court entered on March 9, 2010 (P-313).

e.    Application to employ Global Hunter Securities, LLC ("GHS") as financial advisor and investment banker. The employment of GHS was approved by Order of the Bankruptcy Court entered on June 1, 2010 (P-412).

The Committee filed the following application to employ counsel:

a.    Application to Employ Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (the "Lugenbuhl Application") as counsel for the Committee. The Lugenbuhl Application was approved by Order of the Bankruptcy Court entered on November 4, 2009 (P-174).

### 4. Cash Collateral Orders

Since the Petition Date, the Bankruptcy Court has entered a number of orders relating to the use of cash collateral. An Amended Final Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection Liens was entered on April 5, 2010 (P-336) (the "Cash Collateral Order"). Subsequently, the Bankruptcy Court has entered the following additional order related to the Cash Collateral Order and the Debtor's right to use cash collateral:

- On May 6, 2010, the Bankruptcy Court entered its Order (P-377) approving the Debtor's request to use cash collateral solely for purposes of reacquiring the Debtor's lost interest in the oil and gas lease located at East Cameron Block 219.
- On June 14, 2010, the Court entered its Order (P-427) extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including August 31, 2010, but expressly denying the Debtor's request to modify the Cash Collateral Order insofar as it related to the Empire Escrow.
- On September 14, 2010, the Court entered its Order (P-507) further extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including October 31, 2010.
- On December 13, 2010, the Court entered its Order (P-556) further extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including January 31, 2011, and allowing for the payment of certain expenses as set forth therein.

### 5. Schedules and Claims Bar Date

On October 1, 2009, the Debtor filed its Schedules, identifying its assets and liabilities. The Schedules were amended on October 23, 2009 and on February 9, 2010.

On March 12, 2010, the Bankruptcy Court established a Bar Date for filing of proofs of claim as May 3, 2010. (the "Bar Date").

### 6. CIT'S Motion to Appoint Chapter 11 Trustee

On October 20, 2009, CIT filed a Motion to Appoint Chapter 11 Trustee. After extensive discovery, a trial on the Trustee Motion was held on February 10, 2010. On February 17, 2010, an Order and Ruling were entered by the Court, denying the Trustee Motion.

### 7. Substantive Consolidation Adversary Proceeding

On February 15, 2010, the Committee filed a Complaint requesting that the estates of the Debtor and its non-debtor subsidiary, Offshore, be substantively consolidated. The parties have exchanged initial disclosures. The Debtor has failed to this date to provide the Committee's counsel with deposition dates for the Debtor's officers and directors and employees, and the Committee will be seeking an extension of the discovery cutoff based upon, *inter alia*, the Debtor's

failure to cooperate in discovery and the fact that the Plan disposes of the Substantive Consolidation Litigation.

Subject to confirmation of the Plan, and the consideration afforded to the Committee and the other Holders of Claims and Interests, the Committee will dismiss the Substantive Consolidation Litigation without prejudice.

## 8.    Mediation

On May 19 – 20, 2010, the Debtor, Offshore, CIT, Whitney, the Committee and several other interested parties participated in a mediation before former Bankruptcy Judge Gerald Schiff regarding issues relating to the ownership and obligations associated with the Empire Lease, possible reorganization plans and the Committee's Substantive Consolidation Adversary Proceeding.  At the conclusion of the mediation, after two (2) full days of extensive negotiations led by Judge Schiff, several of the parties, including the Debtor, Offshore, the Committee, and certain Holders of Oil Well Lien Claims entered into a non-binding Term Sheet that formed the basis of the Debtor's Plan and the Debtor's Disclosure Statement.  Approval of the Debtor's Disclosure Statement was denied and the Court terminated exclusivity so as to allow the Plan Proponents and other parties in interest to file competing plans.

## 9.    Empire Litigation

On July 13, 2010, CIT filed an Original Complaint seeking a declaration regarding ownership of the Empire Lease and the validity, priority and extent of liens affecting the Empire Lease.  CIT contends that the Debtor should be recognized as the holder of an 85% interest in the Empire Lease and that CIT has a valid and first priority lien against the Debtor's 85% interest.

On October 8, 2010, CIT filed its Amended Complaint naming as additional defendants certain holders of oil well liens, which, *inter alia*, addressed certain issues raised in the Debtor's and Offshore's motions to dismiss for failure to join indispensible parties, and the deadline for the additional parties to file responsive pleadings has not yet expired.

Subject to confirmation of the Plan, the consideration afforded to the Committee and the other Holders of Claims and Interests, and the resulting control of Offshore bestowed upon the Plan Trust as the sole shareholder of Offshore, the Plan Trust shall settle and compromise the Empire Litigation such that the Plan Trust shall have an eighty-five percent (85%) working interest in the Empire Lease and Offshore shall have a fifteen (15%) working interest in the Empire Lease.

## 10.    Denial of Approval of Debtor's Disclosure Statement and Termination of Exclusivity

On November 3, 2010, a continued hearing on the Debtor's disclosure statement was held. At that hearing, multiple parties objected to the Debtor's disclosure statement, and the Plan Proponents requested that in addition to denial of approval of the Debtor's disclosure statement,

that the Court terminate exclusivity to allow other parties, including the Plan Proponents, to file plans of reorganization. At the conclusion of that hearing, the Court denied approval of the Debtor's disclosure statement and terminated exclusivity.

## III.    DESCRIPTION OF THE PLAN

### A.    Summary of the Plan

The entire text of the Plan has been provided, with this Disclosure Statement, to all Holders of Claims and Interests known to the Plan Proponents based upon filings by the Debtor and other parties in interest in the Chapter 11 Case. The Plan is the operative controlling legal document and, therefore, should be read carefully and independently of this Disclosure Statement. Creditors, Claimants, and other Holders of Claims and Interests, are further urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan.

Subject to the foregoing limitations, the Plan proposes to classify all Claims and Interests in and against the Debtor as Administrative Claims, Priority Tax Claims, and into five (5) separate classes. The treatment of each of these categories and classes of Claims is discussed in more detail below and in Articles III and IV the Plan.

The Plan will be compliant with the priority scheme of the Bankruptcy Code. The purpose and effect of the Plan is to, *inter alia*, (a) provide for the creation of a Plan Trust, which shall receive from the Debtor and will own on behalf of the Plan Trust Beneficiaries, certain property, including without limitation, (i) all funds on deposit in the Empire Escrow, (ii) all of cash or cash equivalents of the Debtor, including any other revenue generated from the production of the Debtor's oil and gas properties prior to the Effective Date, (iii) the entirety of the Debtor's interests in certain oil and gas properties to be identified in a plan supplement to be filed prior to the Confirmation Hearing, (iv) all Causes of Action of the Debtor reserved under the Plan, including without limitation, the Avoidance Claims, the Offshore Claims, the D&O Claims, the El Paso Claims and the Baker Claims, (v) the Debtor's equity interest in Offshore, (vi) any and all other property held by the Plan Trust, and, (vii) the proceeds, products and offspring of any such property (collectively, the "Plan Trust Assets"); and (b) provide that the Plan Trust shall be primarily responsible for conducting any operations necessary to liquidate the Plan Trust Assets and to enhance or preserve the value of the Plan Trust Assets consistent with the expeditious and beneficial liquidation of such Plan Trust Assets. However, to the extent that any business decision involves more than $300,000.00 in a capital expenditure or the alienation of Plan Trust Assets with a value in excess of $300,000.00, the Plan Trust, through the Plan Trustee, shall obtain the approval of the Plan Committee (as described below).

On the Effective Date, except as otherwise provided for herein, (i) the existing Debtor Equity Interests shall be deemed extinguished, cancelled and of no further force or effect, and (ii) the obligations of the Debtor (and the Plan Trust) under any agreements governing the Debtor Equity Interests and any indebtedness or obligation of the Debtor with respect to the Debtor Equity Interests shall be discharged without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person.

## B.    Unclassified Claims

### 1.    Administrative Claims

On or as soon as practicable after the later of (i) the Effective Date or (ii) the date that an Administrative Claim becomes an Allowed Administrative Claim, each Administrative Claim that is an Allowed Claim shall be paid in full, in Cash; provided, however, that Administrative Claims, the payment of which are not expressly provided for elsewhere in the Plan and that represent indebtedness incurred in the ordinary course of business by the Debtor, shall be paid by the Plan Trustee either (i) in the ordinary course of business in accordance with the terms and conditions of any agreements related thereto or (ii) as otherwise agreed among the Plan Trustee and the Holder of such Administrative Claim.  Additionally, any fees due to the U.S. Trustee's Office pursuant to 28 U.S.C. § 1930 will be paid as they become due by the Debtor or the Plan Trustee.

### 2.    Professional Fee Claims

All Professionals seeking payment of an Administrative Claim pursuant to an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under Sections 503(b)(2), 503(b)(3) or 503(b)(4) of the Bankruptcy Code shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days of the occurrence of the Effective Date. If granted, such an award by the Bankruptcy Court shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon between the Holder of an Administrative Claim and the Plan Proponents or, on and after the Effective Date, the Plan Trustee.

Based upon the Debtor's Disclosure Statement, the Debtor believed that as of October 20, 2010, the estimate of professional fees remaining to be paid to Debtor's counsel was $5,000.00 and the amount remaining to be paid to Committee's counsel was approximately $70,000.00.  While the Committee cannot aver as to the estimated fees of the Debtor's professionals, the Committee's professionals presently have fees remaining to be paid in the amount of approximately $130,000.00.

Additionally, in its Disclosure Statement, the Debtor sets forth the following estimates of additional fees and expenses likely to be incurred by the Debtor's professionals prior to Confirmation:

- Professional Fees of Debtor's Counsel: approximately $125,000.00;
- US Trustee Fees: approximately $3,900.00;
- Professional Fees of Global Hunter: approximately $262,000-$524,000.00.

The Plan Proponents do not have specific knowledge or information as to the basis for the Debtor's estimates, but would note that under the proposed Plan, the Debtor's financial advisor, Global Hunter, would not be entitled to a success fee of any sort.  Conversely, given the substantial

amount of time and effort expended to date and to be expended in the future by counsel for the Committee, the Committee believes that the former estimate of fees in the amount of $75,000.00 for the period from October 20, 2010 is no longer sufficient. Instead, the Committee believes that its estimated professional fees from the date of filing this Disclosure Statement through confirmation, in addition to the amounts presently outstanding, shall be approximately $75,000.00. In addition, CIT, as a Plan Proponent, intends to seek payment of its fees and expenses for prosecution of the Plan and related matters. CIT estimates that its professional fees and expenses from the date of filing of this Disclosure Statement through confirmation of the Plan will be approximately $75,000.00.

### 3. Priority Tax Claims

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to different treatment, the Plan Trustee shall pay to each Holder of an Allowed Priority Tax Claim the total amount of such Claim in full in equal quarterly installments beginning on the Initial Distribution Date in deferred cash payments, over a period not exceeding five (5) years after the Petition Date in accordance with Section 1129(a)(9)(C) and Section 511 of the Bankruptcy Code with interest at the rate(s) specified in and in accordance with applicable federal and state law, which rates are subject to periodic adjustment pursuant to applicable law. The first such quarterly installment shall occur at the end of the Quarter which is at least twenty (20) days after the latest of (i) the Effective Date, or (ii) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim.

Based upon the Debtor's Disclosure Statement, the Debtor believes there are Priority Tax Claims in a total approximate amount of $65,000.00. The Plan Proponents are unable at this time to independently verify this estimation.

### C. Classification and Treatment of Claims and Interests

The classification of Claims and Debtor Partnership Interests against the Debtor pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 2 | CIT Secured Claim | Impaired | Entitled to Vote |
| 3 | Oil Well Lien Claims and General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | RLI Insurance Company Claim | Impaired | Entitled to Vote |
| 5 | Debtor Equity Interests | Impaired | Deemed to Reject |

### 1. Class 1: Other Priority Claims

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date

on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the Plan Proponents and such Holder shall have agreed upon in writing; *provided*, that such treatment is on more favorable terms to the Debtor (or the Plan Trust after the Effective Date), than the treatment set forth in <u>clause (A)</u> above.

Based upon the Debtor's Disclosure Statement, the Debtor believes that as of the date of the submission of the Debtor's Disclosure Statement, October 20, 2010, the Debtor was not aware of the existence of any such Claims. However, out of an abundance of caution, the Plan Proponents have included and provided treatment for this potential Class of Claims, as they are unable to independently verify the Debtor's position.

To the extent that any Class 1 Other Priority Claims exist, the rights and Interests of Holders of Other Priority Claims are Unimpaired pursuant to the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.

## 2. Class 2: CIT Secured Claim

The Holder of the Allowed Class 2 CIT Claim shall receive a *pro rata* interest equal to eighty percent (80%) of beneficial interests in the Plan Trust Assets, which shall entitle each Holder of an Allowed Class 2 CIT Claim to 80% of every Plan Trust Distribution. For the avoidance of doubt, the Holder of the Allowed Class 2 CIT Secured Claim shall be entitled to recover a *pro rata* interest equal to eighty percent (80%) of any Plan Trust Distributions to be made as a result of the sale of any Plan Trust Assets, regardless of the applicability of any Liens or security interests held by the Holder of the Allowed Class 2 CIT Secured Claim in such Plan Trust Assets.

The Holder of the Allowed Class 2 CIT Secured Claim shall retain its existing mortgages and Liens on all of the Assets transferred by the Debtor to the Plan Trust up through and including such time as the Holders of Allowed Class 2 CIT Secured Claims receives on account of such Claims consideration in the total amount of Fifteen Million Dollars ($15,000,000.00). CIT's mortgages and liens shall be fully preserved and maintained in accordance with the terms thereof without the need for additional documentation, except as set forth herein. To the extent any additional documentation is necessary, the Plan Trustee shall be authorized and directed to execute such documentation.

Based upon the Debtor's Disclosure Statement, the Debtor believes that as of the date of the submission of the Debtor's Disclosure Statement, October 20, 2010, the estimated amount of the CIT Secured Claim is approximately $35 Million.

The rights and Interests of a Holder of a Class 2 CIT Secured Claim are Impaired pursuant to the Plan and are entitled to vote to accept or reject the Plan.

### 3. Class 3: Oil Well Lien Claims and General Unsecured Claims

Each holder of an Allowed Oil Well Lien Claim and Allowed General Unsecured Claim shall receive a *pro rata* interest equal to twenty percent (20%) of beneficial interests in the Plan Trust Assets, which shall entitle each Holder of an Allowed Class 3 Claims to 20% of every Plan Trust Distribution. For the avoidance of doubt, each Holder of an Allowed Class 3 Oil Well Lien Claim and Allowed General Unsecured Claim shall be entitled to recover a *pro rata* interest in twenty percent (20%) of any Plan Trust Distributions to be made as a result of the sale of any Plan Trust Assets, regardless of the applicability of any Liens or security interests held by the Holder of the Allowed Class 2 CIT Secured Claim in such Plan Trust Assets.

The rights and Interests of Holders of Class 3 Oil Well Lien Claims and General Unsecured Claims in Classes are Impaired pursuant to the Plan and are entitled to vote to accept or reject the Plan.

### 4. Class 4: RLI Insurance Company Claim

RLI Insurance Company issued bonds (the "Bonds") on behalf of Debtor to cover obligations of Debtor arising from or out of the ownership and operation of its oil and gas properties and activities related thereto (the "Bonding Program"). The obligations covered by the Bonds include, but are not limited to, royalty obligations, plugging and abandonment obligations and penalties assessed for non-compliance with applicable rules and regulations governing ownership and operation of oil and gas properties. The Bonding Program includes, but is not limited to, bonds issued in regard to oil and gas property on the Outer Continental Shelf ("the Leases"). Under the Bonding Program, bonds were issued to the Minerals Management Service (nka BOEMRE). The approximate principal sum outstanding under the Bonds is $11,025,000.00. The obligations of the Debtor in regard to the Bonds are evidenced by, among other things, the Bonds, various assignments of savings accounts and various indemnity agreements (the "Bond Documents"), or any other documents subsequently entered into between Debtor and RLI.

Under the Plan, the Plan Trust formed hereunder (at the direction of the Plan Trustee) will own interests in, and, through a designated operator, operate certain oil and gas properties. To the extent the Bonds relate to Plan Trust Assets, the Plan Trust will assume the indemnity agreements and assignments of plugging-and-abandonment savings accounts (the "P&A Accounts") between it and RLI and the rights of RLI under the Bond Documents are unimpaired and shall pass through the Debtor's bankruptcy unaffected in any manner and will become the obligations of the Plan Trust. To the extent the Bonds relate to Assets that are not Plan Trust Assets, such Bonds, Bond Documents and P&A Accounts shall not be assumed by the Plan Trust, but will otherwise remain available to satisfy P&A obligations on such assets. There will be no release of any guarantors, indemnitors or other parties liable to RLI under the terms of the Bond Documents or otherwise, and the Plan Trust will fully cooperate with RLI in the exercise of RLI's rights against parties other than the Plan Trust pursuant to the Bond Documents or otherwise, in regard to the payment of plugging and abandonment expenses relating to the Debtor's offshore Leases and the discharge of the Bonds pursuant to their terms and conditions.

The rights and Interests of the Holder of the Class 4 RLI Insurance Company Claim are Unimpaired pursuant to the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.

### 5. Class 5: Debtor Equity Interests

Under the Plan, all existing Debtor Equity Interests shall be cancelled as of the Effective Date and the Holders thereof shall not receive or retain any property under the Plan on account of such Debtor Equity Interests.

Holders of Class 5 Debtor Equity Interests Claims are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, such Holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

### D. Means of Implementation of the Plan

### 1. Operation of the Debtor Between the Confirmation Date and the Effective Date

On the Confirmation Date, the Person identified in Section 5.4(d) of the Plan as the initial Plan Trustee shall be appointed as the Chief Restructuring Officer of the Debtor (the "CRO"), and shall have the sole authority and power to operate as the Debtor as a Debtor-in-Possession, subject to the supervision of the Bankruptcy Court, during the period from the Confirmation Date through and until the Effective Date. Any obligation incurred by the Debtor during that period shall be Allowed or disallowed as an Administrative Claim in accordance with Section 503(b) of the Bankruptcy Code as if incurred prior to the Confirmation Date. The CRO shall have the power to implement the terms of the Plan, and to execute any documents necessary to implement the Plan without the need for any further corporate action or authority.

### 2. Operation of the Plan Trust Post-Effective Date

From and after the Effective Date, the Plan Trustee shall take such actions as are necessary or appropriate to transfer to the Plan Trust all right, title and interest in and to the Plan Trust Assets; and, to pay all post-petition ordinary course operating expenses and any Allowed Administrative Expenses that are or become due and payable within thirty (30) days after the Effective Date.

### 3. Valuation of Properties Subject to Oil Well Lien Claims

If necessary in order to determine the secured status of the Holders of Oil Well Lien Claims, the Court shall conduct a hearing pursuant to Section 506(a) of the Bankruptcy Code to value the Debtor's interests in the property subject to the Oil Well Lien Claims.

4.      **The Plan Trust and Appointment, Powers and Removal of the Plan Trustee**

a.      **Establishment of the Plan Trust**

On the Effective Date, the Debtor, by and through the CRO to be appointed pursuant to Section 5.1 of the Plan, shall execute the Plan Trust Agreement, a copy of which is attached to the Plan as ***Exhibit A***, and shall take all other steps necessary to establish the Plan Trust. The Confirmation Order shall include and constitute approval of the Plan Trust Agreement and authorization of the Debtor to execute the Plan Trust Agreement.

b.      **Purpose of the Plan Trust**

After the Effective Date, the Plan Trust will own the Plan Trust Assets (as defined hereinbelow) and shall have the flexibility to conduct any operations necessary to liquidate the Plan Trust Assets and to enhance or preserve the value of the Plan Trust Assets consistent with the expeditious and beneficial liquidation of such property. However, to the extent that any business decision involves more than $300,000.00 in a capital expenditure or the alienation of Plan Trust Assets with a value in excess of $300,000.00, the Plan Trust and the Plan Trustee shall obtain the approval of the Plan Committee.

c.      **Transfer of Trust Assets by Debtor to the Plan Trust**

Upon the Effective Date, but subsequent to the execution of the Plan Trust Agreement, and subject to the Liens and security interests granted herein, certain property of the Debtor's Estate shall be transferred and vested in the Plan Trust, free and clear of any and all Claims, Interests, debts, Liens, security Interests, and encumbrances of any kind or type, except those Claims, debts, Liens, security Interests, and encumbrances specifically provided for under the Plan or in the Confirmation Order, including without limitation (i) 85% of the funds on deposit in the Empire Escrow, (ii) all of cash or cash equivalents of the Debtor, including any other revenue and accounts generated from the production of the Debtor's oil and gas properties prior to the Effective Date, (iii) the entirety of the Debtor's interests in certain oil and gas properties to be identified in a plan supplement to be filed prior to the Confirmation Hearing, (iv) all Causes of Action of the Debtor reserved under this Plan, including without limitation, the Avoidance Claims, the Offshore Claims, the D&O Claims, the El Paso Claims and the Baker Claims, (v) the Debtor's equity interest in Offshore, (vi) any and all other property held by the Plan Trust, and, (vii) the proceeds, products and offspring of any such property (collectively, the "Plan Trust Assets").

d.      **Appointment of the Plan Trustee**

On the Effective Date, an individual or entity designated by the Plan Proponents at the Confirmation Hearing, or any other individual or entity approved by the Bankruptcy Court, shall be appointed as the Plan Trustee under the Plan. Any successor Plan Trustee shall be appointed as set forth below. The Plan Trustee's powers, duties, bonding requirements, and compensation shall

be set forth in the Plan Trust Agreement, a form of which is attached to the Plan as ***Exhibit A***.

### e.  Successor Plan Trustee(s)

Until such time as the Holder of Class 2 CIT Secured Claims receives cumulative payments under this Plan in the amount of Fifteen Million Dollars ($15 Million) in Cash, CIT and Whitney shall have the exclusive right to remove the Plan Trustee and select and appoint a successor Plan Trustee or appoint a successor Plan Trustee upon the existing Plan Trustee becoming incapacitated or resigning. Thereafter, the Plan Committee shall be granted the exclusive authority to remove the Plan Trustee and appoint a successor Plan Trustee or appoint a successor Plan Trustee upon the existing Plan Trustee becoming incapacitated or resigning. However, at any time after the Effective Date, and upon the unanimous vote of the Plan Committee, the Plan Trustee may be removed and a successor Plan Trustee may be appointed.

### f.  Powers and Duties of the Plan Trustee

The Plan Trustee shall have the rights and powers of a debtor-in-possession under Section 1107 of the Bankruptcy Code (including specifically the same duties owed by the Debtor to both Holders of Claims and Interests), the rights and powers as set forth in the Plan Trust Agreement, and such other rights, powers and duties incident to causing the performance of the Debtor's obligations under the Plan, including, without limitation, the following:

i. Perfect and secure his right, title and interest to any and all Plan Trust Assets;

ii. Reduce all of the Plan Trust Assets to his possession and conserve, protect, collect and liquidate or otherwise convert all Plan Trust Assets into Cash, including without limitation, the operation of the Plan Trust and Offshore;

iii. Distribute the net proceeds of Plan Trust Assets as specified herein;

iv. Release, convey or assign any right, title or interest in or to the Plan Trust Assets;

v. Pay and discharge any costs, expenses, fees or obligations deemed necessary to operate or preserve the Plan Trust Assets or any part thereof or to preserve the Plan Trust;

vi. Purchase insurance as is necessary for ongoing operations; insure and protect Plan Trust Assets;

vii. Protect the Plan Trust and the Plan Trustee from liability;

viii. Deposit Plan Trust funds and draw checks and make disbursements thereof;

ix. Employ such attorneys, accountants, engineers, agents, tax specialists, other professionals, and clerical assistants as the Plan Trustee may deem necessary. The Plan Trustee shall be entitled to rely upon the advice of retained professionals and shall not be liable for any action taken in reliance on such advice. The fees and expenses of all such professionals shall be charged as expenses of the Plan Trust and shall be paid upon approval of the Plan Trustee;

x. Employ brokers, investment brokers, sales representatives or agents, or other Persons necessary to manage the Plan Trust Assets;

xi. Take any action required or permitted by the Plan or the Plan Trust Agreement;

xii.   Execute obligations, whether negotiable or non-negotiable;

xiii.   Settle, compromise or adjust by arbitration, or otherwise, any disputes or controversies in favor of or against the Plan Trust;

xiv.   Waive or release rights of any kind;

xv.   Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

xvi.   Negotiate, renegotiate or enter into any contracts or agreements relating to the Plan Trust's oil and gas properties, including without limitation, farmout agreements, assignments, operating agreements, or any other document or agreement necessary for and in connection with the operation of oil and gas properties;

xvii.   Negotiate, renegotiate or enter into any contracts or agreements binding the Plan Trust, and to execute, acknowledge and deliver any and all investments that are necessary, required or deemed by the Plan Trustee to be advisable in connection with the performance of his/her duties;

xviii.   Have instituted and prosecute all Causes of Action on behalf of the Plan Trust and prosecute or defend all appeals on behalf of the Estate or the Plan Trust;

xix.   In general, without in any manner limiting any of the foregoing, deal with the Plan Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owing the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter;

xx.   Serve as a representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute all Causes of Action, including without limitation, the Avoidance Claims, the Offshore Claims, the D&O Claims, the El Paso Claims, and the Baker Claims, in the name of the Plan Trust or as necessary in the name of the Debtor. Additionally, the Plan Trustee will have power to (1) do all acts contemplated by the Plan to be done by the Plan Trustee and (2) do all other acts that may be necessary or appropriate for the final liquidation and distribution of the Plan Trust Assets;

xxi.   Review all fee applications filed by Professionals employed during the Chapter 11 Case and shall have authority to object to same;

xxii.   Exercise the duty to assess the merits of Claims and object to those Claims that the Plan Trustee determines to be, in whole or in part, without merit, to prosecute such objections and defend Claims and counterclaims asserted in connection therewith, to transfer any residual; and

xxiii.   File such post-confirmation reports with the Bankruptcy Court as are required under applicable statute or by the local rules of the Bankruptcy Court.

### g.   Payment of Fees and Expenses of the Plan Trustee

The compensation to be paid to the Plan Trustee and any and all professionals retained by the Plan Trustee shall generally comport with the customary and reasonable professional compensation payable in this district in accordance with Section 330 of the Bankruptcy Code. The payment of fees and expenses to the Plan Trustee and its professionals shall not require the approval of the Bankruptcy Court, but shall be made in the ordinary course of business subject to

review by the Plan Committee as provided herein.

### h. Liability

The Plan Trustee shall have no liability for any of its acts or omissions in any case whatsoever arising in connection with the activities of the Plan Trustee as provided for under the Plan unless it shall have been guilty of fraud, willful misconduct or gross negligence. The Plan Trustee and its professionals shall be indemnified by the Plan Trust for any Claims or Causes of Action arising from or relating to the exercise of its duties unless it shall have been guilty of fraud, willful misconduct or gross negligence. In performing its duties hereunder, the Plan Trustee may consult with counsel. None of the provisions of the Plan shall require the Plan Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any rights and powers. The Plan Trustee may rely without inquiry upon any writing delivered hereunder which it believes in good faith to be genuine and to have been given by a proper person.

### i. Termination of Plan Trust and Plan Trustee

The Plan Trust shall become effective upon the Effective Date. Thereupon, the Plan Trust shall remain and continue in full force and effect until the Plan Trust Assets have been wholly converted to Cash or abandoned and all costs, expenses, and obligations incurred in administering the Plan Trust have been fully paid and all remaining income and proceeds of the Plan Trust Assets have been distributed in payment of Allowed Claims and, if applicable, Allowed Interests pursuant to the provisions of the Plan. The Plan Trust will terminate at the end of ten (10) years from the Effective Date; provided, that upon complete liquidation of the Plan Trust Assets and satisfaction as far as possible of all remaining obligations, liabilities and expenses of the Plan Trust pursuant to the Plan prior to such date, and upon the conclusion of the prosecution of all Causes of Action by the Plan Trust and all Claim objections brought by the Plan Trustee or the Debtor, the Plan Trustee may, with approval of the Bankruptcy Court, sooner terminate the Plan Trust; and provided further, that prior to the end of ten (10) years from the Effective Date the Plan Trustee or any beneficiary of the Plan Trust may move the Bankruptcy Court to extend the termination date of the Plan Trust after notice to interested parties and an opportunity for hearing. On the termination date of the Plan Trust, the Plan Trustee will execute and deliver any and all documents and instruments reasonably requested to evidence such termination. Upon termination and complete satisfaction of its duties under the Plan Trust Agreement, the Plan Trustee will be forever discharged and released from all powers, duties, responsibilities and liabilities pursuant to the Plan Trust other than those attributable to the fraud, gross negligence or willful misconduct of the Plan Trustee. The Plan Trustee shall file a motion with the Bankruptcy Court for entry of a Final Decree pursuant to Fed. R. Bankr. P. 3022 promptly upon administration in full of the Debtor's estate and the Plan Trust Assets.

### j. Tax Treatment of the Plan Trust

The Plan Trust is to be established for the benefit of the Plan Trust Beneficiaries. All

items of income, deduction, credit or loss of the Plan Trust shall be allocated *pro rata* for federal, state and local income tax purposes among the Plan Trust Beneficiaries.

### k.     Budget; Cash Reports

Within thirty (30) days after the Effective Date, the Plan Trustee will prepare and submit to the Plan Committee a proposed budget for the period from the Effective Date through the conclusion of the next full month.  Thereafter, on or before the 15th day of each of the next eleven months, the Plan Trustee will prepare and submit to the Plan Committee a proposed budget for the next month, and together with a reconciliation for the previous monthly budget.  Beginning on the 15th day of the 12th month following the Effective Date, and on the 15th day of that same month in each calendar year in which the Plan Trust is in existence, the Plan Trust shall prepare and submit to the Plan Committee a proposed twelve-month budget, with a budget reconciliation for the previous twelve-month period.  The budget contemplated herein will include proposed projected expenses, proposed projected revenues, and a proposed operating reserve. The Plan Trust, the Plan Trustee, and the Plan Committee will operate within the approved budgets as they may be modified with the consent of the Plan Committee. Upon the reasonable request of the Plan Committee, the Plan Trustee will prepare and submit to the Plan Committee reports on available Cash in the Plan Trust.

### 5.     Creditors Committee and Plan Committee

### a.     Termination of Creditors Committee

The Creditors Committee will continue in existence until the Effective Date, to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code, and will perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors Committee will be dissolved and its members will be deemed released by the Debtor and its Estate (i) of all their duties, responsibilities and obligations in connection with the Chapter 11 Case, and (ii) from all claims and Causes of Action relating to or arising directly or indirectly from services performed.  On the Effective Date, the retention or employment of the Creditors Committee's Professionals and other agents will terminate, except as is necessary to address fee applications filed by the Creditors Committee or its Professionals. Upon the dissolution of the Creditors Committee, no notice to the Creditors Committee that might otherwise be required pursuant to an order of the Bankruptcy Court (e.g., a Procedures Order) shall be required.

### b.     Establishment of the Plan Committee; Powers and Responsibilities

On the earlier of (i) the Effective Date, or (ii) seven (7) days after entry of the Confirmation Order, the Plan Committee will be formed and constituted and will consist of the following five (5) members, designated by (i) CIT**;** (ii) Whitney; (iii) Helis Oil & Gas Company, LLC; (iv) Baker Hughes Incorporated; and (v) a Holder of an Allowed General Unsecured Claim or designee to

be named prior to or at the Confirmation Hearing. If a Plan Committee member sells, transfers or assigns any right to or interest in its Claim, said member will be immediately removed from the Plan Committee. The remaining Plan Committee members will elect a replacement member by a majority vote. The Plan Committee shall adopt bylaws, which shall provide for the governance of the Plan Committee. The Plan Committee shall have the following powers and responsibilities to the extent that any business decision of the Plan Trustee involves more than $300,000.00 in a capital expenditure or the alienation of Plan Trust Assets with a value in excess of $300,000.00:

    i.    The Plan Committee shall monitor the Plan Trust and the Plan Trustee in the performance of their obligations under the Plan, including the duties to object to Claims, prosecute Causes of Action, and distribute the funds required under the Plan.

    ii.    The Plan Committee shall be responsible for the termination, selection and replacement of the Plan Trustee, subject to Bankruptcy Court approval if and only if the vote of the Plan Committee is not unanimous.

    iii.    The Plan Committee shall review and either approve or reject in its discretion the:
1. budget for the Plan Trust prepared by the Plan Trustee, including projected expenses, projected revenues and an operating reserve;
2. proposals by the Plan Trustee to borrow money or grant liens;
3. proposals by the Plan Trustee to modify the Plan;
4. proposals by the Plan Trustee to postpone the scheduled date of a distribution to Holders of Allowed Claims;
5. proposals by the Plan Trustee with respect to initiation, prosecution, and defense of litigation, including but not limited to, claim objections;
6. proposals by the Plan Trustee with respect to disposition and settlement of any claim or litigation; and
7. requests for compensation in excess of budgeted amounts by the Plan Trustee and his/her professionals.

    iv.    The Plan Committee shall have such other powers and responsibilities as set forth in the Plan or the Plan Trust Agreement.

### c.    Payment of Fees and Expenses of the Plan Committee

The members of the Plan Committee will serve without compensation for their performance of services as members of the Plan Committee, except that they will be entitled to reimbursement of reasonable expenses by Plan Trust.

### d.    Indemnification and Limitation of Liability

Neither the Plan Committee, nor any of its members, designees, or professionals, nor any duly designated agent or representative of the Plan Committee, or their respective employees, will be liable for the act or omission of any other member, designee, agent, or representative of the Plan Committee, nor will any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such

member's fraud, willful misconduct or gross negligence. The Plan Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with counsel, accountants and its agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Plan Committee will be under no obligation to consult with counsel, accountants or its agents, and its determination to not do so will not result in the imposition of liability on the Plan Committee, or its members and/or designees, unless such determination is based on willful misconduct or gross negligence. The Plan Trust shall indemnify and hold harmless the Plan Committee and its members, designees, and professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their fraud, willful misconduct or gross negligence, with respect to the Plan Trust or the implementation or administration of the Plan.

### e. Termination of the Plan Committee and/or Plan Committee Members

When the Plan Trust has made all payments provided for in the Plan to the Holders of Allowed Claims and, if applicable, to Holders of Allowed Interests, and all other obligations of the Plan Committee under the Plan have been fulfilled, the duties, powers and responsibilities of the Plan Committee shall terminate forthwith and the Plan Committee shall dissolve.

### 6. Failure or Refusal of Debtor's Pre-Confirmation Management to Cooperate with Plan Implementation

In the event that the Debtor Pre-Confirmation Management fails to cooperate with the CRO to undertake any and all actions and steps necessary to effectuate the implementation of the Plan on or within seven (7) days of the entry of the Confirmation Order, the Plan Trust and Plan Committee contemplated hereunder shall be formed and granted the powers and duties afforded hereunder without further action by the Debtor's Pre-Confirmation Management or further order of the Court.

### 7. Settlement and Compromise of Empire Litigation

On the Effective Date, the Plan Trustee, on behalf of the Plan Trust and Offshore (as the sole shareholder), shall settle and compromise the Empire Litigation such that the Plan Trust shall have an eighty-five percent (85%) working interest in the Empire Lease and Offshore shall have a fifteen (15%) working interest in the Empire Lease. The trial of the rank and priority of the CIT Liens at issue in the Empire Litigation shall be conducted at the hearing of Confirmation of the Plan and the plan is conditioned upon a finding by the Bankruptcy Court that CIT's Liens are valid, first priority liens.

### 8. Dismissal of the Substantive Consolidation Litigation

Subject to confirmation of the Plan, and the consideration afforded to the Committee and the other Holders of Claims and Interests, the Committee will dismiss the Substantive Consolidation Litigation without prejudice.

### 9. Conditions Precedent to Confirmation and Effectiveness of Plan and Waiver and Timing of Same

The Plan will not be confirmed unless and until the Bankruptcy Court enters (a) an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered, and (b) the Confirmation Order has been entered by the Bankruptcy Court. Unless otherwise agreed, or determined by the Bankruptcy Court, the Confirmation Order shall have the provisions and make the findings indicated in the Plan.

The Plan, however, will not be effective and the Effective Date will not have occurred until the events have occurred:

a.     the Confirmation Order shall: (i) have been entered by the Bankruptcy Court and is not subject to any stay; (ii) be in form and substance satisfactory to the Plan Proponents and shall specifically approve the terms of the Plan Trust Agreement and shall authorize and direct the execution thereof by the Debtor and approve the appointment of the Plan Trustee; (iii) provide that the Plan Trustee is authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate any and all contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan, including the execution of the Plan Trust Agreement; and (iv) provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

b.     the Plan Trust Agreement shall be executed;

c.     all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained;

d.     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

The Plan Proponents or Plan Trustee may waive any of the foregoing conditions precedent without leave of or notice to parties in interest or to the Bankruptcy Court and without any hearing. In the event that any or all of the conditions specified hereinabove Plan have not been satisfied or waived by the Plan Proponents or the Plan Trustee on or before sixty (60) days after the Confirmation Order becomes a Final Order, (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, and (c) the Debtor and all Holders of Claims and

Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date.

## 10.     Payment or Satisfaction of Claims in Classes 1, 2, 3 and 4

Payment of Allowed Other Priority Claims, CIT Secured Claims, Oil Well Lien Claims and General Unsecured Claims, and the RLI Insurance Company Claim will be made by the Plan Trustee from available Cash and any additional funds obtained by the Plan Trustee through its efforts in exercising the duties and responsibilities vest in the Plan Trust pursuant to the Plan and the Plan Trust Agreement. It is contemplated that the Plan Trustee, as holder of one hundred percent (100%) of the equity interests in Offshore, shall take steps to distribute the proceeds on deposit in the Empire Escrow in accordance with the terms of the Plan, and that any amounts attributable to Offshore's fifteen percent (15%) interest in the Empire Lease shall be distributed on a *pro rata* basis to the Holders of Allowed Oil Well Lien Claims affecting the Empire Lease, with such amounts to be credited against the Claims, if any, of such Allowed Oil Well Lien Claims against the Debtor's Estate.

## E.     Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code generally gives a debtor the ability, subject to approval of the Bankruptcy Court, to assume or reject Executory Contracts and Unexpired Leases before the confirmation of a plan of reorganization. An Executory Contract or Unexpired Lease may be assumed or rejected either through a plan of reorganization or by order of the Bankruptcy Court on motion, after notice and hearing. Following a debtor's rejection of an Executory Contract or Unexpired Lease, the Bankruptcy Court grants the other party to the contract or lease a limited period in which to file a proof of claim for any damages incurred because of the rejection. To assume an Executory Contract or Unexpired Lease, the Bankruptcy Code requires a debtor to promptly cure existing defaults, with certain limitations, and provide adequate assurance of future performance of its obligations under the Executory Contract or Unexpired Lease.

Under the Plan, on the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, or an Executory Contract or Unexpired Lease set forth on *Exhibit B* to the Plan (to submitted by the Plan Proponents at least ten (10) days prior to the Confirmation Hearing), each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected, pursuant to Section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date.

Pursuant to Section 7.5 of the Plan, all Claims arising from the rejection of an Executory Contract or Unexpired Lease under Section 7.2 of the Plan, if any, shall be evidenced by the filing of a properly executed Proof of Claim form filed with the Bankruptcy Court within the earlier of thirty (30) days of notice of entry of the Confirmation Order approving the rejection of such Executory Contract and Unexpired Lease (the "Bar Date for Rejection Damages"). Failure to file a Proof of Claim on or before such deadline shall result in disallowance in full of any such Claim and the holder

of such Claim shall be forever barred from asserting such Claim against the Debtor or the Plan Trust, and the Plan Trustee and his respective successors and assets and properties. For the avoidance of doubt, the Bar Date for Rejection Damages set forth in Section 7.5 of the Plan is <u>not</u> applicable to any Claim for rejection damages arising out of an Executory Contract or unexpired leases previously rejected in accordance with an order of the Bankruptcy Court.

### F.      Release, Discharge, Injunction, and Exculpation

#### 1.      Release by the Debtor

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Plan Trust, the Plan Trustee and any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, any successor to the Debtor or the Debtor's Estate or any Estate Representative, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever, including for negligence, but excluding for fraud, willful misconduct, intentional tortious acts or gross negligence in connection with or related to the Debtor, the Chapter 11 Case, or the Plan (other than the rights of the Debtor, the Plan Trust or any Estate Representative to enforce the Plan and the contracts, instruments, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtor, the Estate, the Plan Trust, the Plan Trustee or any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, an Estate Representative, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Plan Trust, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, the Plan Trust, the Plan Trustee or any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, an Estate Representative, against (i) any member of the Committee; (ii) any Professionals of the Committee; (iii) CIT and Whitney; (iv) any advisors or professionals retained by CIT or Whitney, and (iv) with respect to each of the above-named Persons, such Persons' principals, employees, agents, affiliates, current and former officers and directors; *provided*, *however*, that nothing in Section 8.2 of the Plan shall be deemed to prohibit the Debtor, Plan Trust or the Plan Trustee from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee that is based upon any alleged breach of fiduciary obligations owed to the Debtor or the Plan Trust.  For the avoidance of doubt, the releases granted by the Debtor in Section 8.2 of the Plan shall not relate to any Claims or Causes of Action specifically reserved by the Debtor pursuant to Article IX of the Plan and described in greater detail in Section III(G)(2) of this Disclosure Statement.

#### 2.      Continuance of Automatic Stay and Injunctions

All injunctions, Liens, or stays provided for in this Chapter 11 Case under Sections 105 or

362 of the Bankruptcy Code, pursuant to Orders of the Bankruptcy Court, or otherwise, and in existence on or immediately before the Confirmation Date will remain in full force and effect until the Effective Date. Thereafter, the injunction provisions of Section 8.4 of the Plan shall take effect.

### 3. Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Persons who have held, hold, or may hold a Claim or other debt or liability of Debtor or Interest or other right of any Debtor partner, or any other Cause of Action arising from or related to the Debtor's Chapter 11 Case, shall be permanently enjoined, on and after the Effective Date, from taking any actions on account of such Claims, debts, liabilities, or Interests or rights, including but not limited to: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest against any of the Debtor, the Plan Trust, or any Professionals employed in the Debtor's case and each of their respective current or former officers, directors, agents, members, partners, shareholders, employees and representatives; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree or order against the Debtor on account of any such Claim or Interest against the Debtor, the Plan Trust, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective current or former officers, directors, agents, members, partners, shareholders, employees and representatives; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest, or the Plan Trust, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective affiliates, current or former officers, directors, agents, members, partners, shareholders employees and representatives; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to or from the Debtor, the Plan Trust, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective affiliates, current or former officers, directors, agents, members, partners, shareholders employees and representatives; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, unless in any matter involving the Debtor, the Plan Trust, or any Professional retained in the Debtor's Chapter 11 Case, the matter is brought only in the Bankruptcy Court. Any person or Person injured by any willful violation of such injunction, including but not limited to filing an action in any other court or forum, shall recover actual damages, including costs and professionals' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator. The Bankruptcy Court also may impose any additional sanctions as may be appropriate under the circumstances, including contempt sanctions.

### 4. Exculpation and Limitation of Liability

**(a)** None of the (i) members of the Committee; (ii) Professional of the Committee; ; (iii) CIT and Whitney; (iv) any advisors or professionals retained by CIT or Whitney, or (v) with respect to each of the above-named Persons, such Persons' principals, employees, agents, affiliates, current and former officers and directors, shall have or incur any liability to any holder of a Claim or an Debtor Interest, or any other party-in-interest, or any of their respective agents, employees, representatives,

advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence, but excluding acts or omissions which are the result of fraud, gross negligence, willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**(b)**     Notwithstanding any other provision of the Plan, no holder of a Claim or a Debtor Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against (i) any member of the Committee; (ii) any Professionals of the Committee; ; (iii) CIT and Whitney; (iv) any advisors or professionals retained by CIT or Whitney, and (v) with respect to each of the above-named Persons, such Persons' principals, employees, agents, affiliates, current and former officers and directors, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence but excluding acts or omissions which are the result of fraud, gross negligence, willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### G.     Other Provisions of the Plan

#### 1.     Transfer of Trust Assets by Debtor to the Plan Trust

Upon the Effective Date, but subsequent to the execution of the Plan Trust Agreement, certain property of the Debtor's Estate shall be transferred and vested in the Plan Trust, free and clear of any and all Claims, Interests, debts, Liens, security Interests, and encumbrances of any kind or type, except those Claims, debts, Liens, security Interests, and encumbrances specifically provided for under the Plan or in the Confirmation Order, including without limitation (i) all funds on deposit in the Empire Escrow, (ii) all of cash or cash equivalents of the Debtor, including any other revenue generated from the production of the Debtor's oil and gas properties prior to the Effective Date, (iii) the entirety of the Debtor's interests in certain oil and gas properties to be identified in a plan supplement to be filed prior to the Confirmation Hearing, (iv) all Causes of Action of the Debtor reserved under the Plan, including without limitation, the Avoidance Claims, the Offshore Claims, the D&O Claims, the El Paso Claims and the Baker Claims, (v) the Debtor's

equity interest in Offshore, (vi) any and all other property held by the Plan Trust, and, (vii) the proceeds, products and offspring of any such property

## 2. Reservation of Claims

Except as otherwise provided in the Plan, all Claims and Causes of Action in favor of the Debtor or Plan, including but not limited to all Claims and Causes of Action under Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, are reserved and are to be transferred to and prosecuted after the Effective Date by the Plan Trust. Causes of Action shall be interpreted to include, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands, actions, defenses, offsets, powers, privileges and licenses whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise.

Pursuant to the Bankruptcy Code, a debtor-in-possession may avoid pre-petition transfers of assets of the debtor as preferential transfers under 11 U.S.C. § 547 or as fraudulent transfers under Sections 544 and 548 of the Bankruptcy Code. Preferential transfers are subject to avoidance only if made within ninety (90) days before the Petition Date, or one year in the case of transfers to "insiders," and fraudulent transfers may be avoided only if made within two (2) years of the Petition Date. To the extent Section 544 of the Bankruptcy Code enables the Debtor to revoke transfers under Louisiana law, generally the "reach back" period is one (1) year from the date the Debtor learned or should have learned of that the transfer increased its insolvency, but never more than three (3) years from the date of the transfer.

The Debtor's Disclosure Statement indicates at page 23 that the Debtor believes that "[b]ecause the Debtor's operations were virtually halted in September, 2008, as a result of the Hurricane damage to offshore pipelines, very few transfers were made during the period immediately prior to the commencement of this bankruptcy case. Further, the transfers were likely ordinary course of business transactions, including payment of rent, wages / amounts due to contractors, insurance premiums, parking, AmEx expenses, withholding taxes, equipment leases."[6] Additionally, the Debtor references an Exhibit 9, which is to be provided at a later date. As of the present time, the Plan Proponents have not evaluated and lack specific knowledge regarding what Avoidance Claims, if any, exist. However, out of an abundance of caution, all claims that could potentially be brought under Sections 544, 547, 548, 550, 551 and 553 of the Bankruptcy Code are hereby specifically reserved. Any party considering whether to vote on the Plan should consult its own billing records to determine what amounts, if any, were received from the Debtor during the ninety (90) days preceding the Petition Date.

Pursuant to Section 546 of the Bankruptcy Code, Claims under Sections 544, 545, 547, 548, 549, and 550, must be commenced no later than two (2) years after the entry of the order for relief, i.e. the Petition Date. Therefore, the Plan Trustee will be required to assert such Claims on or prior to June 15, 2011.

---

6 *See* Debtor's Disclosure Statement, at page 23.

Additionally, the Debtor specifically reserves any and all claims or Causes of Action with regard to the following:

- **The D&O Claims:** shall mean any and all Claims and Causes of Action against any present or former director or officer of the Debtor, along with any and all other Causes of Action or Claims of any kind against any present or former director or officer of the Debtor or any other Person which may be covered under Policy No. DOC 2974663 08 issued by Zurich North America Specialties or Policy No. 555-75-82 issued by National Union Fire Ins. Co. of Pittsburg or any other insurance policies to which the Debtor or its present or former officers or directors may be beneficiaries.

- **The Offshore Claims:** shall mean, without limitation, any and all actions, Causes of Actions or Claims by the Debtor against its wholly-owned subsidiary, including without limitation, claims arising under the Bankruptcy Code, other applicable Federal law or any applicable state law.

- **The El Paso Claims:** As of the Petition Date, Debtor owned a 65.952% working interest in property known as Federal Outer Continental Shelf Oil and Gas Lease 19750, all of East Cameron Block 219. The U.S. Department of the Interior, Minerals Management Service, granted the lease for a primary term, commencing in 1998, and continuing in force after expiration of the primary term so long as the lessee maintains production. Since prior to the Petition Date, East Cameron 219 had one platform facility and one gas well. The gas well on the property was shut-in for the passing of Hurricanes Ike and Gustav which struck the Gulf Coast in September, 2008. Due to required repairs to the third-party pipeline owned by El Paso Corporation and/or El Paso Production Company (collectively sometimes referred to as "El Paso"), the well continued to be shut-in until mid-April, 2009, when El Paso reported the repairs were completed and it was ready to receive the production into the pipeline. The well produced for one day and shut-in due to high pipeline pressure. El Paso insisted the problem was not high pipeline pressure but productivity problems with the well. In or about October, 2009, within days after the lease had expired for non-production, the Debtor discovered that the cause of non-production was the failure of El Paso to realize that a sub-sea valve downstream from the production at East Cameron 219 was closed. El Paso reported to the Debtor that they planned to have a dive boat out to re-open the valve in November, 2009. Debtor and Offshore attempted to have the MMS reinstate the lease on the basis that non-production was due to a force majeure, to no avail. The MMS put the open block up for auction on or about March 17, 2010. Offshore re-purchased the lease at the March 17, 2010 auction, at which time it was required to pay the initial bonus price of $25,500.00, followed by the final bonus price of $137,000.00. In addition, the estimated costs to re-instate the production platform to the new lease with MMS totaled $139,300. During the case, the Debtor, with the authority of the Bankruptcy Court, re-acquired its 65% interest in EC 219. Re-acquisition cost to the Debtor totals approximately $200,000.00, which includes lease costs, and inspection and other costs charged by MMS. The investigation into the claims against El Paso is ongoing, but the Debtor believes that it has a claim for reimbursement of the costs to reacquire its interest in the EC 219 lease from

El Paso.[7]

- **The Baker Claims:**  In the Debtor's Disclosure Statement, the Debtor states that it "is continuing to investigate a potential cause of action against Baker Hughes for negligence and/or breach of contract in connection with the drilling, re-working and/or completion of the Empire well."  Insofar as such claims exist, the Plan Proponents reserve such claims.

### 3.    Objections to Claims

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date, unless extended by order of the Court, objections to Claims shall be filed with the Court.  Under the Plan, the Plan Trustee has full right, power and authority to investigate and if necessary, object to and settle any Claim or objection to any Claim after the Confirmation Date.

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim to the extent it is a contested Claim, unless and until such contested Claim becomes an Allowed Claim.  All Disputed Claims are not entitled to vote with respect to the Plan, unless such Claim is estimated, for voting purposes, by order of the Court.

Distributions due to Holders of Allowed Claims are determined by computing the Distributions required by the Plan as if all disputed Claims are Allowed Claims in the full amount claimed by the Holder thereof.  Distributions for Holders of Disputed Claims shall be reserved and segregated, pending determination of entitlement thereto under the terms of the Plan.  At such time that a Disputed Claim becomes an Allowed Claim, the Distribution reserved for such Claim shall be delivered to the Holder of such Allowed Claim as provided for in the Plan.

The Plan Trustee will withhold from the property to be distributed to Holders of Claims or Interests within a given class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the date on which such Distribution would have been made to the Holder of the Disputed Claim if the Claim was, in fact, an Allowed Claim, and will place such withheld property in the Disputed Claim Reserve; provided, however, that in no event shall the Plan Trustee place in Disputed Claim Reserve amounts for classes of Claims which shall receive no Distribution pursuant to the Plan.  The Debtor will analyze the variances between its records and filed Proof of Claims, and reserve such amounts.

### 4.    Default Under the Plan

Article XI of the Plan provides that the Holder of an Allowed Claim may notify the Plan Trustee in writing of a default under the Plan.  If such a written notice of a default is transmitted to the Plan Trustee, the Plan Trustee, or any party in interest will have thirty (30) days from receipt of the notice to cure the alleged default.  If the alleged default is not cured, the aggrieved party is authorized

---

[7] The summary of the El Paso Claims has been taken by the Plan Proponents from the Debtor's Disclosure Statement, as the Plan Proponents presently lack specific knowledge regarding the exact nature and scope of the alleged claims. For this reason, the Plan Proponents specifically reserve any and all Claims and Causes of Action against El Paso that are not expressly described hereinabove insofar as the Claims and Causes of Action arise out of or in connection with the circumstances described herein.

to seek relief from the Bankruptcy Court. Additionally, in the event that an Entity other than the Plan Trustee acts or fails to act in compliance with the Plan, the Plan Trustee may seek to hold that Entity in contempt of the Confirmation Order and to have appropriate sanctions imposed.

### 5. Modification of the Plan

Pursuant to Article XII of the Plan, the Plan Proponents reserve their rights according to the Bankruptcy Code, to amend or modify the Plan before the Confirmation Date. After the Confirmation Date, the Plan Trustee may, upon order of the Bankruptcy Court, and according to Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

### 6. Revocation of the Plan

The Plan Proponents may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, then it will be deemed null and void.

### 7. Payment of Statutory Fees and Continuing Reporting Obligations

United States Trustee's fees do not require allowance by the Court as both pre-confirmation and post-confirmation fees are payable pursuant to Section 1930 of Title 28 of the United States Code. Such fees will be paid in cash and in full pursuant to the applicable provisions of the Bankruptcy Code and other statutory provisions by the Plan Trustee. Moreover, the Plan Trustee shall continue post-confirmation to comply with all disbursement and other reporting requirements imposed by the Office of the United States Trustee for the period up to the date an order is entered either granting final decree, converting the case to chapter 7 or dismissing the case.

### 8. Payment of Post-Confirmation Fees and Expenses

From and after the Confirmation Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Plan Trustee will pay the reasonable fees and expenses of professional persons thereafter incurred by the Plan Trustee, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan. The payments by the Plan Trustee shall be made from the funds of the Plan Trust.

### 9. Exemption from Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any and all sales or transfers of assets, by the Debtor or the Plan Trust, the creation of any mortgage, deed of trust or other security interest or Lien, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan or any Asset Purchase Agreement, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the sales, transfers, Distributions or transactions contemplated

under the Plan and any agreement to purchase an Asset shall not be subject to any stamp, sales, real estate transfer, mortgage recording, or other similar tax.

**10.     Retention of Jurisdiction**

The Plan provides for the Bankruptcy Court to retain jurisdiction over many aspects of the Plan. The specific purposes for which the Bankruptcy Court retains jurisdiction with respect to the Chapter 11 Case are set forth in Article XIII of the Plan.

## IV.     FINANCIAL INFORMATION

Because the Plan Proponents do not have direct access to the Debtor's books and records, the Plan Proponents aver that the Debtor's present financial information can best be discerned by interested parties by reviewing the Debtor's Schedules and Statement of Financial Affairs, as amended, which contain a schedule of the Debtor's assets and liabilities as of the Petition Date, and the Debtor's monthly operating reports ("MORs") that have been filed with the United States Bankruptcy Court for the Eastern District of Louisiana during the pendency of the Chapter 11 Case and up through November 30, 2010. These documents, as amended, present the most complete picture available to the Plan Proponents of the financial position and operating results of the Debtor for the relevant period before and after the Petition Date. Creditors are advised to review these documents to fully understand the Assets and liabilities of the Debtor.

## V.     MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN FOR THE DEBTOR AND CERTAIN HOLDERS OF CLAIMS

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims and Interests. The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes to the Tax Code or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below. The following summary does not address foreign, state, or local tax consequences of the Plan, nor does it address the United States federal income tax consequences of the Plan to the particular circumstances of any Holder or to Holders subject to any special income tax rules (such as banks, governmental authorities or agencies, pass through entities, brokers and dealers in securities, mutual funds, regulated investment companies, insurance companies, financial institutions, small business investment companies, trusts, estates, and tax-exempt organizations). Furthermore, this summary does not apply to Holders of Claims or Interests that are not United States persons (as such term is defined in the Tax Code).

The United States federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. The Debtor has not requested any ruling from the IRS or an opinion of outside tax counsel with respect to any of the tax aspects of the Plan. Thus, no

assurance can be given as to the interpretation that the IRS will adopt.

Furthermore, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and the Holders of Claims or Interests. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN SHOULD CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH ANY OFFERING FOR SALE OF SECURITIES.

**IRS CIRCULAR 230 DISCLOSURE:** IN COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS AND ALL OTHER INTERESTED PARTIES ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE AND WAS WRITTEN IN CONNECTION WITH AND FOR THE SOLE PURPOSE OF PROMOTION OF THE PLAN.

A.      **Tax Consequences to Certain Holders of Claims.**

Any recovery on a Claim by a Claim holder generally will be treated as payment of the debt underlying the Claim to the extent of either the cash and/or the fair market value of any property received by the holder in respect of the debt Claim. A recovery on a debt Claim that represents a payment of principal on this debt Claim generally is not taxable. However, a recovery of principal may give rise to income or gain to the extent the relevant debt Claim either (x) was not previously included in income, or (y) was the subject of a prior bad debt or worthless debt deduction. A Claim holder may recognize a loss deduction to the extent that the value of its recovery is less than the Claim holder's adjusted tax basis in its Claim as of the Effective Date.

A Claim holder generally will be required to recognize ordinary income on the recovery of its Claim to the extent that the amount of the recovery represents interest (or "original issue discount" ("OID") or "market discount") accrued in respect of the debt Claim. Pursuant to the Plan, distributions received in respect of Claims will be allocated first to the principal amount of such Claims, with any excess allocated to any accrued but unpaid interest (or OID). However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. holders of Claims not previously required to include in their taxable income any accrued but unpaid interest (or market discount) on a Claim may be treated as receiving taxable interest (or market discount)

to the extent the consideration they receive under the Plan is allocable to accrued but unpaid interest (or market discount). Holders previously required to include in their taxable income any accrued but unpaid interest (or OID or market discount) on a Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest (or OID or market discount) is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST, OID OR MARKET DISCOUNT.

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, the nature of the Claim in such holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. A holder's aggregate tax basis for any consideration received under the Plan generally will equal the amount (including the fair market value of any property) received by the holder in satisfaction of its Claim (less any amount allocable to interest or OID as described in the preceding paragraph). The holding period for any consideration received by a holder under the Plan generally will begin on the day following the receipt of such consideration by the holder.

Holders of Claims who recognize capital losses as a result of payment of their Claims under the Plan will be subject to limits on their use of capital losses. For non-corporate Claim holders, capital losses may be used to offset any capital gains (without regard to holding periods). Non-corporate claim holders also may utilize capital losses to offset ordinary income in an amount not to exceed the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains for the relevant taxable year. For corporate Claim holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders of Claims who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Non-corporate holders of Claims may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income (as described above) for an unlimited number of years. Corporate Claim holders generally may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## B. Information Reporting and Backup Withholding

The information reporting requirement may apply to Distributions or other payments or Transfers made pursuant to the Plan. Certain Holders may be subject to the backup withholding, which is essentially an advance payment is made to the IRS that may be refunded to the extent it results in an overpayment of tax. Accordingly, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions unless that Holder falls within an exemption category and, when required to do so, such Holder provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. The Plan Trust will comply with all applicable reporting and withholding requirements of the Tax Code.

## C. The Disputed Claims Reserve

From and after the Effective Date, and until such time as all of the objections to Claims have been resolved by Final Order and Distributions to the Holders of Disputed Claims have been accomplished pursuant to such Final Order, the Plan Trustee shall maintain the Disputed Claims Reserve. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims if and when such Claims are subsequently Allowed and to the Plan Trustee for uses consistent with the terms of the Plan when any Disputed Claims are subsequently disallowed. Such Distributions should be taxable to the recipient in accordance with the principles discussed in the above paragraphs.

## VI.  ALTERNATIVES TO THE PLAN

If the Plan were not confirmed, then the likely outcome would be the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, which would require the immediate appointment of a Chapter 7 bankruptcy trustee to liquidate the remaining assets of the Debtor and to distribute the proceeds of that liquidation. The Plan Proponents believe that the Holders of Claims against the Debtors would recover less in a Chapter 7 Liquidation than they would recover under the proposed Plan.

This conclusion is based upon the information provided by the Debtor in the section of the Debtor's Disclosure Statement entitled "Liquidation Analysis." For purposes of the Plan, the Plan Proponents adopt and incorporate the following "Liquidation Analysis" from the Debtor's Disclosure Statement:[8]

Pursuant to the Debtor's Liquidation Analysis,[9] the Debtor believes that recoveries under a Chapter 7 liquidation scenario would be significantly lower than that proposed by the Plan for a variety of reasons. First, the sale of the Debtor's assets under a compressed timeframe and the distressed nature of a Chapter 7 liquidation

---

8 *See* Debtor's Disclosure Statement at pages 43 45.
9 The Debtor's Liquidation Analysis is attached hereto as ***Exhibit 6***.

will most likely result in lower sale value that the Debtor will receive under the terms of the Plan. These properties have been extensively marketed by management of the Debtor and, at this time, management believes that the resulting reorganization plan provides the best value to the estate. Second, the conversion of the case to Chapter 7 liquidations would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Interests. Third, litigation regarding the priority of claimant relating to the payment of costs to drill and complete the Empire renders the Plan and the avoidance of such litigation the best alternative for all parties concerned.

Accordingly, each holder of a Claim will receive or retain under the Plans a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

A Liquidation Analysis prepared by the Debtor is attached as Exhibit 11 to this Disclosure Statement.[10] The valuations of oil and gas properties are based on the Reserve Report dated March 17, 2010, prepared by James F. Hubbard, Petroleum Engineer, along with the assumptions detailed below:

**EMPIRE:**

1 Well Proved Producing Reserves $70/bl oil and $5 gas PV10 = $22.3M in the Reserve Report based on Virgin Oil with 39.891% NRI. The new NRI based on the Empire Settlement Agreement with the creditors would be 29.891%, or approximately 25% less. Accordingly, $22.3M x 0.75 = $16.7M FNI PV10. Discounted to 40% for one-well field risk = valuation of $6.5M.

**SHIP SHOAL 153:**

2 Wells Proved Producing Reserves $70/bl oil and $5 gas FNI PV10 = $17.1M. The Reserve Report numbers related to this contemplates 205,392 barrels of oil production per year going out 7 years (2011 thru 2017 production years), a daily rate of approximately 570 bopd. The "flat" oil production thru 2017 was based on assumption well would not produce water until 2018. Generally, once well begins producing, water increases quickly and production life ends in 12 to 18 months thereafter. The #A1ST2 well has produced approximately 1.3 million barrels, has a high water cut that is moving up at every test separator gauge of the fluid volume. In recent months, the #4ST2 well has begun prematurely producing a water-cut in the fluid volume, which has steadily increased. Accordingly, operator cut the choke

---

10 *See **Exhibit 6*** to this Disclosure Statement, which is identical to Exhibit 11 to the Debtor's Disclosure Statement.

- 50 -

back on the well to a current 8/64 inch to try to produce as much oil as possible before the water takes over the well. The current oil production rate is approximately 185 bopd, down from earlier levels of approx. 600 bopd water-free for several years (the well began producing water on 3/14/10). Based on the water cut in this well, and the negligible remaining reserves in the A1STR2 well, we modified the valuation for this property by reducing the estimated remaining recoverable reserves in the #4ST2 well to 30% of the $1.643M barrels (gross volume to the 8/8ths) in the Reserve Report. Coupled with a reduction in the gas pricing from $5.00 to $3.75/mmbtu current pricing, means a net of approximately $5.04M FNI PV10.

**EAST CAMERON 2:**

The Reserve Report net recoverable reserves in this proposed well, classified as proved undeveloped, totals 138,000 barrels of oil. Using a market valuation for proved undeveloped at $4.00/boe = $548,000.

**EAST CAMERON 219:**

The $150,000 value reflects a nominal value for this property due to limited remaining reserves in the Reserve Report, but the well continuing to have a 1mmcfgpd capability when we get it hooked up, supported by 3,000 psi on the well-head indicating some remaining gas reserves. The valuation of this property should be adjusted to the amount of the Debtor's claim against El Paso for reimbursement of lease cost, plus costs to comply with MMS requirement prior to re-starting the well, which totals $207,000 ($206,938).

**HIGH ISLAND 200:**

The $125,000 is a leasehold nominal value for this interest in this property which has no estimated or booked reserves.

**WEST CAMERON 78:**

This value of $1.5M is based on estimated net proven gas reserves in the Reserve Report of 1.5 Bcfe, valued at $1.00/mcfe due to a facility and pipeline already in place.

**HIGH ISLAND 199:**

The estimated net proven gas reserves in the Reserve Report totals 5.5 Bcf, and utilizing a value of $.50/mcfe due to lack of infrastructure in place and owned by debtor, this reflects a fair value of $2.75M less an additional $1.5M cost to set a structure following a successful completion of the proposed well, resulting in a

value of approximately $1.25M for this property.

Based upon the Debtor's Liquidation Analysis, which the Plan Proponents are unable to independently verify, the Plan Proponents believe that the facts clearly evidence that the Plan Proponents' proposed Plan is superior to liquidation under Chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Case. The Plan Proponents also believe that the Plan results in a fair balancing of all parties' rights, and again urges all Creditors and Holders of Interests to vote to accept the Plan.

## VII.    **VOTING PROCEDURES**

To be confirmed by the Bankruptcy Court, the Plan must be accepted by each Class of Claims and Interests whose rights are Impaired by the provisions of the Plan. Generally, a Claim that will not be paid in full is considered "Impaired." Under the Bankruptcy Code, a Class of Claims or Interests is deemed to have accepted the Plan if the Plan is accepted by Claimants or Interest Holders in such a Class holding at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests of such Class that in each case have actually voted on the Plan.

### A.    **Ballots and Voting Deadline**

Ballots are to be used for voting on the Plan. Completed Ballots should be sent to:

> **Official Committee of Unsecured Creditors of Virgin Oil Company, Inc.**
> **Attention: Stewart F. Peck**
> **Lugenbuhl, Wheaton, Peck,**
>    **Rankin & Hubbard**
> **601 Poydras Street, Suite 2775**
> **New Orleans, LA 70130**

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M., CENTRAL STANDARD TIME, ON _____ ___, 2011 (THE "BALLOT DATE"). ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR INTEREST THAT DOES NOT SHOW AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.

NOTE: FAXED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE WILL NOT BE COUNTED.

Ballots, attached hereto as **_Exhibit 7_**, have been prepared for Claimants.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT

COUNSEL FOR THE DEBTOR AT THE FOLLOWING ADDRESS AND TELEPHONE NUMBER:

> Mr. Stewart F. Peck
> Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
> 601 Poydras Street, Suite 2775
> New Orleans, LA  70130
> Telephone: (504) 568-1990
> Facsimile:  (504) 310-9195

You may be contacted by representatives of the Plan Proponents with regard to your vote of the Plan. Votes cast by Holder of Claims and Interests will be irrevocable once received by the Debtor, unless the Bankruptcy Court, after application, notice and hearing, permits a change of vote.  If any ballot received by the Debtor is not discernible as to the Class of the Claim or Interest of the name of the Holder thereof, such ballot will be disregarded and not counted.

## B.      Claims and Existing Equity Interests Entitled to Vote

Each Holder of an Allowed Claim in an Impaired class of Claims shall be entitled to vote separately to accept or reject the Plan as provided in such Order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other Order or Orders of the Bankruptcy Court.  Notwithstanding the foregoing, Holders of Debtor Equity Interests Claims in Class 5 are deemed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

## VIII.  CONFIRMATION OF THE PLAN

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor has disclosed specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also imposes requirements that, given an Impaired Class, at least one Class of Impaired Claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims or Interests Impaired under the Plan.  The Bankruptcy Court may confirm the Plan only if it finds that all of the requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met.  The Plan Proponents believe that the requirements for confirmation have been satisfied.

## A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold the Confirmation Hearing upon appropriate notice to all creditors.  Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

By Order of the Bankruptcy Court dated _____ ___, 2011, the Confirmation Hearing has been scheduled for _____ ___, 2011, at __:__ a.m./p.m., at the United States Bankruptcy Court, Eastern District of Louisiana, 500 Poydras St., Courtroom B-709, New Orleans, Louisiana 70130. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice to creditors or parties in interest except an announcement made at the Confirmation Hearing or any adjournment of it. Any objection to confirmation must be written and filed with the Bankruptcy Court with proof of service and served upon the following parties on or before _____ ___, 2011:

> **Stewart F. Peck**
> **Lugenbuhl, Wheaton, Peck**
> **Rankin & Hubbard**
> **601 Poydras Street, Suite 2775**
> **New Orleans, LA 70130**

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan. If the Bankruptcy Court determines that such requirements have been satisfied, an order will be entered confirming the Plan. The requirements of Section 1129 are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and is not by any means forbidden by law.

4. The Debtor and/or the Plan Trust will pay for services or for costs and expenses in, or in connection with or incident to, the Chapter 11 Case or the Plan, and such payments have been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.     The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Plan Trust. The appointment to, or continuance in, such office of such individual is consistent with the Interests of creditors and equity security holders and with public policy, and the Plan Proponents have disclosed the identity of any insider that the Plan Proponents will employ or retain, and the nature of any compensation for such insider.

6.     With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Distribution Date under the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. *See* the Debtor's Liquidation Analysis, attached hereto as ***Exhibit 6***.

7.     Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

8.     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and other Priority Claims will be paid in full on the Distribution Date.

9.     If at least one Impaired Class exists, at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

10.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Plan Proponents believe that the Plan (i) satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) complies with or will comply with all of the requirements of Chapter 11, and (iii) was proposed in good faith. The Plan Proponents further believe that Holders of all Claims and Interests under the Plan may ultimately receive payments under the Plan having present value as of the Distribution Date in amounts not less than the amounts likely to be received by holders of such Claims if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.

## C.     Cramdown

If any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Plan Proponents if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" within the meaning of the Bankruptcy Code. A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its Claims or Interests. "Fair and equitable" has different meanings for secured and unsecured Claims.

With respect to a secured Claim, "fair and equitable" means either (i) the Impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Distribution Date at least equal to the value of such creditor's interest in the property securing its Liens; or (ii) property subject to the Lien of the Impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale, and such Lien proceeds must be treated in accordance with clauses (i) or (iii) herein; or (iii) the Impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan. With respect to an Unsecured Claim, "fair and equitable" means either: (i) each Impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

In the event one or more Classes of Impaired Claims or Interests rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests.

## D.     Feasibility

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11).

The Plan Proponents believe that their proposed Plan is not likely to be followed by the need for liquidation or further reorganization of the Debtor. Specifically, the Plan Proponents' proposed Plan contemplates the transfer of the Plan Trust Assets—which constitute a substantial majority of the assets of the Debtor—to the Plan Trust, which shall be primarily responsible for conducting any operations necessary to liquidate the Plan Trust Assets and to enhance or preserve the value of the Plan Trust Assets consistent with the expeditious and beneficial liquidation of such Plan Trust Assets and the.

The Plan Proponents believe that the Plan proposes a suitable method for such liquidation and Distribution and that Confirmation of the Plan is not likely to be followed by the need for any further financial reorganization. Therefore, the Plan is feasible and satisfies the requirements of Section 1129 of the Bankruptcy Code.

# IX.    <u>CONCLUSION</u>

The Plan Proponents believe that Confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Claims and Interests.  In addition, other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  **THEREFORE, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS AND INTERESTS TO VOTE <u>IN FAVOR OF</u> THE PLAN**

Respectfully submitted this 30th day of December 2010.

LUGENBUHL, WHEATON, PECK,
   RANKIN & HUBBARD

 */s/ Stewart F. Peck*
STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
JOSEPH P. BRIGGETT (#33029)
601 Poydras Street, Suite 2775
New Orleans, LA  70130
Telephone:  (504) 568-1990
*Attorneys for Official Committee of*
*Unsecured Creditors*

AND

PATTON BOGGS, LLP

 */s/ Brent R. McIlwain*
Brent R. McIlwain (TX Bar No. 10951200)
Brian J. Smith (TX Bar No. 24066101)
2000 McKinney, Suite 1700
Dallas, Texas 75201

and

CARVER, DARDEN, KORETZKY, TESSIER,
FINN, BLOSSMAN & AREAUX, LLC
David F. Waguespack (#21121)
1100 Poydras Street, Suite 3100
New Orleans, Louisiana 70163
*Attorney for CIT Capital USA, Inc., as*
*Administrative Agent for CIT Capital USA, Inc. and*
*Whitney National Bank*