# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VIRGIN OIL COMPANY, INC. | * | CASE NO: 09-11899 |
| | * | |
| *Debtor* | * | Section "A" |
| | * | |
| | * | Chapter 11 |

**************************************

# DISCLOSURE STATEMENT AS OF DECEMBER 31, 2010
## FOR PLAN OF REORGANIZATION
## <u>PROPOSED BY VIRGIN OIL COMPANY, INC.</u>

LAW OFFICE OF EMILE L. TURNER, JR., L.L.C.
EMILE L. TURNER, JR. (#12963)
LEO D. CONGENI, *of counsel* (#25626)
424 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-9120
Facsimile: (504) 581-4962

***Attorneys for Virgin Oil Company, Inc.***

# TABLE OF CONTENTS

I.      Introduction..................................................................................................1
II.     Definitions and Construction of Terms………………………………………1
III.    Purpose of Disclosure Statement and Summary of Plan………………......8
IV.     Description of Debtor's Business ..................................................................9
        A.  History and Events Leading to the Bankruptcy Case ...........................9
        B.  Pre-Petition Structure........................................................................11
             i.    Loans................................................................................................11
             ii.   Equity / Ownership .........................................................................11
             iii.  Operations………………………………………………………11
             iv.   Management.....................................................................................12
        C.  Description of Oil and Gas Properties…………………………………13
        D.  Events During Chapter 11 Cases .......................................................15
             i.    Continuation of Business ...............................................................15
             ii.   Motions and Applications to Employ Professionals................15
             iii.  Cash Collateral Orders .................................................................16
             iv.   Schedules and Claims Bar Date.....................................................16
             v.    Trustee Motion...............................................................................17
             vi.   Mediation.......................................................................................17
             vii.  Adversary Proceeding filed by the Committee………………17
             viii. Adversary Proceeding filed by CIT…………………………17
             ix.   Marketing Process ……………………………………………18
        E.  Causes of Action ……………………………………………………18
             i.    D&O Claim……………………………………………………18
             ii.   Claims between Debtor and VOS……………………………18
             iii.  Avoidance Actions……………………………………………20
             iv.   Other Claims…………………………………………………20
V.      Summary of Plan.........................................................................................21
        A.  General Overview .............................................................................21
        B.  Classification and Treatment of Claims and Interests ........................22
        C.  VOS Distributions to Creditors………………………………………27
        D.  New Value Contribution.....................................................................28
        E.  Effect of Confirmation.......................................................................30
        F.  Objections to Claims..........................................................................33
        G.  Obligations relating to P&A and RLI Insurance Company ................34
        H.  Obligations under OCSA, 43 U.S.C. § 1331, *et seq*...........................35
        I.  Obligations relating to P&A of High Island 198…………………….35
        J.  Potential Objection to Plan……………………………………………35
        K.  Unsecured Creditors' Trust……………………………………………36
VI.     Executory Contracts....................................................................................39
        A.  Interest in Oil and Gas Leases ...........................................................39
        B.  Assumption ......................................................................................39
        C.  Cure Payments and Procedures..........................................................40
        D.  Effect of Confirmation......................................................................41

E. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ................................. 41

VII. Confirmation Procedures ........................................................................ 42

A. Voting Procedures .............................................................................. 42

B. Confirmation Hearing ........................................................................ 43

C. Requirements for Confirmation of the Plan ....................................... 43

D. Liquidation Analysis .......................................................................... 45

E. Feasibility .......................................................................................... 47

F. Unfair Discrimination and Fair and Equitable Treatment ................... 49

VIII. Certain Risk Factors to be Considered ..................................................... 50

A. Objection to Classifications ............................................................... 50

B. Risk of Non-Confirmation ................................................................. 50

IX. Tax Consequences .................................................................................... 51

X. Conclusion ................................................................................................ 51

## EXHIBIT LIST

Exhibit 1        Plan of Reorganization

Exhibit 2        Commitment Letters

Exhibit 3        Empire Drilling, Completion and Workover Costs

Exhibit 4        Empire Joint Interest Owner Summary of Payments

Exhibit 5        Equity Holders

Exhibit 6        Decimal Ownership Active Leases with Virgin Offshore Joint Interest Partners

Exhibit 7        Excerpts from Reserve Report dated March 17, 2010

Exhibit 8        Plug and Abandonment Estimated Costs

Exhibit 9        Transfers Prior to Petition Date

Exhibit 10       Empire Payout

Exhibit 11       Liquidation Analysis

Exhibit 12       Projected Revenue and Expenses Scenario 1

Exhibit 13       Projected Revenue and Expenses Scenario 2

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION.  IF THE DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE PLAN.  ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

# I.  INTRODUCTION

On August 26, 2009, the United States Bankruptcy Court for the Eastern District of Louisiana entered an Order converting the involuntary case filed on June 25, 2009 under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code") against Virgin Oil Company, Inc. to Chapter 11 of the Bankruptcy Code.  The Debtor's Plan of Reorganization is attached to this Disclosure Statement as Exhibit 1.  In the event of conflict or difference in definitions and provisions contained in this Disclosure Statement and the Plan, the definitions and provisions in the Plan shall control.

# II.  DEFINITIONS AND CONSTRUCTION OF TERMS

Unless the context requires otherwise, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, the feminine and the neuter.  Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in the initially-capitalized form in the Plan: An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.  The words "in the Plan", "in this Plan", "this Plan", "hereto", "hereof," "herein," or "hereunder" and other words of similar import, unless specifically stated otherwise, refer to the entirety of the Plan, and not to a particular Section of the Plan.  The words "Article," "Section," "subsection," "clause" or "sentence" refer to particular provisions of the Plan and not to the entirety thereof. The word "including" (and with correlative meaning, the word "include") means including, without limiting or restricting the generality of any description preceding the word "including" or "include," and shall mean "including, but not limited to."  The use of the word "any" shall mean "any and all," and the use of the word "all" shall also mean "any and all."  The words "shall" and "will" are used interchangeably and have the same meaning.  Unless the context requires otherwise, the following words and phrases shall have the meanings set forth below when used in initially capitalized form in this Plan:

1.1      *"Administrative Expense Claim"* shall mean a Claim for any cost or expense of administration of the Debtor's Chapter 11 Case entitled to priority in accordance with the provisions of Sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) actual and necessary expenses of preserving the Estate and operating the Debtor's business, (b) fees and expenses of Professionals to the extent allowed by a Final Order under Sections 328, 330 and 503 of the Bankruptcy Code, and (c) fees and charges properly assessed against the Debtor in Possession under Section 1930 of title 28 of the United States Code.   It shall not include the cure costs with respect to executory contracts and unexpired leases assumed by the Debtor pursuant to Section 365 of the Bankruptcy Code.

1.2      *"Allowed"* shall mean with respect to any Claim against or Interest in the Debtor, a Claim or Interest (a) proof of which is timely Filed (or by order of the Bankruptcy Court or as otherwise provided herein is not required to be Filed), (b) that is listed by such Debtor in its Schedules as liquidated in amount, non-disputed and non-contingent and for which no proof of claim has been Filed, or (c) expressly allowed pursuant to this Plan; and, in each case with

respect to (a) and (b) above, either (i) no objection (or an amendment of the Schedules with respect thereto) to its allowance, amount, or classification has been interposed within the applicable period for filing same fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) such objection (or an amendment of the Schedules with respect thereto), if so interposed, has been determined and fixed by a Final Order (but only to the extent so determined and fixed and not where fixed and allowed solely for purposes of voting to accept or reject the Plan). Claims that are not Allowed or are disallowed by Final Order or otherwise, including those disallowed under Section 502(d) of the Bankruptcy Code, shall not be Allowed Claims.

1.3    *"Allowed Amount"* shall mean, with respect to each Claim:

(a)  the dollar amount of an Allowed Claim as determined by a Final Order or as set forth in this Plan;

(b)  in the event that no such determination of the Allowed Amount of a Claim is made pursuant to subsection (a), the dollar amount agreed to by the Claimant and the Debtor or, after the Effective Date, the applicable Reorganized Debtor;

(c)  in the event that no Allowed Amount is determined pursuant to clause (a) or agreed to pursuant to clause (b) above, the amount estimated by a Final Order of the Bankruptcy Court for purposes of distribution pursuant to Section 502 of the Bankruptcy Code; or

(d)  in the event that an Allowed Amount is not determined, agreed to or estimated pursuant to clauses (a), (b) or (c) above, the dollar amount as to which no objection to the allowance, amount or classification thereof has been interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

Unless otherwise specified herein or in a Final Order, the Allowed Amount of any Claim shall not include interest accruing on such Claim from and after the Petition Date.

1.4    *"Allowed Claim"* shall mean a Claim to the extent that it has been Allowed. It shall include the total principal amount of the claim, plus, if applicable, allowed interest, allowed attorney's fees, and any other allowed charges, fees or penalties to the extent allowable under 11 U.S.C. § 506.

1.5    *"Assets"* shall mean all property of the Debtor as defined in Section 541(a) of the Bankruptcy Code, including but not limited to, all of the Debtor's rights, title and interests in and to all state and federal oil and gas leases, immovable and real property and appurtenances thereto, improvements thereon, cash, deposits, telephone numbers, trade names, trade secrets, trademarks, copyrights, business "know how," goodwill, bank accounts of any and all types of any kind, tangible personal property, furniture, fixtures, equipment, machinery, inventory, general intangibles, general accounts, accounts receivable, intellectual property of all types and kinds, contract rights, licenses and permits, contracts and agreements, privileges of any and all kinds, and any and all other property and rights of the Debtor and its estate, including any and all Avoidance Claims and Causes of Action and any and all defenses, which could be exercised by or on behalf of a Chapter 11 trustee or a debtor in possession.

1.6     *"Avoidance Claim"* shall mean all rights, claims, causes of action, avoiding powers, suits and proceedings of or brought by or which may be asserted by a debtor in possession or a person under chapter 5 of the Bankruptcy Code, including by way of illustration and not limitation, under Sections 510, 541, 544, 547, 548, 549, 550, 553 and 554 of the Bankruptcy Code, together with any claims, rights, remedies or demands that may be asserted by a creditor or representative of creditors under similar applicable state or other laws, and claims in the nature of substantive consolidation, successor liability, veil piercing, or alter-ego.

1.7     *"Bankruptcy Code"* shall mean title 11 of the United States Code, as amended from time to time.

1.8     *"Bankruptcy Court"* shall mean the United States Bankruptcy Court for the Eastern District of Louisiana; having jurisdiction over the Chapter 11 Case, or if such court ceases to exercise jurisdiction over the Chapter 11 Case, such other court having jurisdiction under Title 28 of the United States Code over the Chapter 11 Case.

1.9     *"Bankruptcy Rules"* shall mean the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Local Rules of the Bankruptcy Court, in each case as amended from time to time during the Chapter 11 Case.

1.10    *"Business Day"* shall mean any day that is not a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

1.11    *"Cash"* shall mean legal tender of the United States of America, cash equivalents, and readily marketable securities or instruments, including but not limited to, bank deposits, accounts, certified or cashiers checks, timed certificates of deposit issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

1.12    *"Causes of Action"* shall mean, without limitation, any and all of the Debtor's and the Estate's actions, causes of action, rights, suits, claims, accounts, debts, sums of money, damages, judgments, claims and demands, redemption and repurchase of property, actions, defenses, offsets, powers (including all police, regulatory, and enforcement powers and actions that may be taken), privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable, accruing to and in favor of the Debtor or Debtor in Possession pursuant to the Bankruptcy Code or any applicable statute or law or legal theory. For avoidance of doubt, Causes of Action include, but are in no way limited to (a) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (b) claims pursuant to Section 362 of the Bankruptcy Code, (c) such claims and defenses as fraud, mistake, duress, and usury, (d) all Avoidance Claims, and (e) all Causes of Action that are assertable by or may be directly or derivatively asserted by the Debtor, its Estate, the Reorganized Debtor, or a representative of the Estate on behalf of Creditors of the Debtor or the Estate.

1.13    *"Century"* shall mean Century Exploration Company.

1.14    *"Chapter 11 Case"* shall mean the chapter 11 case of the Debtor pending before the Bankruptcy Court.

1.15    *"CIT"* shall mean CIT Capital USA, Inc., including CIT as administrative agent for CIT and Whitney National Bank.

1.16    *"Claim"* shall have the meaning as set forth in the Bankruptcy Code.

1.17    *"Claimant"* or *"Creditor"* shall mean the holder of a Claim, together with any predecessor or successor in interest with respect to such Claim.

1.18    *"Class"* shall mean any group of Claims or Interests classified together by this Plan pursuant to Section 1122 of the Bankruptcy Code.

1.19    *"Collateral"* shall mean property of the bankruptcy Estate which secures a Claim of a Creditor of the Estate.

1.20    *"Confirmation Date"* shall mean the date of entry on the docket of the Bankruptcy Court of the Confirmation Order.

1.21    *"Confirmation Hearing"* shall mean the hearing before the Bankruptcy Court regarding confirmation of this Plan and related matters under Section 1128 of the Bankruptcy Code.

1.22    *"Confirmation Order"* shall mean the order signed by the Bankruptcy Court confirming this Plan.

1.23    *"Convenience Claim"* shall mean: (i) a General Unsecured Claim in an amount less than or equal to $1,000.00; or (ii) a General Unsecured Claim in an amount greater than $1,000 whereby the holder of such Claim agrees to reduce such Claim to $1,000 and accept the treatment provided in this Plan to Convenience Claims; *provided further, however,* that any General Unsecured Claim that is a component of a larger Claim shall not be considered or treated as a Convenience Claim in Class 8.

1.24    *"Cramdown"* shall mean the confirmation of this Plan pursuant to 11 U.S.C. § 1129(b) notwithstanding any rejection by an Impaired Class or Classes of holders of Claims or Interests of this Plan.

1.25    *"Debtor"* shall mean Virgin Oil Company, Inc.

1.26    *"Debtor in Possession or Debtor in Possession"* shall mean the Debtor between the Petition Date and the Effective Date.

1.27    *"Disclosure Statement"* means the Disclosure Statement Filed in connection with the Plan, as modified or amended, approved by the Bankruptcy Court on _____.

1.28    *"Disputed Claim"* shall mean any Claim that is not an Allowed Claim.  In the event that any portion of a Claim is not an Allowed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan until entry of a Final Order fixing and determining the Allowed Amount thereof.  Without limiting any of the foregoing, a Claim that is the subject of or part of a pending objection, motion, complaint, counterclaim, setoff, recoupment, Avoidance Claim, litigation claim or defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed a Disputed Claim, unless the Plan or the Confirmation Order expressly provides otherwise.

1.29    *"Disputed Claims Reserve"* shall mean the reserve established pursuant to Article 7 of the Plan with respect to Disputed Claims.

1.30    *"Distribution Date"* shall mean each date any payment of Cash or distribution of Assets is due to the holders of Allowed Claims or Allowed Interests under this Plan.

1.31    *"D&O Claim"* shall mean claims against Policy No. DOC 2974663 08 issued by Zurich North America Specialties or Policy No. 555-75-82 issued by National Union Fire Ins. Co. of Pittsburg, which policies generally provide primary and excess coverage for claims against the directors and officers of the Debtor.

1.32    *"Effective Date"* shall mean the date which is specified as the "Effective Date" in the Notice of Occurrence of Effective Date filed in the record of the Bankruptcy Case pursuant to Article 11.2 of the Plan.

1.33    *"Empire Lease"* shall mean State of Louisiana Lease for Oil and Gas and Other Liquid or Gaseous Minerals No. 18165, Plaquemines Parish, Louisiana.

1.34    *"Empire Lien Claimant"* shall mean any Entity possessing or having a right to assert a lien claim against the Empire Lease arising under the laws of the State of Louisiana.

1.35    *"Empire Operating Agreement"* shall mean that certain Operating Agreement between Virgin Oil Co., Inc. and Virgin Offshore USA, Inc. governing the exploration, development and operation of the Empire Lease.

1.36    *"Entity"* shall mean an individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code) or any political subdivision thereof, or other person.

1.37    *"Equity Interests"* shall mean, collectively, any and all "equity securities" (as defined in Section 101(16) of the Bankruptcy Code) in a Debtor.

1.38    *"Estate"* shall mean the estate of each Debtor, as defined in Section 541 of the Bankruptcy Code.

1.39    *"File"* or *"Filed"* means properly filed with the clerk of court of the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the clerk of court of the Bankruptcy Court for the Chapter 11 Case.

1.40 *"Final Order"* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (a) which has become final for purposes of 28 U.S.C. § 158 or such analogous law or rule in the case of an order of a state court and (b)(i) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor (or, if after the Effective Date, by the Reorganized Debtor) or, (ii) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, (x) such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed with no modifications thereof, or (y) certiorari, reargument or rehearing has been denied, and (z) the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired with no such further appeal, petition for certiorari or motion for reargument or rehearing having been sought or pending; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 or other analogous rules of state courts governing procedures in cases before other courts may be filed with respect to such order or judgment shall not render such order or judgment not to be a Final Order.

1.41 *"Impaired"* shall mean, with respect to any Class, that such Class is "impaired" under the Plan within the meaning of Section 1124 of the Bankruptcy Code.

1.42 *"Lien"* shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

1.43 *"New Value Contribution"* shall mean $250,000 or such other amount paid by the person(s) whose bid is chosen at the auction of the Equity Interests in the Debtor.

1.44 *"Non-Empire Lien Claimant"* shall mean any Entity other than an Empire Lien Claimant possessing or having a right to assert a lien claim against any Asset in which the Debtor holds an interest.

1.45 *"Petition Date"* shall mean June 25, 2009.

1.46 *"Plan"* shall mean this Chapter 11 Plan of Reorganization in its present form or as it may, from time to time, be modified, amended or supplemented in accordance with the terms hereof, together with any exhibits thereto.

1.47 *"Prime Rate"* shall mean the prime rate, as reported by the Wall Street Journal on the Effective Date.

1.48 *"Priority Tax Claim"* shall mean any Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

1.49 *"Professional"* shall mean any professional (a) retained by the Debtor in the Chapter 11 Case or (b) to be compensated pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code. It shall not include the attorneys or other professionals employed by any Creditor.

1.50    *"Property Tax Claims"* shall mean any obligations that the Debtor has to any government unit or any other person or entity for a tax measured or determined based upon the value of property of the Estate and shall include any Claims in or concerning any property which may have been sold, transferred or forfeited as a result of the failure of the Debtor to pay any property tax liability, including ad valorem property taxes, and which may have been sold by any federal, state or local taxing authority at public or private sale and for which the Debtor has a right to redeem, recover or purchase such property from either the taxing authority or any governmental unit or any trust, individual or entity that may have obtained or purchased such property or in any manner obtained any right or interest in such property.

1.51    *"Reorganized Debtor"* shall mean the Debtor after the Effective Date.

1.52    *"RLI"* shall mean RLI Insurance Company.

1.53    *"Schedules"* shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor as required by Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented through the Confirmation Date.

1.54    *"Secured Claim"* shall mean any Allowed Claim of any Claimant secured by a Lien on the Debtor's interest in any Assets as set forth in the Plan or as determined by the Bankruptcy Court pursuant to Section 506(a) of the Bankruptcy Code.

1.55    *"Ship Shoal Operating Agreement"* shall mean that certain Offshore Operating Agreement dated December 12, 2003 between Century, VOS and Virgin Oil Co., Inc. covering portions of Federal Offshore Oil and Gas Leases, Blocks 150, 153 and 154 of Ship Shoal Area.

1.56    *"Transferred Claims and Causes of Action"* shall mean the claims, Causes of Action, demands, and all other rights and remedies (legal or equitable) of the Debtor and the Estate, for or on behalf of Creditors and/or the Debtor and/or the Estate, including but not limited to any and all claims and/or causes of action that may be asserted derivatively on behalf of the Debtor, the Estate or the Reorganized Debtor by the Estate and/or the Debtor referenced on Exhibit P-1 attached hereto.

1.57    *"Unsecured Creditors' Trust Agreement"* shall mean the Trust Agreement pursuant which the Unsecured Creditors' Trust is established, a copy of which is attached hereto as Exhibit P-2.

1.58    *"Unsecured Creditors' Trust", "UC Trust" or "UCT"* shall mean the trust that shall be created on the Effective Date in accordance with Article 7 of the Plan.

1.59    *"Unsecured Creditors' Trust Trustee" or "UCT Trustee"* shall be _____, subject to Bankruptcy Court approval at the Confirmation Hearing.

1.60    *"Unimpaired"* shall mean, with respect to any Class, that such Class is not Impaired.

1.61    *"Unsecured Claim"* means any Claim that is not an Administrative Claim, Priority Claim, Secured Claim, or a Claim otherwise specifically classified in another class in

this Plan. To the extent a Secured Creditor has a deficiency claim, such claim shall be treated and vote as an Unsecured Claim unless such creditor makes an election pursuant to 1111(b).

1.62 *"VOS"* shall mean Virgin Offshore USA, Inc.


### III. PURPOSE OF DISCLOSURE STATEMENT AND SUMMARY OF PLAN

All persons receiving this Disclosure Statement and the Plan attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached thereto, in addition to reviewing the text of this Disclosure Statement. This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to explain fully the various aspects of the Plan as it affects all Holders of Claims and Interests. However, to the extent any questions arise, the Debtor urges you to seek independent legal advice.

The Plan contemplates the reorganization of the Debtor through the infusion of new capital in the amount of $10 million by Paxton Energy or AESI Holdings, LLC or an alternative plan sponsor who, upon conclusion of an extensive marketing effort by the Debtor with assistance of its financial advisor, submitted a confidential term sheet, subject to conduct of due diligence on the Debtor, in exchange for acquisition of an equity interest in the Reorganized Debtor and/or Reorganized Debtor entering into a credit facility to fund the Plan and future drilling operations and security agreement to secure repayment of funds borrowed, which terms will be negotiated in good faith. The Reorganized Debtor will grant the plan sponsor a lien on all of the assets of the Reorganized Debtor securing repayment of $10 million, along with an additional loan by the plan sponsor in the amount of approximately $21.5 million intended to fund drilling and completion of wells, cover P&A expenses and possibly purchase prospective properties. The funding indebtedness to the plan sponsor shall be evidenced by a note subject to terms to be negotiated in good faith. The equity interests in the Debtor will be sold in exchange for the New Value Contribution, subject to the equity rights obtained by the plan sponsor. Attached as Exhibit 2 are copies of commitment letters to provide the funds necessary to fund the Plan.

The liens in favor of the Debtor's lenders, CIT Capital USA, Inc. ("CIT") and Whitney National Bank ("Whitney"), will be extinguished on the Effective Date by payment of the present value of their liens against the property of the estate, with the remaining deficiency claim, if any, provided for in the class governing general unsecured creditors or, alternatively, if CIT and Whitney elect to have their allowed claims treated as secured under 1111(b) of the Bankruptcy Code, the full allowed amount, and the present value of their liens, will be paid over time from operating revenue of the Reorganized Debtor. The Debtor will cure defaults under and assume its Joint Operating Agreement with Century Exploration Company governing the operation of Federal Offshore Oil and Gas Leases referred to as Blocks 150, 153, 154, Ship Shoal Area and the agreement governing operations of the Louisiana State oil and gas lease referred to as Empire. Creditors, who either billed the Debtor or Virgin Offshore USA, Inc. ("VOS") under any contract or agreement, including without limitation under Master Service

Agreements with VOS, shall be paid their pro rata share, whether as part of the Allowed Empire Lien Claimants group or as an Allowed Unsecured Creditor, as the case may be, of ten (10%) percent production proceeds in the Empire Lease. Existing equity interest holders will contribute new value monies to retain an interest to be determined, subject to the terms to be negotiated with the plan sponsor. The new value contribution and recovery, if any, from insurers issuing certain directors and officers policies shall fund distributions to general unsecured creditors under the Plan. The Debtor shall emerge from bankruptcy as the Reorganized Debtor with the assets of the Debtor revesting in the Reorganized Debtor pursuant to the terms of the Plan, free and clear of any liens, encumbrances or other interests, subject to CIT's right to elect under § 1111(b) to retain its liens.

## IV. DESCRIPTION OF DEBTOR'S BUSINESS

### A. History and Events Leading to the Bankruptcy Case

Debtor was incorporated as a Louisiana "C" corporation on March 8, 1996, for the purpose of developing an exploration and production oil and gas business in China and the United States. Upon securing its first drilling concession in China, Debtor formed Virgin-China, Ltd., a wholly owned Cayman Island subsidiary, in March 1998. Four wells were successfully drilled, and a second concession was acquired during that year. The business was subsequently sold to an investor group from China when management concluded the risks of continuing Chinese operations were outweighed by the rewards of reducing exposure.

In 1999, the Debtor participated in four wells with Hunt Petroleum located offshore, Gulf of Mexico, through a newly-formed entity called Virgin Offshore, LLC. This entity is owned approximately 17% by Debtor, and continues to hold interests in two wells on the block, currently shut-in awaiting pipeline replacement following hurricane-related damages.

On March 23, 2002, following the participation in seventeen wells by the Debtor as a non-operating partner, Debtor formed a wholly-owned subsidiary, Virgin Offshore, U.S.A., Inc. ("VOS"), for the purpose of serving as Operator of properties to be acquired. The Debtor and VOS' business model involved the purchase of oil and gas leases in the name of VOS. Eventually a decision to drill a well was made depending on factors including probability of success, size of the reservoir and pipeline and facilities accessibility. Debtor and Offshore would then raise money from third party investors often on a third for a quarter basis. Typically this meant investors would pay 33% of the drilling costs to earn a 25% interest in the well. In a typical case, the investors would pay 66% of the drilling costs to earn a 50% interest and Virgin Oil would receive a 50% interest and pay only 33% of the drilling costs.

VOS' involvement was necessary to enable transfers to the investors free and clear of liens in favor of CIT or Whitney. The liens were to affect only the Debtor's working interest, not the third party investors or VOS'. The portion not transferred to investors would be transferred to the Debtor and the Debtor's interest would be carried for at least a portion of the drilling costs. The Debtor's lenders have always been aware of this business model and its benefits to the Debtor.

By 2004, the Debtor and VOS had grown their reserve base to 11.0 MMBoe, and operated six facilities through VOS. By year-end 2005, the Debtor and VOS' proved reserve base had grown to approximately 16.0 MMBoe, however, the Debtor's borrowing base of $28 million was fully-leveraged following $17 million of dry hole expense incurred from the drilling of two high-potential wells separately with Chevron and Mariner Energy as partners. The Debtor began "self-marketing" its assets during the first half of 2006, and on June 30, 2006 entered into an agreement with a London-based oil company for an asset sale, projected to close by year-end. However, the buyer proved unable to close, and the agreement was terminated in December 2006.

During the summer of 2007, the Debtor participated in the drilling of a fifty billion cubic foot prospect at High Island Block 198, situated structurally high to a productive Spinnaker Exploration well, and logged 150 feet of gas pay in the well. The well was subsequently completed, for a total well cost of approximately $18 million. The completion proved to be "tight," thus providing a very limited reservoir and in six months the well no longer produced. This and other wells needing investment caused the Debtor to seek additional capital through a larger credit facility. On September 11, 2007, Debtor entered into a $75 million credit agreement with CIT and Whitney, providing an immediate $38 million of available funding to satisfy outstanding obligations.

By mid-2008, the Debtor decided to participate in the drilling of a well on a lease set to expire with proved reserves of approximately 1.0 MMBoe at Empire Field, onshore Plaquemines Parish, Louisiana. At the time the decision was made to raise capital to drill Empire, the Debtor was the owner of an 85% interest in the Empire Lease. The Debtor contends that CIT agreed to release its lien against an approximate 35% interest in the Empire lease to facilitate the Debtor and VOS selling a 50% interest on a promoted basis. The deal provided for a transfer of 50% interest to investors free and clear of CIT's lien in exchange for investors paying drilling costs of the first well based on the AFE in the amount of approximately $2.4 million. Based on the estimated cost to drill the first well, sufficient income would be generated to pay 100% of the costs to drill the first well.

During the testing phase of the Empire well operation in September 2008, Hurricane Ike related issues forced the owners to set a plug and re-drill the well, which caused the Debtor to incur approximately $7 million of expenses owed to vendors. While every hurricane in the past resulted in only a few days of shut-in time on the offshore properties, Hurricane Ike followed the coastline from Louisiana to Texas, causing the destruction of major commercial pipelines which move oil and gas into shore. Repairs took months, and in the Debtor's case production was not re-established on its properties until June 2009. The Debtor's pre-hurricane monthly cash flow had been approximately $4 million, comfortably covering its budget for ongoing obligations and well plans.

Attached as Exhibit 3 is chart reflecting Empire Drilling, Completion and Workover Costs and Exhibit 4 reflects actual payments made by Empire joint owners toward said costs.

In 2008, the Debtor engaged Scotia Waterous (USA) Inc. to assist with marketing its assets. The Debtor entered into serious negotiations for a sale of approximately 75% of assets of

the Debtor and VOS in 2009 for $44 million, but an agreement was never finalized.

The ten month down-time after the Hurricanes in 2008 and inability to close a sale of the Debtor's assets resulted in the Debtor's inability to keep unsecured creditors from pushing the company into bankruptcy. An involuntary Chapter 7 case was filed on June 25, 2009, and eventually converted to Chapter 11 on August 20, 2010.

### B. Pre-Petition Structure

#### i. Loans

The Debtor is a borrower in (i) an asset based revolving loan facility ("First Lien Credit Facility) with CIT as administrative agent, and CIT and Whitney as lenders (collectively "First Lien Lenders"), secured by a first lien on all of the Debtor's right, title, and interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production, and (ii) a term loan facility ("Second Lien Credit Facility") with CIT as administrative agent for the second lien lenders ("Second Lien Lenders") secured by a second lien on the Debtor's interest in oil and gas leases and all personal property directly related thereto, including any production and proceeds of production (the First Lien Facility and the Second Lien Facility are collectively, the "Credit Facility").

CIT contends that as of the Petition Date, pursuant to the First Lien Credit Facility, the Debtor was indebted to the First Lien Lenders in the approximate amount of not less than $17 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "First Lien Debt").

CIT contends that as of the Petition Date, pursuant to the Second Lien Credit Facility, the Debtor was indebted to the Second Lien Lenders in the approximate amount of not less than $18 million, plus accrued unpaid interest, charges and other fees chargeable under the First Lien Credit Facility (the "Second Lien Debt").

#### ii. Equity / Ownership

Attached as Exhibit 5 is a complete list of all equity interest holders by type and class of stock. No corporation or individual owns more than 10% of any class of the Debtor's equity interests.

#### iii. Operations

As of the Petition Date, Debtor employed or had engaged Chief Executive Officer, R. Fulton (Tony) Smith, Chief Financial Officer Joseph Gibbs, Brennan Disher as Operations Manager, Charles Roberts, Petroleum Engineer, General Counsel Denise M. Dorner and two officer assistants. Debtor had and continues to act as agent for VOS, operator of properties in which the Debtor has an interest and not operated by a third party, non-affiliate of the Debtor. All permits and licenses required by the State or Federal Government relating to the oil and gas properties owned and operated by Debtor and VOS are in the name of VOS. Currently the Debtor employs CEO, R. Fulton (Tony) Smith, Controller Keith Pyle, accountant Kraig Stutes, Operations Manager Brennan Disher, Geologist Weider Horizons, two assistants and a receptionist.

### iv. Management

Current management will continue to manage the Reorganized Debtor after its emergence from bankruptcy.

R. Fulton (Tony) Smith, Jr., is the Chairman and Chief Executive Officer of the Debtor. He began his career thirty-five years ago as a contract petroleum landman for Exxon. Later he formed and served as chairman of Alliance, PLC, a London-based production company. Mr. Smith took Alliance public in 1988 on the London Stock Exchange. Mr. Smith founded the Debtor in 1996. He earned a degree in Business Administration in Economics from Loyola University and participated in post-graduate studies in Management at Harvard Business School. He is an active member and past director of the Independent Petroleum Association of American and member of the American Association of Petroleum Landmen.

Prior to the Petition Date, Mr. Smith's monthly salary was $20,715.00. Mr. Smith agreed to a temporary reduction in salary to $15,000.00 per month during the pendency of this case. The Reorganized Debtor shall agree to employ Mr. Smith for an initial two-year term with a monthly gross salary of $20,715.00.

Keith Pyle is the Treasurer of the Debtor. He has over twenty years of experience in the financial side of the oil and gas industry. He began his career at Texaco Exploration as an accountant and later worked at Dominion Exploration as lead production and budgeting analysis. Mr. Pyle graduated from Louisiana State University with a Bachelor of Science degree in Finance.

Mr. Pyle shall continue to be employed by the Reorganized Debtor at his current pay of $6,667.00 per month.

William F. Vollenweider was employed by the Debtor after the Petition Date as a Geologist / Consulting Exploration Manager. He has over fifty years of experience in the oil and gas industry as a petroleum geologist. He is a certified petroleum geologist, Member No. 3826 of the American Association of Petroleum Geologists and a member of the Society of Independent Professional Earth Scientists – No. 2278.

After its emergence from bankruptcy the Reorganized Debtor intends to retain Mr. Vollenweider on a consulting basis.

Brennan Disher is the Operations Manager for the Debtor. He has over thirty-five years of experience in many different areas of the oil and gas industry. He first joined Texaco in 1975 as a petroleum engineer and remained there until 1993, after which time he consulted with a number of oil and gas firms, including Unocal, ChevronTexaco, Helis and Forest Oil.

Mr. Disher is paid $15,000 per month by the Debtor and will be retained by the Reorganized Debtor.

## C. Description of Oil and Gas Properties

Attached as Exhibit "6" is a list of Debtor's decimal ownership interest in oil and gas leases.

In preparing the following descriptions of Debtor's oil and gas properties, the Debtor relied on, among other things, the reserve report dated March 17, 2010 (the "Reserve Report"), prepared by James F. Hubbard, Petroleum Engineer. A copy of the pertinent portions of the Reserve Report are attached hereto as Exhibit "7", including the Mr. Hubbard's summary and evaluation of proved reserves for each property.

Estimates regarding the net investment necessary for each property, lease operating expenses and cost to plug and abandon the properties are managements' estimates based on its experience with similar properties.

### i) Unexpired Leases:

EAST CAMERON 2:

The Debtor owns a 25.014% working interest in a Federal Oil and Gas Lease referred to as OCS G10605, Block 2 of East Cameron ("East Cameron 2"). Potential future net income from new drilling amounts to approximately $8.66 million (classified as "proven" reserves in the Reserve Report). The estimated net investment totals approximately $1.25 million. Net operating expenses during the estimated term of production totals approximately $540,000. Net plugging and abandonment expenses total $625,000, to be paid in 2016, proceeds to be escrowed from production revenues.

EAST CAMERON 219:

The Debtor owns a 65.952% working interest in Federal Oil and Gas Lease referred to as OCS G19750, Block 219, East Cameron ("East Cameron 219"). Potential future net income from new drilling (6500 sd. prospect) amounts to approximately $30 million (classified as "possible" reserves in the Reserve Report). The estimated net investment to cover new drilling expenses totals approximately $4.62 million. Net operating expenses during the estimated term of production totals approximately $3 million. Net plugging and abandonment expenses total $1.98 million, to be paid in 2020, proceeds to be escrowed from production revenues.

EMPIRE:

The Debtor owns a disputed interested in Louisiana State Oil and Gas Lease referred to as SL 18165, Empire Field, Plaquemines Parish Louisiana (referred to as the "Empire Lease"). This currently producing well provides an estimate of potential future net income (classified "proven" reserves in the Reserve Report) of $72.5 million. The estimated net additional investment to cover new drilling expenses totals approximately $386,000. Net operating expenses during the estimated term of production totals approximately $2.62 million. Net plugging and abandonment expenses total $250,000, paid after 2024, proceeds to be escrowed from production revenues.

**HIGH ISLAND 199:**

The Debtor owns an unrecorded 50% working interest in Federal Oil and Gas lease referred to as OCS G30664, Block 199, High Island. Potential future net income from new drilling (assumed drilled from an existing platform facility operated by Mariner Energy), comprises $30 million (classified "proven" reserves in the Reserve Report). The estimated net investment totals approximately $3.5 million. Net operating expenses during the estimated term of production totals approximately $2.76 million. Net plugging and abandonment expenses total $500,000, paid in 2016, proceeds to be escrowed from production revenues.

**SHIP SHOAL 153 / 154:**

Pursuant to a Joint Development Agreement with Century Exploration, the Debtor owns a working interest in Federal Oil and Gas Leases referred to as Block 154, Ship Shoal and Block 153, Ship Shoal. This currently producing property comprising two wells provides an estimate of potential future net income (classified "proven producing" reserves), at a modified 30% of the Reserve Report numbers based on early encroachment of produced water in the reservoir, of $8.57 million. Net operating expenses during the estimated term of production totals approximately $3.71 million. Net plugging and abandonment expense totals $1.13 million, paid in 2013, proceeds escrowed from production revenues. There are two additional prospects to drill comprising future net income of $64.5 million. The estimated net investment totals $6.7 million. Net operating expenses during the estimated term of production totals approximately $4.32 million. Net plugging and abandonment expenses total $1.61 million, paid in 2020, proceeds to be escrowed from production revenues.

**WEST CAMERON 78:**

The Debtor owns a 17.732% working interest in Federal Oil and Gas Lease referred to as OCS G 33043, Block 78, West Cameron ("West Cameron 78"). Potential future net income from re-drilling the prospect from the existing platform totals $8.56 million. The estimated net additional investment to cover drilling expenses totals $1.4 million. Net operating expenses during the estimated term of production totals approximately $510,000. Net plugging and abandonment expenses total $434,000, paid in 2016, proceeds to be escrowed from production revenues. The Debtor previously had an interest in Lease 19702, Block 78, West Cameron – said lease expired and was reacquired in June, 2009.

**HIGH ISLAND 200:**

The Debtor owns an interest in an Federal Oil and Gas Lease referred to as OCS G 330665, Block 200, High Island, which leasehold interest has nominal value - no estimated or booked reserves.

ii)     **Expired Leases:**

Attached as Exhibit "8" is a list of expired oil and gas leases in which the Debtor had an interest, along with an estimate of potential plug and abandonment obligations of the Debtor.

Under applicable non-bankruptcy law and pertinent operating agreements, joint owners of the wells listed on Exhibit "8" will remain responsible for their proportionate share of the plug and abandonment costs.

## D.  Events During Chapter 11 Case

On June 25, 2009, certain petitioning creditors filed an involuntary petition for relief against the Debtor.  An order for relief under Chapter 7 of the Bankruptcy Code was entered on August 20, 2009 and, on August 26, 2009, the Court converted this case to Chapter 11, retroactive to August 20, 2009.  The case was originally assigned to the Honorable Jerry Brown, Bankruptcy Judge, and transferred to the Honorable Elizabeth Magner, Bankruptcy Judge.

### i)      Continuation of Business

Following the Petition Date, the Debtor has continued to operate as debtor-in-possession with the protection of the Bankruptcy Court and the automatic stay pursuant to § 362 of the Bankruptcy Code.  The automatic stay, with limited exceptions, enjoined the commencement or continuation of litigation against the Debtor.

Subject to the supervisory powers of the Bankruptcy Code, operations during the pendency of this Chapter 11 case by the Debtor have included efforts to increase production at Empire.  The Debtor had an acid treatment completed in November, 2009.  The next step taken by the Debtor was installation of a compressor.  The Debtor's efforts resulted in significant enhancement in productivity from the Empire well.  Post-petition, Debtor paid Empire expenses based on a 53% working interest.  Since the Petition Date, net revenue on an 8/8ths basis from the Empire well has been escrowed per order of this Court, subject to payment of expenses to operate the Empire well.  As of July 31, 2010, $2,082,196.93 had been deposited into the Empire Escrow account.

### ii)     Motions and Applications to Employ Professionals

The Debtor filed a number of motions and applications since the Petition Date, including the following:

a.)     Application to Employ the Law Office of Emile L. Turner, Jr., LLC and Leo D. Congeni, *of counsel*, as counsel for the Debtor.  A final order approving the application was entered on September 25, 2009 (P-96).

b.)     Application to employ Geiger, Laborde & Laperouse, L.L.C. as special counsel to represent the Debtor in connection with oil and gas regulatory, ownership, and operatorship matters and ongoing litigation involving the Debtor.  This employment of special counsel was approved per Order

entered October 26, 2009 (P-149).

c.)  Application to employ James F. Hubbard and James F. Hubbard Petroleum Consultant, L.L.C. ("JFH") for the purposes of assisting in evaluating oil and gas properties for sales, acquisitions, financing, accounting documents and expert testimony. The employment of JFH was approved by the Court on March 9, 2010 (P-313).

d.)  Application to employ Weider Horizons Investment Corporation ("WHI") as a geologist for purposes of assisting in investigating additional reserves on the Debtor's properties. The employment of WHI was approved by the Court on March 9, 2010 (P-313).

e.)  Application to employ Global Hunter Securities, LLC ("GHS") as financial advisor and investment banker (P-370). The employment was approved on June 1, 2010.

### iii)  Cash Collateral Orders

Since the Petition Date, the Bankruptcy Court has entered a number of orders relating to the use of cash collateral. An Amended Final Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection Liens was entered on April 5, 2010 (P-336) (the "Cash Collateral Order"). Subsequently, the Bankruptcy Court has entered the following additional orders related to the Cash Collateral Order and the Debtor's right to use cash collateral:

- On May 6, 2010, the Bankruptcy Court entered its Order (P-377) approving the Debtor's request to use cash collateral solely for purposes of reacquiring the Debtor's lost interest in the oil and gas lease located at East Cameron Block 219.
- On June 14, 2010, the Court entered its Order (P-427) extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including August 31, 2010, but expressly denying the Debtor's request to modify the Cash Collateral Order insofar as it related to the Empire Escrow.
- On September 14, 2010, the Court entered its Order (P-507) further extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including October 31, 2010.
- On December 13, 2010, the Court entered its Order (P-556) further extending the Debtor's right to use cash collateral in accordance with the terms of the Cash Collateral Order and the approved budget up through and including January 31, 2011.

### iv)  Schedules and Claims Bar Date

On October 1, 2009, the Debtor filed its Schedules, identifying its assets and liabilities. The Schedules were amended on October 23, 2009 and on February 9, 2010.

On March 12, 2010, the Bankruptcy Court established a Bar Date for filing of proofs of claim as May 3, 2010. (the "Bar Date").

### v) Trustee Motion

On October 20, 2009, CIT filed a Motion to Appoint Chapter 11 Trustee. After extensive discovery, a trial on the Trustee Motion was held on February 10, 2010, at which time the Court ruled orally from the Bench that the Trustee Motion would be denied. On February 17, 2010, an Order and Ruling were entered by the Court, denying the Trustee Motion.

### vi) Mediation

On May 19 – 20, 2010, the Debtor, CIT, Whitney, the Official Committee of Unsecured Creditors and several other interested parties participated in a mediation before former Bankruptcy Judge Gerald Schiff regarding issues relating to the ownership and obligations associated with the Empire Lease, possible reorganization plans and the Official Committee of Unsecured Creditors' Complaint to substantively consolidate the Debtor with its non-debtor subsidiary. At the conclusion of the mediation, after two full days of extensive negotiations led by Judge Schiff, several of the parties, including the Debtor and the Committee, entered into a non-binding Term Sheet that forms the basis of the treatment under the Plan of the Empire Lien Holders and creditors under Master Service Agreements.

### vii) Adversary Proceeding filed by the Committee

On February 15, 2010, the Official Committee of Unsecured Creditors filed a Complaint requesting that the estates of the Debtor and its non-debtor subsidiary, VOS, be substantively consolidated. A status conference on the Complaint filed by the Committee is currently scheduled for October, 18, 2010. The Plan resolves the issues raised in the Complaint.

### viii) Adversary Proceeding filed by CIT

On July 13, 2010, CIT filed an Original Complaint seeking a declaration regarding ownership of the Empire Lease and the validity, priority and extent of liens affecting the Empire Lease. CIT contends that the Debtor should be recognized as the holder of an 85% interest in the Empire Lease and that CIT has a valid and first priority lien against the Debtor's 85% interest.

VOS and the Debtor have filed motions to dismiss CIT's complaint for failure to join indispensible parties. A hearing on the motion is scheduled for October 12, 2010.

For the reasons discussed in paragraph IV(E)(ii) of this Disclosure Statement, the Debtor contends that even should CIT prevail in the adversary proceeding and establish that the Debtor has an 85% interest in the Empire Lease (notwithstanding that CIT has admitted that it had released its lien against 35% of the Empire Lease to permit transfer of 50% free and clear for purposes of raising funds to drill the Empire well), the Plan provides for the fair and equitable treatment of CIT's lien.

CIT recently amended its Original Complaint to add person who have recorded liens against the Empire Lease. The deadline for said new defendants to file responsive pleadings has yet to expire.

### ix) Marketing Process

GHS was engaged with approval of the Court on June 1, 2010. The purpose of the engagement includes, among other things, identifying parties interested in acquiring the Debtor's assets, or in sponsoring a plan of reorganization as well as in financing any such transaction. Since its engagement, GHS has worked closely with management for the Debtor in preparing offering materials and establishing a virtual data room. GHS circulated the offering materials to prospective persons, resulting in inquiries from multiple parties, the execution of confidentiality agreements and various meetings and calls with interested parties. With the assistance of GHS, the Debtor established a deadline for term sheets in mid-September. Debtor considered term sheets and, based thereon, is negotiating with an alternative plan sponsor, subject to said persons completion of due diligence.

### E. Causes of Action

### i) D&O Claims

On November 2, 2009, the Debtor notified National Union Fire Ins. Co. of Pittsburg, Pa. and Zurich American Ins. Co. (insurers providing coverage for claims against directors and officers of the Debtor) of an event, situation and/or circumstance that may give rise to a claim against the directors and officers of the Debtor ("D&O Claims"). The notice was provided based primarily on the allegations made by CIT in its Trustee Motion.

On August 20, 2010, the Committee of Unsecured Creditors demanded that the Debtor authorize it to pursue the D&O Claims due to the inability of the Debtor to litigate the claims because of alleged conflicts of interest between the Debtor and its directors and officers.

The Debtor's investigation into the D&O Claims is ongoing. As of the date of this Disclosure Statement, the Debtor has not discovered any D&O Claims that it intends to pursue. However, the non-binding Term Sheet entered into during the mediation referenced above, which forms the basis of the treatment under the Plan of the Empire Lien Holders and creditors under Master Service Agreements, provides that the Committee may pursue the D&O Claim, although recovery shall be limited to the proceeds of the policy and there shall be no recourse against the officers and directors. The Plan incorporates said agreement memorialized in the Term Sheet. The Committee has indicated that any claims against the officers and directors, personally, must be preserved for the estate, regardless of the mediation Term Sheet.

### ii) Claims between Debtor and VOS

The Plan resolves any and all claims by VOS against the Debtor. VOS contends that the Debtor's failure to participate in the drilling and completion of the Empire well gives rise to a

claim for recoupment of the Debtor's share of said costs, plus non-consent penalties, from proceeds allocable to Debtor's interest in the Empire Lease and that said claim for recoupment has priority over other claims, including CIT's mortgage. VOS contends its treatment is authorized under the Empire Joint Operating Agreement and applicable law. See Grace-Cajun Co. No.3 v. FDIC, 882 F.2d 1008 (5th Cir. 1989). In Grace-Cajun, the United States Court of Appeals for the Fifth Circuit held that a co-owner paying a non-paying co-owner's share of well costs gives rise to "a right of prior claim" to proceeds allocable to the non-paying co-owner's interest until the costs are recouped. The "right of prior claim" takes priority over a person holding security interest in the non-paying co-owner's proceeds of production.

If VOS is correct, its recoupment claim would likely include a right to recover the approximately $7 million in unpaid drilling and completion costs, plus possible penalties under the Operating Agreement of 400% for failure to fund completion costs and 800% for failure to fund costs to sidetrack the Empire well. Even should the Court refuse to enforce the penalties against the Debtor, VOS has a strong argument that it may offset costs of production against revenue attributable to Debtor's interest and Debtor may not share in production until said costs estimated at $7 million are paid in full.

The costs and payments toward Empire drilling and completion are set forth on Exhibits 3 and 4. Based on an audit conducted in-house by the Debtor, unpaid costs associated with drilling, completion and re-working of Empire wells should total approximately $5 million based on payments of approximately $5.4 million by VOS toward joint interest billings covering Empire costs and total costs of approximately $10.4 million. Payments from VOS and/or third party joint owners were deposited into Debtor's normal operating account which, in turn, was used to pay vendors on all properties. In 2008, approximately two – three months of payments in response to Empire joint interest billings totaling in excess of $2 million were applied to cover monthly operating expenses of the Debtor or expenses associated with non-Empire properties. Consequently, unpaid bills associated with Empire total approximately $7 million, rather than $5 million.

The Debtor is settling the claims of VOS by releasing rights to the Empire Escrow, currently valued at approximately $3 million, plus granting VOS a greater net revenue interest in the Empire Lease. The settlement enables the Debtor (and CIT if it makes an 1111(b) election) to receive a revenue stream from the Empire well immediately after the Plan Effective Date without the delay of VOS recoupment of its entire claim, which at minimum likely amounts to $7 million.

Alternatively, based on the admission of CIT that it believed that it released its lien against 35% of the Empire lease, VOS intends to request subordination of CIT's lien.

The Debtor believes the foregoing settlement is reasonable and the best alternative for proposing a confirmable plan and limiting needless expense related to litigation of the Empire issues. To date VOS has paid approximately $5.5 million towards drilling and completion costs and the Debtor has paid $138,840 (post-petition share of work-over procedures). In essence, VOS is agreeing under the Plan to recoup its claim over time, rather than immediately out of the Debtor's share of revenue. Further, it adopts the non-binding agreement between the Debtor,

Empire Lien Claimants and the Committee of Unsecured Creditors that was reached during the mediation held before Judge Schiff. CIT, while a party to the mediation, failed to make an offer attractive to any other party, and, consequently, was not part of the agreement.

### iii) Avoidance Actions

A debtor-in-possession may avoid pre-petition transfers of assets of the debtor as preferential transfers under 11 U.S.C. § 547 or as fraudulent transfers under § 544 and 548 of the Bankruptcy Code. Preferential transfers are subject to avoidance only if made within ninety (90) days before the Petition Date, or one year in the case of transfers to "insiders," and fraudulent transfers may to avoided only if made within two (2) years of the Petition Date. To the extent § 544 of the Bankruptcy Code enables the Debtor to revoke transfers under Louisiana law, generally the "reach back" period is one (1) year from the date the Debtor learned or should have learned of that the transfer increased its insolvency, but never more than three (3) years from the date of the transfer.

Because the Debtor's operations were virtually halted in September, 2008, as a result of the Hurricane damage to offshore pipelines, very few transfers were made during the period immediately prior to the commencement of this bankruptcy case. Further, the transfers were likely ordinary course of business transactions, including payment of rent, wages / amounts due to contractors, insurance premiums, parking, AmEx expenses, withholding taxes, equipment leases.

Attached as Exhibit 9 is a list of Transfers Prior to the Petition Date made by the Debtor.

In addition to the transfers listed on the above referenced exhibit, the Debtor also sold its interest in West Cameron 494 Pipeline on or about May 27, 2009. The Debtor believes the transfer was, among other things, made in exchange for a contemporaneous payment of cash equal to the estimated value of the property.

The Debtor is continuing to investigate potential avoidance actions and reserves the right to supplement this disclosure.

Avoidance actions against holders of General Unsecured Claims will not be pursued by the Debtor under the Plan, but avoidance actions are reserved for defensive purposes.

The Debtor believes treatment of avoidance actions in this manner is proper and necessary, as it will facilitate and rehabilitate post-reorganization relationships with key suppliers, employees and contractors, consistent with the overall purpose of the Plan and agreement reached at the May 19-20 mediation to preserve the Debtor as a going concern and because said treatment is justified because the claims likely have little if any value due to ordinary course of business and subsequent new value defenses of the recipients.

### iv) Other Claims

**Claim against El Paso Corporation (sometimes referred to as the "Claim Against El Paso"):**  As of the Petition Date, Debtor owned a 65.952% working interest in property known as Federal Outer Continental Shelf Oil and Gas Lease 19750, all of Block 219 East Cameron. The U.S. Department of the Interior, Minerals Management Service, granted the lease for a primary term, commencing in 1998, and continuing in force after expiration of the primary term so long as the lessee maintains production.  Since prior to the Petition Date, East Cameron 219 had one platform facility and one gas well.  The gas well on the property was shut-in for the passing of Hurricanes Ike and Gustav which struck the Gulf Coast in September, 2008.  Due to required repairs to the third party pipeline owned by El Paso Corporation and/or El Paso Production Company (collectively sometimes referred to as "El Paso"), the well continued to be shut-in until mid-April, 2009, when El Paso reported the repairs were completed and it was ready to receive the production into the pipeline.  The well produced for one day and shut-in due to high pipeline pressure.  El Paso insisted the problem was not high pipeline pressure but productivity problems with the well.  In or about October, 2009, within days after the lease had expired for non-production, the Debtor discovered that the cause of non-production was the failure of El Paso to realize that a sub-sea valve downstream from the production at East Cameron 219 was closed.  El Paso reported to the Debtor that they planned to have a dive boat out to re-open the valve in November, 2009.  Debtor and VOS attempted to have the MMS reinstate the lease on the basis that non-production was due to a force majeure, to no avail.  The MMS put the open block up for auction on or about March 17, 2010.  VOS re-purchased the lease at the March 17, 2010 auction, at which time it was required to pay the initial bonus price of $25,500.00, followed by the final bonus price of $137,000.00.  In addition, the estimated costs to re-instate the production platform to the new lease with MMS totaled $139,300.  During the case, the Debtor, with the authority of the Bankruptcy Court, re-acquired its 65% interest in EC219.  Re-acquisition cost to the Debtor totals approximately $200,000.00, which includes lease costs, and inspection and other costs charged by MMS.  The investigation into the claims against El Paso is ongoing, but the Debtor believes that it has a claim for reimbursement of the costs to reacquire its interest in the EC 219 lease from El Paso.

**Claim against Baker Hughes:**  The Debtor is continuing to investigate a potential cause of action against Baker Hughes for negligence and/or breach of contract in connection with the drilling, re-working and/or completion of the Empire well.

# V.  SUMMARY OF PLAN

## A.  General Overview

The Debtor believes that the Plan is in the best interests of creditors, will provide maximum return to creditors and enable the Reorganized Debtor to emerge from bankruptcy as a viable entity with the ability to meet its day-to-day obligations, including its obligations under State and Federal law to plug and abandon wells no longer used.

The Plan will recognize the ownership decimals on active leases in which the Debtor and VOS are joint as owners as reflected on Exhibit 6, except that to the extent CIT elects under

1111(b) to have the full amount of its Allowed Claim treated as secured, the Debtor will retain an 85% working interest in the Empire Lease and a 29.891% net revenue interest in the Empire Lease. The Plan also settles all claims relating to the Empire property. Accordingly, the pending adversary proceedings are resolved per the terms of the Plan.

### B. Classification and Treatment of Claims and Interests

Allowed Administrative Expense Claims against the Debtor are unclassified under the Plan. The Debtor presently estimates such Claims as follows:

Professional Fees of Committee Remaining to be Paid = approximately $70,000
Professional Fees of Debtor Counsel Remaining to be Paid = approximately $5,000

Debtor estimates professional fees and expenses through confirmation as follows:

Professional Fees of Committee = approximately $75,000
Professional Fees of Debtor's Counsel = approximately $125,000
U.S. Trustee Fees = approximately $3,900
Professional Fees of Global Hunter = approximately $262,000 - $524,000

Each Allowed Administrative Expense Claim shall be paid in full, in Cash, by the Reorganized Debtor on the Effective Date or upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Reorganized Debtor or otherwise established pursuant to an order of the Bankruptcy Court; provided, however, that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession shall be paid by the applicable Reorganized Debtor in accordance with the terms and conditions of the particular transactions, the applicable non-bankruptcy law, and any agreements relating thereto or any order of the Bankruptcy Court.

The Debtor shall continue to report to the U.S. Trustee by the twentieth (20th) day of each month the total disbursements of the Debtor for the previous month and shall timely pay quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6).

All Professionals, who are seeking compensation or who have been compensated from the estate of the Debtor in Possession during the Chapter 11 Case, or who are seeking compensation from the estate of the Debtor in Possession or from the Reorganized Debtor for services rendered or reimbursement of expenses incurred from the Petition Date through and including the Effective Date, pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code, shall (a) File final applications for allowance of compensation for services and reimbursement of expenses incurred from the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, be paid in full by the Reorganized Debtor or as otherwise provided in this Plan in such amounts as are Allowed by Final Order of the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) when mutually agreed upon by such holder of an Administrative Expense Claim and the Reorganized Debtor.

Administrative Expense Claims must be Filed (except as provided above) no later than thirty (30) days after the Effective Date or any such Administrative Expense Claim is and shall be deemed to be forever barred and unenforceable against the Debtor, Reorganized Debtor, its respective estate, and its Assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

The following is a summary of the treatment of classified Claims under the Plan:

| CLASS | TREATMENT |
|---|---|
| Class 1 Allowed Priority Tax<br><br><br>Estimated Amount:<br><br>$65,000 | Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim, excluding any penalties assessed by such taxing authority, but including applicable interest which at the option of the Reorganized Debtor shall be paid (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Priority Tax Claim and the Reorganized Debtor; or (c) in Cash payments commencing sixty (60) days after the Effective Date, in equal quarterly installments, with an amortization rate calculated on a twenty-five (25) year repayment period, with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code, with the outstanding principal balance, together with all accrued and unpaid interest, being due and payable on August 20, 2014.<br><br>Class 1 is Impaired by the Plan. The holders of Class 1 Claims are entitled to vote to accept or reject the Plan. |
| Class 2 Allowed Property Tax Claims<br><br><br>Estimated Amount:<br><br>Debtor does not believe there are any claims in this class. | Each holder of an Allowed Property Tax Claims shall be paid the Allowed Amount of its Allowed Property Tax Claim, at the option of the Reorganized Debtor: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Claim and the Reorganized Debtor; or (c) in full, in Cash, in four (4) equal quarterly installments, with interest at the applicable legal rate, with the first payment being due sixty (60) days after the Effective Date.<br><br>Provided further, that the Debtor shall be authorized to pay any Claims of any Claimants in this Class in full in order to preserve and protect its rights and interests in such property and in order to redeem, repurchase or reclaim such property in accordance with applicable law prior to the expiration date of any such redemption, reclamation or repurchase period.<br><br>Notwithstanding the foregoing, nothing in this Plan or the treatment provided in this section is intended to discharge or alter the validity, priority, and enforceability of any Liens or security interests afforded to or permitted for Allowed Property Tax Claims under applicable law.<br><br>Class 2 is Impaired by the Plan. The holders of Class 2 Claims are entitled to vote to accept or reject the Plan. |
| Class 3 Secured Claim of CIT | The Class 3 claim of CIT shall receive on the Effective Date the sum of $10,000,000.00 in full satisfaction of any security interests CIT possess in any assets of the Debtor or, to the extent that CIT makes an 1111(b) election, CIT shall receive |

| | |
|---|---|
| Estimated Amount:<br><br>$35 million | quarterly payments such that the value of such payments has a present value of $10,000,000 and the sum of the payments equal the face amount of the CIT Claim on the Petition Date reduced by any payments received by the CIT during the case. In the event CIT makes an 1111(b) election, then CIT shall be allowed to retain its security interests unless such interests are subordinated to the claims of VOS.<br><br>CIT shall not be permitted to share in the 10% production payment out of the Empire Lease or the $1,000,000 payments to creditors by VOS. Class 3 is Impaired by the Plan. The holders of Class 3 Claims are entitled to vote to accept or reject the Plan. |
| Class 4(A) Empire Lien Claimants<br><br><br>Estimated Amount:<br><br>$4.7 million | Class 4(A) Empire Lien Claimants shall be entitled to participate in the VOS settlement described below.<br><br>The Debtor's investigation into the classification of claims as Empire Lien Claims or unsecured is ongoing and, pursuant to Article 9 of the Plan, the right to object to the amount or classification of claims, including classification as an unsecured creditor or Allowed Empire Lien Claim, are reserved.<br><br>Class 4 is Impaired by the Plan. The holders of Class 4 Claims are entitled to vote to accept or reject the Plan. |
| Class 4(B) Non-Empire Lien Claimants | Class 4(B) Non-Empire Lien Claimants shall be entitled to participate in the VOS settlement described below.<br><br>Class 4(b) is Impaired by the Plan. The holders of Class 4 Claims are entitled to vote to accept or reject the Plan. |
| Class 5 Virgin Offshore USA, Inc.<br><br>Estimated Amount:<br><br>$6 million in costs due under Ship Shoal and Empire Operating Agreements, plus penalties and other charges thereunder | VOS in settlement of the default by the Debtor under the Empire Operating Agreement and the Ship Shoal Operating Agreement shall receive the following:<br><br>VOS, in settlement of its claim against the Debtor arising out of the Empire Operating Agreement, shall receive:<br><br>    a) A net revenue interest in the Empire Lease of 35.109%<br><br>    b) All amounts held in escrow by the Court representing the proceeds of production from the Empire Lease.<br><br>    c) To the extent that CIT does not make an 1111(b) election, an ownership interest in the Empire Lease such that the ownership of VOS in the Empire Lease after the transfer equals 46.812%.<br><br>    d) VOS agrees to loan the Reorganized Debtor funds for purposes of paying: i) Allowed Administrative Expenses under the Plan, ii) $650,000 to the Debtor for purposes of obligations to plug and abandon wells on expired leases.<br><br>VOS, in settlement of its claim against the Debtor arising out of the Ship Shoal Operating Agreement, shall receive monthly payments from the Debtor out of the proceeds of production from the Ship Shoal lease such that amount necessary to cure and compensate VOS for the default under the Ship Shoal Operating Agreement shall be paid in 12 monthly installments, the first payment commencing after payment in full of Class 4 Claims.<br><br>Class 5 is Impaired by the Plan. The holders of Class 5 Claims are entitled to vote to |

| | accept or reject the Plan. |
|---|---|
| Class 6 Century Exploration<br><br>Estimated Amount:<br><br>$500,000 | In the event CIT makes an 1111(b) election, Century shall receive monthly payments from the Debtor out of the proceeds of production from the Debtor's oil and gas leases such that the amount of the Century claim is paid in 48 equal monthly installments of approximately $13,500 beginning January 1, 2012.<br><br>In the event CIT does not elect to have its allowed claim treated as secured under § 1111(b), Century shall be paid in full within 60 days of the Effective Date.<br><br>Class 6 is Impaired by the Plan. The holders of Class 6 Claims are entitled to vote to accept or reject the Plan. |
| Class 7 RLI Ins. Co.<br><br>Estimated Amount:<br><br>The Debtor believes joint owners owe approximately $225,000 in premiums and other charges to RLI, however RLI has filed a proof of claim in the amount of $550,000. Debtor reserves the right to object to RLI's Proof of Claim. | RLI Insurance Company ("RLI") has issued bonds (the "Bonds") on behalf of Debtor to cover obligations of Debtor arising from or out of the ownership and operation of its oil and gas properties, and activities related thereto (the "Bonding Program"). The obligations covered by the Bonds include, but are not limited to, royalty obligations, plugging and abandonment obligations and penalties assessed for non-compliance with applicable rules and regulations governing ownership and operation of oil and gas properties. The Bonding Program includes, but is not limited to, bonds issued in regard to oil and gas property on the Outer Continental Shelf ("the Leases"). Under the Bonding Program, bonds were issued to the Minerals Management Service (nka BOEMRE). The approximate principal sum outstanding under the Bonds is $11,025,000.00. The obligations of the Debtor in regard to the Bonds are evidenced by, among other things, the Bonds, various assignments of savings accounts and various indemnity agreements (the "Bond Documents"), or any other documents subsequently entered into between Debtor and RLI.<br><br>Pursuant to the Plan, Debtor will continue to own and operate oil and gas properties, and, as a result, will need to keep the Bonding Program in place. Under the Plan, the Reorganized Debtor assumes the indemnity agreements and assignments of plugging-and-abandonment savings accounts (the "P&A Accounts") between it and RLI and the rights of RLI under the Bond Documents are unimpaired and shall pass through the Debtor's bankruptcy unaffected in any manner and will become the obligations of the Reorganized Debtor. Debtor shall pay to RLI accrued, but unpaid, bond fees in the amount of _____ on the Effective Date of the Plan or under such other payment terms as may be agreed to by RLI. Subsequent bond fees shall be paid by the Reorganized Debtor when due as provided in the Bond Documents, or any other documents subsequently entered into between the Debtor and RLI.<br><br>Upon the Effective Date of the Plan, all proofs of claims filed in Debtor's Chapter 11 bankruptcy case by RLI shall be deemed withdrawn. To the extent any other provision in the Plan or Confirmation Order conflicts with the provisions of this treatment, this treatment shall control unless specifically agreed to otherwise by RLI. In addition, and as further consideration for the agreement between the Debtor and RLI with respect to the Plan, the Debtor will sign and grant RLI a full release of all claims that the estate may have under 11 U.S.C. §§ 547, 548, 550 and 551, with said release to be approved as part of the Plan and incorporated into any order confirming the Plan.<br><br>As further consideration for the agreement between the Debtor and RLI with respect to the Plan, the Debtor recognizes and agrees that the funds in the P&A Accounts are dedicated to, and are to be used solely for, the payment of plugging and abandonment expenses relating to the Debtor's offshore Leases, that the Reorganized Debtor will obtain RLI's written approval of a proposed operation relating to plugging and abandonment on any of the Leases prior to expending any funds in the P&A Accounts, |

| | |
|---|---|
| | and that RLI will be entitled to direct communication and consultation with the provider of any services relating to plugging and abandonment operations on any of the Leases.  The Debtor further agrees that RLI's rights in and to the P&A Accounts shall remain as they were at the date of Debtor's filing of its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, and nothing herein or in the Plan of Reorganization shall be construed to modify, alter, diminish, waive or otherwise affect in any way RLI's rights with regard to the P&A Accounts.<br><br>**Rights of RLI Insurance Company (RLI) under, pursuant to and in accordance with the Performance Bonds.**     All obligations of all parties to RLI under the bond, indemnity agreement and related documents will be assumed by the Reorganized Debtor.   RLI's rights under these documents will pass through the bankruptcy unimpaired.  There will be no release of any guarantors, indemnitors or other parties liable to RLI under the terms of the Bond Documents or otherwise.  The Reorganized Debtor will fully cooperate with RLI in the exercise of RLI's rights against parties other than the Reorganized Debtor pursuant to the Bond Documents or otherwise, in regard to the payment of plugging and abandonment expenses relating to the Debtor's offshore Leases and the discharge of the Bonds pursuant to their terms and conditions.<br><br><br>Class 7 is Impaired by the Plan.  The holders of Class 7 Claims are entitled to vote to accept or reject the Plan. |
| Class      8      General Unsecured<br><br>Estimated Amount:<br><br>$8,000,000 | Each holder of an Allowed Class 8 Unsecured Claim will receive its pro-rata share of the sum of the New Value Contribution and the proceeds of the D&O Claim and the Transferred Claims and Causes of Action less any amounts paid to the holders of Allowed Administrative Claims and the Class 8 creditors. To the extent an entity elects to purchase the Equity Interests of the Debtor for an amount in excess of the New Value Contribution the amount paid to the Class 8 creditors shall be increased.<br><br>Proceeds from the D&O Claims, if any, shall be distributed as follows:  a) thirty percent (30%) to valid and allowed Empire lien claimants; and b) seventy percent (70%) to allowed unsecured claimants, including non-Empire lien claimants' deficiency claims and CIT deficiency claims.<br><br>Class 8 is Impaired by the Plan. The holders of Class 8 Claims are entitled to vote to accept or reject the Plan. |
| Class      9      Convenience Claims<br><br>Estimated Amount:<br><br>$5,500 | Each holder of an Allowed Convenience Claim will be paid Cash equal to one hundred (100%) of the Allowed Amount of such holder's Convenience Claim on the later of: (a) the Effective Date, or (b) the date such Convenience Claim becomes an Allowed Claim.   Provided that all Creditors shall have the option to notify the Debtor of its election to reduce its claim to $1,000.00 and be treated as holder of an Allowed Convenience Claim, within forty five (45) days of the Effective Date.<br><br>Class 9 is impaired by the Plan. The holders of Class 9 Claims are entitled to vote to accept or reject the Plan. |
| Class 10 Equity Interests | The holder of the Interests in the Debtor who pay a portion of the New Value Contribution shall retain an Interest in the Debtor in exchange for the payment of the New Value Contribution.   Any holder of an Interest in the Debtor who does not contribute to the New Value Contribution shall have his or her Interest in the Debtor cancelled and terminated as of the Effective Date.  The holder of Equity Interests shall not receive any dividends, loans or other distributions other than tax distributions |

| | based upon the ownership of Equity Interest in the Debtor until all Allowed Claims have been satisfied in full.  Provided further that if there are any adverse tax consequences resulting from the "pass through" tax attributes of Debtor under federal tax laws, then the Debtor shall reimburse the Equity Interest holders to the extent of any such tax liability resulting from the Equity Interest upon the filing of a tax return.<br><br>Class 10 is impaired by the Plan.  The Holders of Class 10 Equity Interests are entitled to vote on the Plan. |
|---|---|
| Class 11(A) Empire Lien Claimants Deficiency Claims<br><br>Estimated Amount:<br><br>$0 | Each holder of an Allowed Class 11(A) Unsecured Claim shall share pro rata with the Class 8 creditors.<br><br>Class 11(A) is impaired by the Plan. The holders of Class 11(A) Claims are entitled to vote to accept or reject the Plan. |
| Class 11(B) Non-Empire Lien Claimants Deficiency Claims<br><br>Estimated Amount: | Each holder of an Allowed Class 11(B) Unsecured Claim shall share pro rata with the Class 8 creditors.<br><br>Class 11(B) is impaired by the Plan. The holders of Class 11(B) Claims are entitled to vote to accept or reject the Plan. |
| Class 12 CIT Deficiency Claims<br><br>Estimated Amount:<br><br>$25,000,000 | Each holder of an Allowed Class 12 Unsecured Claim shall share pro rata with the Class 8 creditors.<br><br>CIT shall not be permitted to share in the 10% production payment out of the Empire Lease or the $1,000,000 payments to creditors by VOS.<br><br>Class 12 is impaired by the Plan. The holders of Class 12 Claims are entitled to vote to accept or reject the Plan. |

## C.  VOS Distributions to Creditors

VOS, to satisfy any liability of the Debtor, and to apply against any liability VOS may have to entities who either billed VOS or the Debtor under any agreement or contract, including without limitation a Master Service Agreement, with VOS on its own behalf or as agent for the Debtor, shall pay to such creditors (the "Settling Creditors"), within ten (10) days of receipt by VOS, their pro rata share (based on the allowed amount of their claims) of a ten (10%) production payment in the Empire Lease in perpetuity for application against such claims and against any lien of such Settling Creditors on the Empire Lease.  Settling Creditors shall also receive each Settling Creditors' respective share (based on the allowed amount of their claims) of $1,000,000 (sometimes referred to as the "Cash Payment") payable by VOS within thirty (30) days of the Effective Date.

Election to be treated as a Settling Creditor shall effect a release of each Settling Creditors' Claim against VOS and the lien of such entities on the Empire Lease.  Settling Creditors, however, are not required to opt in or out of Class 8 to receive the Cash Payment or

share of the 10% production payments. Cash Payment or its share of the 10% production payment received by a Settling Creditor shall be applied to reduce said creditors' Claim against the Debtor.

With respect to the 10% production payment and the $1,000,000 Cash Payment, distributions amongst the Settling Creditors shall be 65% to Allowed Empire Lien Claimants holding a valid lien, shared therein on a pro rata basis, and 35% to holders of allowed unsecured claims, shared therein on a pro rata basis, until such time as all Allowed Empire Lien Claims are paid in full. Upon payment in full to the Allowed Empire Lien Claimants, holders of allowed unsecured claims shall receive their respective pro rata share of 100% of the 10% production payment until paid in full. Thereafter, Allowed Empire Lien Claimants and unsecured claims shall receive their pro rata share, based on the gross amount of each creditor's Allowed Claim, of the 10% production payment in perpetuity. With respect to the Cash Payment, holders of Allowed Empire Liens shall receive their respective share of 65% and holders of unsecured claims shall receive their respective pro rata share of 35%.

To the extent an entity does not participate in the settlement, the production payment and $1,000,000 payment shall be reduced by that entity's pro rata interest.

The 10% production payment in the Empire Lease shall be calculated on an 8/8th's basis, net of royalties and taxes.

Attached as Exhibit 10 is VOS estimate of each Settling Creditor's proportionate share of the $1,000,000 Cash Payment and 10% production payment in the Empire Lease through payment in full of Empire Lien Claimants and thereafter. Exhibit 10 also reflects each creditor's status as unsecured or lien creditor for purposes of the settlement payments.

### D. New Value Contribution

The equity in the Debtor will be sold at an auction. The initial bid shall be $250,000 cash. Only those equity holders in the Debtor who contribute a portion of the cash bid shall receive an equity interest in the Reorganized Debtor. Any equity interest holder in the Debtor who does not contribute to the purchase price will have his or her interest in the Debtor cancelled and terminated as of the Effective Date.

An interested party that meets the requirements set forth below shall be referred to as a "Qualified Bidder".

At the Confirmation Hearing, pursuant to the confirmation of the Debtor's Plan, the Debtor will seek authority to consummate the sale to the winning bidder. To be a Qualified Bidder, an interested party must, no later than 4 pm Central Time 5 days before the Confirmation Hearing (the "Bid Deadline"):

       (*i*)        submit a bid for the Equity Interests;

(ii)    at the submission of the bid, provide an initial cash deposit of $25,000.00 per bid to be held by the Debtor in escrow in a segregated account (the "<u>Deposit</u>");

(*iii*)    agree to provide, if successful at the Auction (hereafter defined), a cash deposit of ten (10%) percent of the purchase price for each winning bid;

(i*v*)    submit an executed offer to purchase the Equity Interests in the Reorganized Debtor upon confirmation of the Plan. The offer cannot be conditioned upon the outcome of any unperformed due diligence on the part of the potential bidder;

(*v*)    submit proof of the present and existing financial ability to close the sale upon the Effective Date of the Debtor's Plan, including, without limitation: (a) proof that such financial ability to close the sale is without any financing contingencies; and (b) current audited financial statements of the potential bidder (or the equity holder(s) of the potential bidder if the potential bidder was formed for the purpose of acquiring the assets), and other such form of financial disclosure acceptable to the Debtor; and

(*vi*)    submit the bid in writing, including verification that the requirements to this paragraph have been satisfied, to counsel for the Debtor at <u>leocongeni@bellsouth.net</u>.

The Debtor and the Official Committee of Unsecured Creditors shall have the right in their sole discretion to determine if a prospective bidder meets the criteria to be deemed a Qualified Bidder, subject to further order from the Court.

If Qualifying Bids are submitted, the Debtor will conduct an auction among any Qualified Bidders on a date and at a time established in the bidding procedures order at United States Bankruptcy Court, 500 Poydras Street, New Orleans, Louisiana 70130 (the "Auction"), which shall commence no earlier than 5 days before the hearing on Plan Confirmation. Each incremental bid must exceed the prior best Qualifying Bid by a cash amount of $25,000.00 and in increments of $25,000.00. Only Qualifying Bidders will be eligible to participate at the Auction as bidders. The Debtor and the Official Committee of Unsecured Creditors may adopt other rules for bidding at the Auction that, in its business judgment, will promote the goals of the bidding process and that are not inconsistent with any of the provisions of these Bid Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith.

The Qualifying Bidder presenting the most favorable offer or offers as determined at the Auction by the Debtor and the Unsecured Creditors' Committee (the "Winning Bidder") must, to remain the Winning Bidder, deposit cash in the amount of ten (10%) percent of the purchase price, at the conclusion of the Auction, to be held by the Debtor in a segregated account, and agrees to close upon the Effective Date of the Debtor's Plan. The Winning Bidder's deposit, along with the Winning Bidder's Deposit placed at the conclusion of the Auction, shall be non-

refundable and forfeited to the Debtor if the Winning Bidder fails to close the sale due to the Winning Bidder's default.

Any bidder other than the Backup Bidder who was not approved by the Bankruptcy Court as the Winning Bidder through a final order approving the Plan shall obtain a full refund of its respective Deposit and any other funds placed in escrow within 5 business days after the final hearing on the Plan. A Backup Bidder who does not close because the Winning Bidder closes the transaction shall obtain a full refund of its respective Deposit and any other funds placed in escrow within 5 business days of the sale to the Winning Bidder.

The final hearing (the "Sale Hearing") will occur on a date and at a time established when the Court schedules the confirmation hearing in the Courtroom of The Honorable Elizabeth Magner, U.S. Bankruptcy Judge, Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana 70130.

Upon the approval of the Debtor's Disclosure Statement the Debtor shall serve via overnight delivery and/or email the Bid Procedures to potential bidders.


### E.  Effect of Confirmation

**Vesting of Assets and Retained Causes of Action:**  Except as otherwise provided herein (see Article V(J), Unsecured Creditors' Trust, *infra*), on the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all Assets of the Debtor in Possession and its respective Estate shall vest in the Reorganized Debtor free and clear of any and all Claims, Liens, Interests, and other interests, charges and encumbrances, except as otherwise expressly provided in this Plan or in the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and may own, use, acquire and dispose of Assets free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if the Chapter 11 Case had never been filed.  The Debtor will not pursue any Avoidance Claims for affirmative recoveries or assert Avoidance Claims against the holders of General Unsecured Claims with respect to such General Unsecured Claims, but reserve all such Avoidance Claims for defensive purposes and may assert Avoidance Claims as defenses against other Claims filed against the Debtor.

Except as otherwise specifically provided in the Plan, the Reorganized Debtor shall retain all rights and is authorized to commence and pursue, as the Reorganized Debtor deems appropriate, any and all claims and Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, and including, but not limited to, the claims and Causes of Action specified in the Plan.  Due to the size and scope of the Debtor's business operations and the multitude of business transactions therein, there may be other claims and Causes of Action that currently exist or may subsequently arise, all of which other claims and Causes of Action shall revest in the Reorganized Debtor.  The Reorganized Debtor does not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued by the Debtor, that any such claims or Causes or Action have been waived or will not be pursued.  Under the Plan, the Reorganized Debtor retains all rights to pursue any and all claims

and Causes of Action to the extent the Reorganized Debtor deem appropriate (under any theory of law or equity, including, without limitation, the Bankruptcy Code and any applicable local, state, or federal law, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case) except as otherwise specifically provided in the Plan.

**Binding Effect:**  The provisions of the Plan shall bind any holder of a Claim against or an Interest in the Debtor and such holder's successors and assigns, whether or not such holder's Claim or Interest is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**Discharge of the Debtor:**  Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the treatment of the Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Interests in the Debtor, the Debtor in Possession, the Reorganized Debtor or the Assets, properties, or property of the Debtor, the Debtor in Possession or the Reorganized Debtor of any nature whatsoever, including any interest accrued on any Claim from and after the Petition Date. Except as expressly otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, all Claims arising before the Effective Date (including those arising under Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code) against the Debtor and the Debtor in Possession (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor, or any conduct for which the Debtor may be deemed to have strict liability under any applicable law), and all Interests shall be irrevocably satisfied, discharged, cancelled and released in full.

For the avoidance of doubt, the Reorganized Debtor shall be responsible only for (a) those payments and Distributions expressly provided for or due under this Plan and (b) Claims and Interests that are not canceled and discharged pursuant to specific and express provisions of this Plan, and then only to the extent and in the manner specifically and expressly provided in this Plan.  All Entities are precluded and forever barred from asserting against the Debtor, the Debtor in Possession or the Reorganized Debtor, or the Assets, properties, or property of the Debtor, the Debtor in Possession or the Reorganized Debtor of any nature whatsoever any Claims or Interests based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date, except for (a) those payments and distributions expressly due under this Plan and (b) Claims and Interests, if any, that are not canceled and discharged under the Plan, but instead survive pursuant to specific and express provisions of the Plan, and then only to the extent and in manner specifically and expressly provided in the Plan.

**Indemnification Obligations:**  The obligations of the Debtor to indemnify, reimburse or limit liability of any person who is serving or has served as one of its directors, officers, employees or agents by reason of such person's prior or current service in such capacity as provided in the applicable articles of organization, operating agreements, partnership agreements, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtor, shall be deemed to be and treated as executory contracts that are assumed by the Debtor and assigned to the Reorganized Debtor pursuant to the Plan and section 365 of the

Bankruptcy Code and shall not be affected by or discharged by this Plan. Nothing in the Plan shall be deemed to affect any rights of any director or officer or any other person against any insurer with respect to any directors or officers liability insurance policies.

**Exculpation:** Under the Plan, neither the Debtor, Reorganized Debtor, Official Committee of Unsecured Creditors, UCT Trustee or any of their respective employees, officers, directors, agents, representatives, professional persons or attorneys shall have or incur any liability to any person and are hereby released from any such liability or any claims or causes of action related thereto for any act taken or omission made in connection with, relating to, or arising out of the: i) the Chapter 11 Case; ii) negotiation, formulation and filing of Plans or other documents relating thereto; iii) formulation, preparation, dissemination or approval of the Disclosure Statement or any financial information or projections included therein or solicitation of votes on or funds for the Plan, iv) confirmation of the Plan and consummation and administration of the Plan and any property to be distributed pursuant to the Plan.

**Term of Certain Injunctions.** Unless otherwise provided in the Plan or in the Confirmation Order, all of the injunctions and/or stays provided for in, or in connection with, the Chapter 11 Case, whether pursuant to Section 105, Section 362, or any other provision of the Bankruptcy Code or other applicable law, in existence on the Confirmation Date, shall remain in full force and effect through the Effective Date and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

**No Successor Liability:** Under the Plan, neither the Debtor nor the Reorganized Debtor will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtor or the Debtor's past or present subsidiaries relating to or arising out of the operations of or Assets of the Debtor or the Debtor's past or present subsidiaries, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. The Reorganized Debtor shall have no successor or transferee liability of any kind or character, for any Claims; provided, however, that the Reorganized Debtor shall have the obligations for the payments specifically and expressly provided, and solely in the manner stated, in the Plan.

**Preservation of Causes of Action:** Unless a claim or Cause of Action against a Creditor or other Entity is expressly and specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Reorganized Debtor expressly reserves such claim or Cause of Action for adjudication or pursuit by the Reorganized Debtor after the Effective Date, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or otherwise. The Reorganized Debtor expressly reserves the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtor or the Debtor in Possession, as trustees for or on behalf of the Creditors, not specifically and expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order against any Entity,

including, without limitation, the plaintiffs or codefendants in any lawsuits. The Reorganized Debtor shall be a representative of the Estate appointed for the purposes of pursuing any and all such claims and Causes of Action under 11 U.S.C. § 1123(b)(3)(B).

Any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may, to the extent not theretofore specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Entity has filed a proof of claim against the Debtor in the Chapter 11 Case, (b) such Entity's proof of claim has been objected to, (c) such Entity's Claim was included in the Debtor's Schedules, or (d) such Entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as disputed, contingent, or unliquidated.


## F. Objections to Claims

The Debtor and, after the Effective Date, the Reorganized Debtor or the UCT Trustee, shall have the exclusive right to object to the allowance, amount or classification of Claims and Interests asserted in the Chapter 11 Case, and such objections may be litigated to Final Order by the Debtor or Reorganized Debtor, as applicable, or compromised and settled in accordance with the business judgment of the Debtor or Reorganized Debtor or the UCT Trustee, as applicable, without further order of the Bankruptcy Court. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims and Interests shall be Filed no later than one hundred and twenty (120) days after the Effective Date, subject to any extensions granted pursuant to further order of the Bankruptcy Court, which extensions may be obtained by the Reorganized Debtor or the UCT Trustee without notice upon ex parte motion.

The Debtor and, after the Effective Date, the Reorganized Debtor or the UCT Trustee may at any time request that the Bankruptcy Court estimate for all purposes, including distribution under this Plan and including payments to the Disputed Claims Reserve account, any Disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code whether or not the Debtor or the Reorganized Debtor or the UCT Trustee has previously objected to such Claim or Interest. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

Notwithstanding anything else contained in the Plan, except with respect to any undisputed, non-contingent and liquidated portion of General Unsecured Claims, no distribution shall be due or made with respect to all or any portion of any Disputed, contingent, or unliquidated Claim until the Claim becomes an Allowed Claim by Final Order. The Reorganized Debtor or the UCT Trustee shall set aside or reserve a portion of the consideration

payable to the holders of Allowed Claims and Allowed Interests in a particular Class to be held in the Disputed Claims Reserve for such Class in an amount sufficient to pay to the holders of all Disputed Claims in such Class the full distributions they may be entitled to if its respective Claims and Interests were ultimately to be allowed in full by Final Order.

### G. Obligations relating to P&A and RLI Insurance Company

Prior to the filing of this bankruptcy case, RLI Insurance Company ("RLI") issued (or caused to be issued) bonds (the "Bonds") on behalf of Virgin Offshore USA, Inc., which is a wholly owned subsidiary of Debtor (the "Debtor"). The Bonds were issued under a bonding program (the "Bonding Program"). The Bonds are necessary and appropriate for the ownership and operation of the Debtor's oil and gas properties.

The obligations of the Debtor in regard to the Bonds are evidenced by, among other things, (i) the Bonds, (ii) various indemnity agreements ( as may have been amended from time to time) between, among others, RLI and the Debtor (the "Indemnity Agreements"), (iii) various assignments of plugging-and-abandonment savings accounts (the "P&A Accounts") dedicated solely to the payment of plugging and abandonment expenses for the Debtor's offshore Leases (as may have been amended from time to time) (the "Assignments") and (iv) by other documents entered into in connection with (i) through (iii) (collectively, the "Bond Documents"). Debtor is liable to RLI for obligations arising under or in connection with the Bond Documents.

The Debtor has determined that the Bonds need to be kept in effect in order for the Properties to be operated. RLI has agreed to keep the Bonds in place subject to the following terms and conditions:

a. The Debtor will assume all of the Bond Documents with the rights of RLI under the Bond Documents being unimpaired and passing through the Debtor's bankruptcy case unaffected in any manner. As a result, obligations of the Debtor arising from, or in any manner related to, the Bonds shall become the obligation of the Reorganized Debtor and nothing in the Plan shall affect the liability of the Reorganized Debtor, or any other co-obligor, for such obligations.

b. On the Effective Date, RLI shall be paid premiums owed on the Bond in the approximate amount of $_____ (plus any other premiums that may become due and owing between the date hereof and the Effective Date).

c. The Debtor will grant RLI, as additional consideration for the continuation of the Bonds, a full release of any and all claims of the estate against RLI under 11 U.S.C. §§ 547, 548, 550 and 551.

d. The funds in the P&A Accounts assigned to RLI pursuant to the Assignments are dedicated to, and are to be used solely for, the payment of plugging and abandonment expenses relating to the Debtor's offshore Leases, that the Reorganized Debtor will obtain RLI's written approval of a proposed operation relating to plugging and abandonment on any of the Leases prior to expending any funds in the P&A Accounts, and that RLI will be entitled to direct communication and consultation with the

provider of any services relating to plugging and abandonment operations on any of the Leases.

        e.     RLI's rights in and to the P&A Accounts shall remain as they were at filing of these proceedings, and nothing herein or in the Plan of Reorganization shall be construed to modify, alter, diminish, waive or otherwise affect in any way RLI's rights with regard to the P&A Accounts.

### H. Obligations under OCSA, 43 U.S.C. § 1331, *et seq.*

Notwithstanding any provision in the Plan to the contrary, including the vesting of all Assets in the Debtor free and clear of all liens of any kind, the Debtor's obligations which arise under the Outer Continental Shelf Act, 43 U.S.C. § 1331, *et seq.* and the regulations enacted pursuant thereto, notices to the lessees, the terms of the leases and other applicable provision of the law are not waived, limited or avoided or otherwise affected by the assumption and vesting of the leases in the Reorganized Debtor.

### I. Obligations Relating to P&A of High Island 198

The Reorganized Debtor intends to plug and abandon High Island 198. However, in the event El Paso, as predecessor in interest in High Island 198, elects to proceed with plugging and abandonment of High Island 198, the Reorganized Debtor agrees to reimburse El Paso directly for the reasonable and necessary plugging and abandonment costs for which the Debtor would be responsible under applicable non-bankruptcy law and/or agreements and further agrees that such costs shall not be released or discharged as part of the Plan. Both the Debtor and El Paso shall retain their rights under applicable non-bankruptcy law and/or agreements with regard to the plugging and abandonment of High Island 198. Notwithstanding the foregoing, any obligation of the Debtor or Reorganized Debtor to reimburse El Paso for plugging and abandonment costs of High Island 198 shall be subject to offset or credit arising out of the Debtor's Claim Against El Paso.

### J. Potential Objection to Plan

CIT may object to confirmation of the Plan based on its contention that excluding CIT from sharing in the VOS payments to the unsecured creditors / Empire lien claimants unfairly discriminates against CIT or violates the Bankruptcy Code's priority scheme. The Debtor believes the Plan may be confirmed notwithstanding CIT's objection for the following reasons:

        1.    VOS has a right of recoupment against the Debtor for the funds it is paid to drill the Empire well. The impact of the right of recoupment is that CIT does not have a lien on the net production proceeds from the Empire Well until such time as Debtor obtains an interest in such proceeds. Debtor has no right to the production proceeds until VOS' rights under either the Empire Joint Operating Agreement or existing state law is satisfied to the extent it applies. Debtor has agreed, in exchange for the consideration it receives under the Plan, to serve as the Debtor's cure payments under 11 U.S.C. § 365 for the

assumption of the Empire well and Empire Joint Operating Agreement;

2. The payments to the creditors other than CIT by VOS satisfy the obligations of VOS to such creditors.  In large measure, the creditors other than CIT have joint and several claims against both VOS and Debtor.  The payments to such creditors are on account of their claims against VOS which, due to the joint and several nature of the claims, will have the effect of, in part, discharging the claims of such creditors against Debtor  The amounts paid by VOS to such creditors will reduce dollar for dollar the claims such creditors have against Debtor;

3. CIT is not included in the payments from VOS because it has no claim against VOS and, in fact, VOS was specifically excluded from the scope of CIT's security interest as evidenced by the CIT loan/collateral documents;

4. The Plan proposes to pay the money in escrow generated by the Empire well to VOS.  Payment of the Empire Escrow to VOS compromises and settles the rights of VOS against Debtor for recoupment of payments by VOS intended to cover Empire well drilling and completion costs and for penalties under the Empire Joint Operating Agreement;

5. As previously indicated, the payments by VOS to the Class 8 creditors merely reduce such creditors' claims against Debtor – it does not extinguish such claims.  Class 8 creditors are not faced with the choice of opting in or out of Class 8 to accept payments from VOS.  To the extent VOS pays the Debtor's share of a Class 8 claim, then VOS will have whatever rights of subrogation exist under applicable state law and VOS will be able to share (to the extent allowed by law) in distributions to Class 8 creditors.

## K.  Unsecured Creditors' Trust

*General.*  On or before the Effective Date, the Reorganized Debtor will enter into an Unsecured Creditors' Trust Agreement with the UCT Trustee and shall take all other necessary steps to establish the Unsecured Creditors' Trust and the beneficial interests therein, which shall be for the benefit of the holders of the Allowed Claims in Classes 1 - 12, in accordance with their respective priorities in distribution as established in Article 3 of this Plan, whether allowed on or after the Effective Date. Such Unsecured Creditors' Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Unsecured Creditors' Trust as a liquidating trust for United States federal income tax purposes, or otherwise materially affect the recovery of holders of Allowed Claims in Classes 1 - 12.  Beneficial interests in the Unsecured Creditors' Trust shall not be represented by certificates.

*Purpose of Unsecured Creditors' Trust.*  The Unsecured Creditors' Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

***Fees and Expenses of Unsecured Creditors' Trust.*** All fees, expenses, and costs of the Unsecured Creditors' Trust shall be paid by the Unsecured Creditors' Trust, and the Reorganized Debtors shall not be responsible for any fees, expenses, and costs of the Unsecured Creditors' Trust.

***Transferred Assets.*** As of the Effective Date, the Reorganized Debtor shall assign and transfer to the Unsecured Creditors' Trust, free and clear of all Claims, liens, charges and encumbrances , all of its right, title and interest in and to the D&O Claims, Transferred Claims and Causes of Action, and all proceeds thereof. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax and shall be free and clear of any liens, claims, and encumbrances, and no other entity, including the Debtor or the Reorganized Debtor, shall have any interest, legal, beneficial, or otherwise, in the Unsecured Creditors' Trust or the assets of the Unsecured Creditors' Trust upon their assignment and transfer to the Unsecured Creditors' Trust (other than as expressly provided herein or in the Unsecured Creditors' Trust Agreement). The UCT Trustee shall also be authorized, on behalf of the Debtor and its Estate, to pursue all objections, counterclaims and defenses against holders of Claims in Classes 1 - 12 that are not waived or released pursuant to the Plan.

***Governance of Unsecured Creditors' Trust.*** The Unsecured Creditors' Trust shall be governed by the Unsecured Creditors' Trust Agreement and administered by the UCT Trustee.

***Appointment of the UCT Trustee.*** The UCT Trustee shall be _____who shall be appointed on the Effective Date, subject to Court approval at the Confirmation Hearing. In the event the Court does not approve the appointment but confirms the Plan, the Court may solicit suggestions with respect to persons able and willing to serve as the UCT Trustee from any party in interest and appoint such person as the UCT Trustee on or before the Effective Date.

***Continuing Court Jurisdiction.*** The Bankruptcy Court shall have continuing jurisdiction over all matters involving the Unsecured Creditors' Trust, which relate to implementation, execution, performance or consummation of the Plan.

***Role of the UCT Trustee.*** In furtherance of and consistent with the purpose of the Unsecured Creditors' Trust and the Plan, the UCT Trustee shall (i) hold the assets of the Unsecured Creditor's Trust for the benefit of the holders of Allowed Claims in Classes 1 through 12, in accordance with their respective priorities in distribution as established in Article 3 of this Plan, (ii) make distributions of assets held by the Unsecured Creditors' Trust to the holders of Allowed Claims in Classes 1 through 12, in accordance with their respective priorities in distribution as established in Article 3 of this Plan, (iii), have the power and authority to prosecute and resolve, in the names of the Reorganized Debtor and/or the UCT Trustee, any Transferred Claims and Causes of Action, (iv) calculate and make distributions of the Unsecured Creditors' Trust assets to the holders of Allowed Claims in Classes 1 through 12, in accordance with their respective priorities in distribution as established in Article 3 of this Plan, (v) liquidate, transfer or otherwise dispose of the Unsecured Creditors' Trust assets or any part thereof or any interest therein upon such terms as the UCT Trustee determines to be necessary, appropriate or desirable, (vi) reconcile Class 1 through 12 Claims (including to object to, seek to subordinate, recharacterize or settle such Claims and Adversary Proceeding), (vii) terminate this Unsecured Creditors' Trust in accordance with the terms of the Plan and the UCT Agreement, (viii) provide

the holders of beneficial interest in the Unsecured Creditors' Trust, annually, with unaudited financial statements, and (ix) sell, liquidate, dispose of or abandon assets of the Unsecured Creditors' Trust. The UCT Trustee shall be responsible for all decisions and duties with respect to the Unsecured Creditors' Trust and the assets of the Unsecured Creditors' Trust, including, but not limited to, decisions related to the application of offsets. In all circumstances, the UCT Trustee shall act in the best interests of all current beneficiaries of the Unsecured Creditors' Trust and in furtherance of the purpose of the Unsecured Creditors' Trust.

**Access to Personnel and Records.** To the extent it has funds available to do so, the Reorganized Debtor shall (i) provide reasonable cooperation and copies (at the expense of the UCT Trustee) of documents that are reasonably requested by the UCT Trustee and/or (ii) make available to the UCT Trustee reasonable access during normal business hours, upon reasonable notice, to personnel and books and records of the Reorganized Debtor to enable the UCT Trustee to perform the UCT Trustee's tasks under the Unsecured Creditors' Trust Agreement and this Plan. Any trade secrets or other similarly confidential information may be divulged pursuant to reasonable confidentiality agreements between the UCT Trustee and the Reorganized Debtor.

**Nontransferability of Unsecured Creditors' Trust Interests.** The beneficial interests in the Unsecured Creditors' Trust shall not be certificated and are not transferable.

**Retention of Professionals by the UCT Trustee.** The UCT Trustee may retain counsel and other professionals, including himself, to assist in his duties as UCT Trustee on such terms as the UCT Trustee deems appropriate without Bankruptcy Court approval. The UCT Trustee may retain any professional who represented parties in interest in the Chapter 11 Case. The Reorganized Debtor shall not be responsible for the fees, costs and expenses of any counsel or other professional retained by the UCT Trustee.

**Compensation of the UCT Trustee.** The salient terms of the UCT Trustee's employment, including the UCT Trustee's duties and compensation to the extent not set forth in the Plan, shall be set forth in the Unsecured Creditors' Trust Agreement or the Confirmation Order and approved by the Court at the Confirmation Hearing. The UCT Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings up to the maximum amount permitted for compensation to trustees under Section 326 of the Bankruptcy Code. He may also be compensated for professional services rendered to the UC Trust.

**Distributions from Unsecured Creditors' Trust.** All distributions of proceeds of UCT Trust assets shall be made in accordance with the terms of the Unsecured Creditors' Trust Agreement by the UCT Trustee as Disbursing Agent.

# VI. EXECUTORY CONTRACTS

## A. Interests in Oil and Gas Leases

The Debtor contends that its interests in oil and gas leases constitute interests in property under applicable law, not an executory contract or unexpired lease. However, for the avoidance of doubt, except as may be expressly provided herein or in the Plan, neither this Disclosure Statement or Plan shall be construed as rejection of any interest of the Debtor in any oil and gas lease, the rights appurtenant to such leases or the production therefrom.

Certain leases are not included on Schedules filed in this case due to, among other things, record title being held in name of a third party, but any such omission should not be construed as a rejection or abandonment of any interest of the Debtor in any oil and gas lease. The Debtor reserves the right to amend its Schedules.

## B. Assumption

Each executory contract or unexpired lease of the Debtor that has not expired by its own terms before the Effective Date or previously been assumed by the Debtor in Possession pursuant to an order of the Bankruptcy Court, shall be assumed by the Debtor as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for any executory contract or unexpired lease (i) that is listed on a "Schedule of Executory Contracts and Unexpired Leases to be Rejected" (to be Filed on or before the day that is ten (10) days prior to the Confirmation Hearing), (ii) that has been previously rejected by the Debtor in Possession pursuant to an order of the Bankruptcy Court, (iii) as to which a motion for rejection of such executory contract or unexpired lease is filed prior to the Effective Date, or (iv) added to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" prior to the Effective Date. Nothing in the Plan, any Exhibit to the Plan, or any document executed or delivered in connection with the Plan or any such Exhibit creates any obligation or liability on the part of the Debtor, the Reorganized Debtor, or any other person or entity that is not currently liable for such obligation, with respect to any executory contract or unexpired lease except as may otherwise be provided in the Plan.

Any executory contract or unexpired lease assumed pursuant to the Plan shall be and hereby is assumed by the Debtor as of the Effective Date and shall be fully enforceable by the Debtor in accordance with its terms thereof, and shall include all written modifications, amendments, supplements of said executory contract or unexpired lease and, as with respect to executory contracts or unexpired leases that relate to real property, shall include all written agreements and leases appurtenant to the premises, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easements, and any other interests in real property or rights *in rem* related to such premises. Listing a contract or lease on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" is not deemed an admission by the Debtor or Reorganized Debtor that such contract is an executory contract or unexpired lease or that the Debtor or Reorganized Debtor has any liability thereunder.

The Debtor reserves the right at any time before the Effective Date to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to: (a) delete any

executory contract or unexpired lease listed on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its assumption under the Plan, or (b) add any executory contract or unexpired lease to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its rejection under the Plan. The Debtor shall provide notice of any such amendment of the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to the party to the affected executory contract and unexpired lease.

The terms of the acceptance of the Empire Operating Agreement and the Ship Shoal Operating Agreement are set forth in Article 4 of the Plan. The terms of acceptance of the indemnity obligations of the Debtor to RLI are set forth in Article 4 of the Plan.

### C. Cure Payments and Procedures

All payments, including any and all cure payments, adequate assurance or compensation for actual pecuniary loss, that are required to be paid or provided by Section 365(b)(1)(A)-(C) of the Bankruptcy Code (collectively, all cure payments, and any and all provisions for adequate assurance and/or compensation for actual pecuniary loss due or required to be paid under Section 365(b)(1)(A)-(C) of the Bankruptcy Code, the "Cure Payments") for any executory contract or unexpired lease that is being assumed under the Plan, unless disputed by the Debtor, shall be made in accordance with the Plan or the schedule of cure payments that will be filed on or before the hearing on the Disclosure Statement that accompanies this Plan. Any non-Debtor party to any executory contract or unexpired lease to be assumed under the Plan that objects to assumption of the executory contract or unexpired lease or believes that a Cure Payment or additional cure payment is due in connection with such assumption must file a written objection to the assumption of such executory contract or unexpired lease in a separate pleading ten (10) days prior to the Confirmation Hearing as an objection to the Plan or the Contract and state in the written objection the grounds for such objection and specifically set forth the amount of any request for a Cure Payment. Unless the non-debtor party to any executory contract or unexpired lease to be assumed files and serves on the Debtor and its counsel an objection to assumption of such executory contract or unexpired lease for any reason, or asserting that a Cure Payment or additional Cure Payment is required or owed in connection with such assumption, by ten (10) days prior to the Confirmation Hearing , then the executory contracts and unexpired leases shall be assumed, and any default then existing in the executory contract and/or unexpired lease shall be deemed cured as of the Effective Date, and there shall be no other cure obligation or Cure Payment due or owed by anyone, including the Debtor and the Reorganized Debtor, in connection with such assumption of the executory contract or unexpired lease. Any Claims for Cure Payments not Filed as part of a written objection to the proposed assumption within such time period will be forever barred from assertion against the Debtor, its Estate, the Debtor, and its Assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof. In the event of an objection to the assumption of executory contracts or unexpired leases regarding the amount of any Cure Payment, or the ability of the applicable Reorganized Debtor to provide adequate assurance of future performance or any other matter pertaining to assumption, (a) the Bankruptcy Court will hear and determine such dispute at the Confirmation Hearing, and, (b) in the discretion of the Debtor, the Debtor (i) may assume such disputed executory contract or unexpired lease by curing any default or providing adequate

assurance in the manner determined by the Bankruptcy Court, or (ii) the Debtor may reject such executory contract or unexpired lease as of the Effective Date.  The Reorganized Debtor shall make any Cure Payment on the later of the Effective Date or the date such Cure Payment is due pursuant to a Final Order or the Plan, provided however that the applicable Reorganized Debtor shall have five (5) Business Days after any order determining the amount of a disputed Cure Payment becomes a Final Order in which to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to provide for the rejection of such executory contract or unexpired lease and, in such an event, such executory contract or unexpired lease shall be deemed rejected as of the Effective Date.

### D.  Effect of Confirmation

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Section 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, its estate, and all parties in interest. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) there are no defaults of the Debtor, no Cure Payments or additional Cure Payments owing (including that there is no compensation due for any actual pecuniary loss), (ii) there is adequate assurance of future performance with respect to each such assumed executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtor and its estate, (iv) upon the Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or unexpired lease. All executory contracts and unexpired leases assumed under the Plan or during this Chapter 11 Case constitute valid contracts and leases, as applicable, enforceable by the Debtor against the non-Debtor counterparties regardless of any cross default or change of control provisions in any contracts or leases assumed or rejected under the Plan or during the Chapter 11 Case.

Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection as of the Effective Date of all executory contracts and unexpired leases which are not assumed under the Plan, with the rejection effective as of the day before the Petition Date, as being burdensome and not in the best interest of the estate.

### E.  Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Any Claims for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed within thirty (30) days after the Effective Date or, with respect to any executory contracts or unexpired leases which are rejected after the Effective Date by amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," no later than thirty (30) days after the date of such amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," or such Claims will be forever barred and unenforceable against the Debtor, Reorganized Debtor, and its Assets and the holders of any

such Claims are barred from receiving any distributions under the Plan.

## VII.     CONFIRMATION PROCEDURES

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor discloses specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also imposes requirements that, given an Impaired Class, at least one Class of Impaired Claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims or Interests Impaired under the Plan.  The Bankruptcy Court may confirm the Plan only if it finds that all of the requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met.  The Debtor believes that the requirements for confirmation have been satisfied.

### A.     Voting Procedures

To be confirmed by the Bankruptcy Court, the Plan must be accepted by each Class of Claims whose rights are impaired by the provisions of the Plan.  Generally, a Claim that will not be paid in full is considered "Impaired."   Under the Bankruptcy Code, a Class of Claims is deemed to have accepted the Plan if the Plan is accepted by Claimants in such a Class holding at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that in each case have actually voted on the Plan.

Ballots are to be used for voting on the Plan.  Completed Ballots should be sent to:

> Virgin Oil Company, Inc.
> **Attention:  Leo D. Congeni, *of counsel***
> Law Office of Emile L. Turner, Jr. LLC
> 424 Gravier Street
> New Orleans, LA 70130

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M., CENTRAL STANDARD TIME, ON _____, 2010 (THE "BALLOT DATE").  ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED.  ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF ANY ALLOWED CLAIM OR INTEREST THAT DOES NOT SHOW AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.  NOTE:  FAXED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE WILL NOT BE COUNTED.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTOR AS FOLLOWS:

Mr. Leo D. Congeni, *of counsel*
Law Office of Emile L. Turner, Jr., LLC
424 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-9120
Facsimile: (504) 581-4962

You may be contacted by representatives of the Debtor with regard to your vote of the Plan. Votes cast by Holder of Claims and Interests will be irrevocable once received by the Debtor, unless the Bankruptcy Court, after application, notice and hearing, permits a change of vote. If any ballot received by the Debtor is not discernible as to the Class of the Claim or Interest of the name of the Holder thereof, such ballot will be disregarded and not counted.

## B. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold the Confirmation Hearing upon appropriate notice to all creditors. Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

By Order of the Bankruptcy Court dated _____, the Confirmation Hearing has been scheduled for _____, 2010 at ___:___o'clock __.m., at the United States Bankruptcy Court, Eastern District of Louisiana, 500 Poydras Street, Courtroom B-709, New Orleans, Louisiana 70130. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice to Creditors or parties in interest except an announcement made at the Confirmation Hearing or any adjournment of it. Any objection to confirmation must be written and filed with the Bankruptcy Court with proof of service and served upon the following parties on or before _____, 2010:

Mr. Leo D. Congeni, *of counsel*
Law Office of Emile L. Turner, Jr., LLC
424 Gravier Street
New Orleans, LA 70130

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan. If the Bankruptcy Court determines that such requirements have been satisfied, an order will be entered confirming the Plan. The requirements of Section 1129 are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and is not by any means forbidden by law.

4. The Debtor will pay for services or for costs and expenses in, or in connection with the Reorganization Case, or in connection with the Plan and incident to the Reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy court as reasonable.

5. The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in the Plan with the Debtor, or a successor to the Debtor under the Plan. The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider.

6. With respect to each Class of Impaired Claims or Interests, either each holder of a Claim or Interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest, property of a value, as of the Distribution Date under the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.]

7. Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

8. Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and other Priority Claims will be paid in full on the Distribution Date.

9. If at least one Impaired Class exists, at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11. The Debtor believes that the Plan (i) satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) complies with or will comply with all of the requirements of Chapter 11, and (iii) was proposed in good faith. The Debtor further believes that Holders of all Claims and Interests under the Plan may ultimately

receive payments under the Plan having present value as of the Distribution Date in amounts not less than the amounts likely to be received by holders of such Claims if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code.

### D. Liquidation Analysis

Among the requirements of the Bankruptcy Code listed above is that in order for a plan to be confirmed, each creditor must receive or retain under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plans a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Pursuant to the Debtor's liquidation analysis, the Debtor believes that recoveries under a Chapter 7 liquidation scenario would be significantly lower than that proposed by the Plan for a variety of reasons. First, the sale of the Debtor's assets under a compressed timeframe and the distressed nature of a Chapter 7 liquidation will most likely result in lower sale value that the Debtor will receive under the terms of the Plan. These properties have been extensively marketed by management of the Debtor and, at this time, management believes that the resulting reorganization plan provides the best value to the estate. Second, the conversion of the case to Chapter 7 liquidations would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Interests. Third, litigation regarding the priority of claimant relating to the payment of costs to drill and complete the Empire renders the Plan and the avoidance of such litigation the best alternative for all parties concerned.

Accordingly, each holder of a Claim will receive or retain under the Plans a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

A Liquidation Analysis prepared by the Debtor is attached as Exhibit 11 to this Disclosure Statement. The valuations of oil and gas properties are based on the Reserve Report dated March 17, 2010, prepared by James F. Hubbard, Petroleum Engineer, along with the assumptions detailed below:

EMPIRE:

1 Well Proved Producing Reserves $70/bl oil and $5 gas PV10 = $22.3M in the Reserve Report based on Virgin Oil with 39.891% NRI. The new NRI based on the Empire Settlement Agreement with the creditors would be 29.891%, or approximately 25% less. Accordingly, $22.3M x 0.75 = $16.7M FNI PV10. Discounted to 40% for one-well field risk = valuation of $6.5M.

SHIP SHOAL 153:

2 Wells Proved Producing Reserves $70/bl oil and $5 gas FNI PV10 = $17.1M. The Reserve Report numbers related to this contemplates 205,392 barrels of oil production per year going out

7 years (2011 thru 2017 production years), a daily rate of approximately 570 bopd. The "flat" oil production thru 2017 was based on assumption well would not produce water until 2018. Generally, once well begins producing, water increases quickly and production life ends in 12 to 18 months thereafter. The #A1ST2 well has produced approximately 1.3 million barrels, has a high water cut that is moving up at every test separator gauge of the fluid volume. In recent months, the #4ST2 well has begun prematurely producing a water-cut in the fluid volume, which has steadily increased. Accordingly, operator cut the choke back on the well to a current 8/64 inch to try to produce as much oil as possible before the water takes over the well. The current oil production rate is approximately 185 bopd, down from earlier levels of approx. 600 bopd water-free for several years (the well began producing water on 3/14/10). Based on the water cut in this well, and the negligible remaining reserves in the A1STR2 well, we modified the valuation for this property by reducing the estimated remaining recoverable reserves in the #4ST2 well to 30% of the $1.643M barrels (gross volume to the 8/8ths) in the Reserve Report. Coupled with a reduction in the gas pricing from $5.00 to $3.75/mmbtu current pricing, means a net of approximately $5.04M FNI PV10.

EAST CAMERON 2:

The Reserve Report net recoverable reserves in this proposed well, classified as proved undeveloped, totals 138,000 barrels of oil. Using a market valuation for proved undeveloped at $4.00/boe = $548,000.

EAST CAMERON 219:

The $150,000 value reflects a nominal value for this property due to limited remaining reserves in the Reserve Report, but the well continuing to have a 1mmcfgpd capability when we get it hooked up, supported by 3,000 psi on the well-head indicating some remaining gas reserves. The valuation of this property should be adjusted to the amount of the Debtor's claim against El Paso for reimbursement of lease cost, plus costs to comply with MMS requirement prior to re-starting the well, which totals $207,000 ($206,938).

HIGH ISLAND 200:

The $125,000 is a leasehold nominal value for this interest in this property which has no estimated or booked reserves.

WEST CAMERON 78:

This value of $1.5M is based on estimated net proven gas reserves in the Reserve Report of 1.5 Bcfe, valued at $1.00/mcfe due to a facility and pipeline already in place.

HIGH ISLAND 199:

The estimated net proven gas reserves in the Reserve Report totals 5.5 Bcf, and utilizing a value of $.50/mcfe due to lack of infrastructure in place and owned by debtor, this reflects a fair value of $2.75M less an additional $1.5M cost to set a structure following a successful completion of

the proposed well, resulting in a value of approximately $1.25M for this property.

## E. Feasibility

Among the requirements under the Bankruptcy Code listed above is that in order to confirm the Plan the Bankruptcy Court must find that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11).

The Debtor believes that confirmation will not likely be followed by liquidation or the need for further reorganization of the Debtor. Financial projections demonstrating the pro forma financial results of the Reorganized Debtor are attached as Exhibits 12 and 13.

The first pro forma (Exhibit 12) is based on CIT making an 1111(b) election under the Bankruptcy Code. The funding for the $10 million payout and future drilling capital will be unavailable should such an election be made by CIT, as a release of CIT's lien on the Debtor's assets is a condition of funding by the third parties. The following are the base assumptions and summary for the first scenario:

- $70/bl or equivalent;
- Current revenue of $3.7M is based on three producing wells: Empire SL #1 and Ship Shoal 153 #4 & A1st2, with additional revenue of $1.7 million from the drilling and completion of WC 78 between [TBD];
- Restricted Empire funds in the amount of $650,000 are released and available for ongoing and future operations;
- CIT shall be paid monthly installments on its secured claim in the amount of $97,000 per month beginning in February 2012;
- Revenues shall be used to pay approximately $500,000 owed to VOS based on its payment of Debtor's joint interest bill from Century;
- P&A projects shall include HI 198 in October, 2010 (funded by El Paso, subject to its claim for reimbursement, less creditors and offsets due to Debtor), Vermillion 179 (approximately $170,000) in December, 2010, WC 494 wells (approximately $475,000) in [TBD], WC 494 platform (approximately $2.3 million) in 2011 and SMI 152 (approximately $300,000) in 2011;
- Beginning in December, 2010, Debtor shall make monthly payments to Century relating to lease assumption; total amount due is approximately $500,000 ($728,000 less credits per 2010 Joint Interest Audit)

The second pro forma (Exhibit 13) is based on CIT electing not to have its allowed claim treated as secured under § 1111(b) of the Bankruptcy Code. Consequently, third party funding entity shall pay CIT $10 million (value of CIT's secured claim) by the Effective Date and shall loan the Debtor an additional $21.5 million in November 2011 for purposes of drilling and/or reworking wells. The following are the base assumptions and summary for the second scenario:

- $70/bl or equivalent;

- Restricted Empire funds in the amount of $650,000 are released and available for ongoing and future operations;
- Reorganized Debtor's net revenue interest in Empire equals 29.8907%.
- Current revenue based on three producing wells: Empire SL #1 and Ship Shoal 153 #4 & A1st2, with additional production from drilling and completion program, including drilling of four wells (WC 78 A1 st2, HI 199 #1, SS 154 #30, EC2 1 st2); program shall begin in February 2012 with capital expenditures of approximately $7,500,000;
- Portion of additional capital shall be used to fund P&A obligations HI 198 in December, 2010 (funded by El Paso, subject to its claim for reimbursement, less creditors and offsets due to Debtor), Vermillion 179 (approximately $170,000) in 2011, WC 494 wells (approximately $475,000) in [TBD], WC 494 platform (approximately $2.3 million) in 2011 and SMI 152 (approximately $300,000) in 2011;
- Assumption obligation to Century (approximately $500,000) and amounts owed to VOS based on its payment of Debtor's joint interest bill from Century, shall be paid in March, 2011, from the $21.5 million capital infusion;
- "RLI Bonds" covers projected bond premiums going-forward, plus payment of $250,000 in March 2011, intended to cover accrued bond fees owed to RLI;
- Remaining portion of capital infusion, if any, shall be used to explore other development opportunities for Reorganized Debtor.

Exhibits 12 and 13 reflect that the Debtor will have sufficient cash flow to satisfy CIT and Whitney's secured claim, whether or not they make an election under § 1111(b) of the Bankruptcy Code. Accordingly, Debtor believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. However, the Debtor cautions that no representations can be made as to the accuracy of the Projections or to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtor. Some assumptions invariably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTOR'S INDEPENDENT ACCOUNTING FIRM.**

**WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE**

BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTOR AND THE REORGANIZED DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR OR THE REORGANIZED DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. HOLDERS OF CLAIMS AND INTERESTS, AS WELL AS OTHER INTERESTED PARTIES, MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO APPROVE A PLAN.

### F. Unfair Discrimination and Fair and Equitable Treatment

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed. If a class of claims rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to § 1129(b) of the Bankruptcy Code – commonly referred to as the "cramdown" provision of the Bankruptcy Code. Under that section, a plan may be confirmed if it does not "discriminate unfairly" within the meaning of the Bankruptcy Code and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

With respect to a secured Claim, "fair and equitable" means either (i) the Impaired Secured Creditor retains its liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Distribution Date at least equal to the value of such creditor's interest in the property securing its liens; or (ii) property subject to the lien of the Impaired Secured Creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) or (iii) herein; or (iii) the Impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to an Unsecured Claim, "fair and equitable" means either: (i) each Impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

In the event one or more Classes of Impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interest.

The "cramdown" prohibition of "unfair discrimination" with respect to the claims of any

impaired, non-accepting class depends upon the particular facts of a case and nature of the claims at issue. Courts have generally interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

The Debtor believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "fair and equitable" and "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

## VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN ITS IMPLEMENTATION.

### A.  Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no guaranty that the Bankruptcy Court would reach the same conclusion.

### B.  Risk of Non-Confirmation of the Plan

Even if the voting classes accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets for the requirements for confirmation and requires, among other things, that the confirmation of a plan must be proposed in good faith and is not likely to be followed by the liquidation or the need for further financial reorganization unless such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan under the Bankruptcy Code.

There can be no guaranty, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

# IX. TAX CONSEQUENCES

THE TAX CONSEQUENCES UNDER THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER. MOREVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE U.S. INTERNAL REVENUE SERVICE, ANY STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE CODE. STATEMENTS REGARDING TAX IMPLICATIONS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) ARE NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# X. CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative. The alternative is liquidation of the Debtor's assets, which would involve substantial litigation and delay and additional administrative costs. Further, the liquidation analysis provided with this Disclosure Statement reflects that the recovery for creditors would be significantly less than may be realized under the Plan. The fact that the Plan results in an assumption by the Reorganized Debtor of the decommissioning obligations of the Debtor also renders the Plan a better option than liquidation.

Consequently, the Debtor urges creditors and interest holders to vote in favor the Debtor's Plan.

Dated:  December 31, 2010


**DISCLOSURE STATEMENT FILED BY:**


        **VIRGIN OIL COMPANY, INC.**


        */s/ Robert F. Smith*
BY:_____
        Robert F. Smith, President



        **LAW OFFICE OF EMILE L. TURNER, JR., L.L.C.**

        */s/ Leo D. Congeni*
BY:_____
        EMILE L. TURNER, JR. (#12963)
        LEO D. CONGENI, *Of Counsel* (#25626)
        424 Gravier Street
        New Orleans, LA  70130
        Phone: 504-586-9120

        *Attorneys for Virgin Oil Company, Inc.*